## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| LEGO A/S, and LEGO SYSTEMS, INC.,<br><br>                    Plaintiffs,<br>     v.<br><br>BEST-LOCK CONSTRUCTION TOYS,<br>                    INC.,<br><br>                    Defendant. | 3:11-CV-1586 (CSH) |

### RULING ON DEFENDANT'S MOTION FOR PRELIMINARY INJUNCTION

HAIGHT, Senior District Judge:

**I.      Introduction**

Plaintiffs Lego A/S and Lego Systems, Inc. (collectively "Lego") have manufactured toys

called "minifigures" since 1978.[1]   Lego's minifigures depict people, all having the same shape but

varying two-dimensional representations of facial features and clothing styles on the head and torso

respectively.   They are designed so that the user can disassemble them and attach them to other

---

[1]  Although this action, No. 3:11cv1586 (the "Present Action") has been consolidated with No. 3:12cv268 (the "Related Action"), this Ruling uses the terms "Plaintiffs" and "Defendant" to refer only to the parties in the Present Action.  The Court draws the parties' attention to the fact that the only defendant in the Present Action is Best-Lock Construction Toys, Inc.  Lego includes Best-Lock Limited, Hong Kong and Torsten Geller as defendants in its captions on filings, though its motion to join these parties as defendants [Doc. 44] has not been granted.  Further, Best-Lock's Answer [Doc. 35] treated Best-Lock Group Limited as a counterclaim plaintiff, though no motion has been filed to join it as a party.  Still further, the text of Best-Lock's Motion for Preliminary Injunction [Doc. 37] treated Best-Lock Construction Group as a counterclaim plaintiff, though it also has never been joined as a party.  As if that were not enough, the captions of that Motion and other pleadings filed by Best-Lock, such as its Reply Memorandum on the present Motion [Doc. 52], have treated yet another entity, Best-Lock Group, as a defendant and counterclaim plaintiff, though it also has never been joined as a party.  Thus, throughout this Ruling the term "Defendant" is used in the singular, referring to Best-Lock Construction Toys, Inc.

figures and studded blocks.  Each minifigure has a cylindrical head, a cylindrical neck, a trapezoidal torso, bent arms, hooked hands and square block-like feet.  In 1994, Lego registered with the Copyright Office two copyrights for the minifigures:  VA 655-104 and VA 655-230 (the "Minifigure Copyrights").

Defendant Best-Lock Construction Toys, Inc. ("Best-Lock") has been selling its own minifigures in the United States since 1998.  These minifigures can also be attached to studded blocks.  Best-Lock's minifigures are the same size as Lego's, and also have cylindrical heads, cylindrical necks, trapezoidal torsos, bent arms, hooked hands and square block-like feet, while differing in color and the two-dimensional representations of facial features and clothing.  These minifigures have been successful; by Best-Lock's account, since 1998 it has sold, in the U.S. alone, over five million product sets containing eighteen million minifigures and exceeding $50 million in revenues.  Declaration of Torsten Geller in Support of Defendant's Motion for Preliminary Injunction ("Geller Decl.") ¶ 12.  Other companies, such as Hasbro, Inc. and Mega Brands, Inc., sell similar minifigures.

On or about July 14, 2011, U.S. Customs and Border Protection (CBP) carried out the first of a series of seizures of shipments from abroad of Best-Lock's toy blocks and minifigures.  CBP sent Best-Lock's counsel a letter dated August 17, 2011, in which it asserted that it is carrying out these seizures because the minifigures infringe the '104 copyright.  Best-Lock petitioned CBP to cease the seizures, and demanded that Lego assist it in doing so, but without success.

On October 14, 2011, Lego filed the present action, alleging infringement of the Minifigure Copyrights.  In the Complaint, as amended on February 13, 2012, Lego makes claims for (1) infringement of the Minifigure Copyrights under 17 U.S.C. § 101, *et seq.*; (2) defamation; and (3)

violation of the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110a, *et seq.*  Lego prays for a preliminary and permanent injunction, restraining Best-Lock from manufacturing or selling its accused minifigures.  Lego also claims its "actual damages" caused by Best-Lock's infringement, and Best-Lock's profits generated thereby.  Amended Complaint [Doc. 40] at 10-11.

On January 5, 2012, Best-Lock filed its Answer, together with counterclaims seeking declarations that the Minifigure Copyrights are invalid and that Best-Lock's minifigures do not infringe them, as well as damages and an injunction based on the seizures of Best-Lock's products by CBP.

Best-Lock filed the present Motion for Preliminary Injunction [Doc. 37] (the "Motion") on February 6, 2012.  Best-Lock requests an injunction under Rule 65(a) of the Federal Rules of Civil Procedure (1) restraining and enjoining Lego from asserting the Minifigure Copyrights against Best-Lock before the CBP; (2) ordering Lego to inform CBP that it consents to the past and future importation and delivery to Best-Lock and its customers of products of Best-Lock's seized or detained by CBP based on the alleged infringement; and (3) ordering Lego to immediately withdraw recordation of Copyright VA 655-104 with the CBP.  In essence, Best-Lock's Motion asserts that the Minifigure Copyrights are invalid, that Lego is estopped from asserting them, and that Best-Lock is suffering continuing and irreparable harm as a result of CBP's seizures of its products.  Lego, of course, opposes the Motion on the grounds that Best-Lock has been infringing the Minifigure Copyrights, and that Lego will likely succeed on the merits of its Complaint.

A hearing on Best-Lock's Motion for a Preliminary Injunction (the "Hearing") was held before the Court on March 8, 2012.  At the Hearing, the parties presented their arguments on the

Motion, and also submitted as evidence certain toys, which were marked as Court Exhibits One through Seven. *See* Exhibit and Witness List [Doc. 61]. These toys include samples of Lego's and Best-Lock's minifigures as well as samples of minifigures manufactured by Hasbro, Inc. and Mega Brands, Inc.

The parties have also fully briefed the Motion. Best-Lock filed a Memorandum of Law in support of the Motion ("Supp. Memo.") on February 6, 2012. It filed therewith three declarations with attached exhibits: the declarations of Torsten Geller, its CEO ("Geller Decl."), Frank Desiderio, one of its attorneys ("Desiderio Decl."), and Stephen Quigley, another of its attorneys ("Quigley Decl."). Lego filed an Opposition to the Motion ("Opp. Memo.") on February 21, 2012. It filed therewith two declarations with attached exhibits: the declarations of Michael McNally, the Brand Relations Director for LEGO Systems, Inc., ("McNally Decl.") and Linda Pollard, a legal assistant at LEGO Systems, Inc. ("Pollard Decl."). On February 28, 2012, Best-Lock filed a Reply Memorandum ("Reply Memo."), along with an additional declaration from Geller ("Reply Decl.") with exhibits.

The Court, having reviewed these briefs and documents, entered an Order [Doc. 74] directing further briefing on whether Lego's claim of copyright infringement by Best-Lock "is barred by laches." The Court raised the question of laches *sua sponte* because the parties had not discussed it in the prior briefs. In obedience to that Order, counsel have filed supplemental briefs [Docs. 75 and 76], which the Court has also considered.

## II.     Standard for Preliminary Injunction

The Second Circuit has recently held that the test for the grant of preliminary injunctions based on alleged copyright infringement is the four-factor test set forth by the Supreme Court in *eBay*

*Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006), while intimating that the *eBay* formulation applies to all applications for preliminary injunctions. *Salinger v. Colting*, 607 F.3d 68, 77, 78 n. 7 (2d Cir. 2010) ("we see no reason that *eBay* would not apply with equal force to an injunction in *any* type of case"). Thus, while *Salinger* involved a request for an injunction by the party alleging infringement, the four-factor test applies likewise to the present request for a preliminary injunction by the alleged infringer. The distinction is significant because the *eBay*/*Salinger* test is not identical to the test most commonly cited.

Under the *eBay* test as developed in *Salinger*, the court must consider four factors. First, the party requesting the injunction must demonstrate either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *Salinger* at 79. Second, the movant must show that it is likely to suffer irreparable injury in the absence of an injunction, paying particular attention to the question of whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury. *Id.* at 80. Third, the court must consider the balance of hardships between the parties and grant the injunction only if that balance tips in the movant's favor. *Id.* Fourth, the court must ensure that the "public interest would not be disserved" by the issuance of a preliminary injunction. *Id.*, *quoting eBay* at 391.[2]

## III.    Likelihood of Success on the Merits

Best-Lock argued initially that it is likely to succeed on the merits in this action for four reasons: (1) Lego is equitably estopped from enforcing its rights under the Minifigure Copyrights,

---

[2] Note that the balance of hardships appears twice in this test, as part of the first element and by itself as the third element. In the first element, the balance of hardships must tip "decidedly" in the movant's favor, while in the third element, it need only tip in the movant's favor .

Supp. Memo. at 10-17; (2) the Minifigure Copyrights are invalid because the allegedly protected elements are functional and because Lego committed a fraud on the Copyright Office, *id.* at 17-19, 23-27; (3) Best-Lock has not infringed the Minifigure Copyrights, *id.* at 19-23; and (4) Lego's CUTPA claim is wholly unsupported, *id.* at 27.

Prompted or perhaps inspired by the Court's *sua sponte* introduction of the subject of laches into the case, Best-Lock now makes the additional argument that laches bars all of Lego's claims against it – equitable and legal.

Lego disagrees with all these contentions. If the Court accepts one or more of Best-Lock's arguments, such a ruling would obviously have a material effect upon the *Salinger* factors, to which the Court must look in determining whether Best-Lock is entitled to the cross-injunction for which it prays in the present Motion.

I discuss each of these issues in the order stated, except that the discussion of laches immediately follows the discussion of equitable estoppel.

### A.    Equitable Estoppel

Best-Lock argues that Lego is estopped from enforcing its rights under the Minifigure Copyrights by the doctrine of equitable estoppel. A copyright defendant invoking equitable estoppel must show that (1) the plaintiff had knowledge of the defendant's infringing acts, (2) the plaintiff either intended that the defendant rely on his acts or omissions or failed to act in such a manner that the defendant had a right to believe that it was intended to rely on the plaintiff's conduct, (3) the defendant was ignorant of the true facts, and (4) the defendant relied on the plaintiff's conduct to its detriment. *Dallal v. New York Times Co.*, No. 05-2924, 2006 WL 463386, at *1 (2d Cir. Feb. 17, 2006) ("*Dallal II*"). Best-Lock argues that Lego failed to assert its copyrights during the period

between 1998, when Best-Lock began to sell its figures, until the filing of this action in 2011, and induced Best-Lock's reasonable reliance on its inaction.  Supp. Memo. at 10-16.

### 1.    Lego's Knowledge

The first element of equitable estoppel in the copyright context is the plaintiff's knowledge of the allegedly infringing acts.  Best-Lock asserts that it sold minifigures from 1998 onwards, and argues that Lego could not have been unaware that it was doing so.  Supp. Memo. at 12.  Lego argues that Best-Lock provides no evidence that they were aware of "continuous, long-term" infringement, conceding that Best-Lock sold minifigures from 1998 onwards but asserting that it has not shown that the minifigures sold in the past were similar to the ones at issue in this action.  Opp. Memo. at 26-28.

Best-Lock asserts, and Lego does not dispute, that from 1998 onwards Best-Lock's minifigures have been sold in more than 50,000 stores throughout the United States, including Wal-Mart, Sears, Target, Toys R Us, FAO Schwartz, Amazon, Walgreens, Family Dollar, and K-Mart, and that many of these retailers simultaneously sold Lego's figures in the same departments or sales areas and often on the same or adjacent shelves.  Geller Decl. ¶¶ 3, 8.  Best-Lock presents photographs of examples of the minifigures it sold from 1998 to the present, which show that throughout that period the minifigures have been of very similar, though not identical, shape and appearance.  Reply Decl. Exhibits A-D.  Best-Lock further presents evidence that it has throughout that period widely promoted the minifigures through catalogues, advertisements and its website.  Geller Decl. Exhibits C-1 through C-13.  In one of these advertisements, the minifigures are shown at roughly real size, Exhibit C-4 (2001), and in others they are quite small, but their overall appearance is visible on close inspection.  Exhibits C-3 (2000), C-5 (2002), C-6 (2003), C-7 (2004),

C-8 (2005), C-9 (2006), and C-10 (2007).  Best-Lock asserts, and Lego does not dispute, that since 1998 it has sold over 18 million minifigures, and has exhibited its figures at trade shows where Lego also exhibited its own figures.  Geller Decl. ¶¶ 12, 14.[3]

Best-Lock's evidence establishes that while its minifigures have changed over the years, they have consistently had an appearance very similar to that of Lego's minifigures.  For example, the minifigures sold between 1998 and 2005, as shown in photographs in Reply Decl. Ex. A, had cylindrical heads, hooked hands, bent elbows, trapezoidal torsos, straight legs, square feet, and painted-on facial features, and were similar in size to the figures sold at present.  These are essentially the characteristics that, in Lego's view, infringe its copyrights.  Opp. Memo. at 8.  Lego, moreover, is a large company which presumably has a marketing staff who are aware of relevant facts about the market for its toys.

Taking these facts together, it strains credulity to imagine that during this 13-year period (1998 to 2011), Lego was blissfully unaware of the activities of Best-Lock, a significant competitor in this specialized toy market.  However, the precise question of knowledge posed by the first equitable estoppel element is more narrow.  That question is whether, at a particular time, Best-Lock was selling a minifigure which Lego believed infringed upon its copyrights.  Lego invokes that question when, in its supplemental brief on the related but discrete subject of laches, it taxes Best-Lock for failing to show that "it was selling the figurine actually accused by the LEGO Group (rather than an earlier and different version of its figurine) for an extended period of time (or even outside the limitations period)." [Doc. 75] at 7.

_____

[3]  Elsewhere, Best-Lock asserts that it sold over 15 million minifigures during that period.  Reply Decl. ¶ 10. The discrepancy is not explained, but is not significant for the present purpose, as either number establishes huge sales.

These questions of timing are also relevant to Best-Lock's newly asserted defense of laches. I discuss the subject of laches, including the timing element, in Part III.B., *infra*. Principally for the reasons stated in that Part, it is not possible to make a finding on this record on the subject of Lego's knowledge of Best-Lock's alleged infringement, that being the first element in equitable estoppel analysis.

### 2.    Lego's Inaction

The second element of the estoppel test in copyright cases, as lately set forth by the Second Circuit, is that "the plaintiff either intended that defendant rely on his acts or omissions or acted or failed to act in such a manner that defendant had a right to believe that it was intended to rely on plaintiff's conduct." *Dallal II*, 2006 WL 463386, at *1. Best-Lock argues that this element is met by Lego's failure to assert its copyrights over the period from 1998 to 2011. Supp. Memo. at 13-14. Lego does not dispute Best-Lock's account, but argues that as a matter of law inaction cannot support equitable estoppel. Opp. Memo. at 28-30.

Lego provides a photograph, in the text of its brief, showing that at least some of its blocks have displayed copyright notices. Opp. Memo. at 32. Lego's Brand Relations Director has stated, in his declaration, that since 1978 Lego sets containing the minifigures have continuously included a copyright notice. McNally Decl. ¶¶ 7-8. Best-Lock's CEO, in response, asserts only that he does not remember seeing a copyright notice on Lego's minifigures, and that he did not locate a copyright notice on two specific minifigures, a photograph of which he attaches to his declaration. Reply Decl. Ex. E. The Court finds that Lego's evidence establishes that at least some of their minifigures displayed copyright notices.

It is established in this circuit that in some circumstances a copyright holder's silence or

inaction can support estoppel.  The Second Circuit, in the only decision which has directly addressed equitable estoppel in the copyright infringement context, referred to the conduct at issue as including the plaintiff's "omissions" or "fail[ures] to act."  *Dallas II*, at *1.  However, as the Second Circuit formulated the test, such omissions or failures support estoppel only if the plaintiff either intended that the defendant rely on them, or the defendant had a right to believe that the plaintiff intended the defendant to rely on them.  *Id.*  In the case at bar, the question is whether Best-Lock had a right to believe that Lego intended Best-Lock to rely upon Lego's inaction in enforcing its copyrights by litigation, given the relevant circumstances, which included Lego's affixation of copyright notices on some of its minifigures.  (Best-Lock does not deny that it was aware of Lego's minifigures).

The *Dallal* case did not resolve the question of whether inaction, standing alone, supports estoppel where a copyright notice was affixed to the plaintiff's products, but it did provide some guidance, albeit in dictum.  The district court, granting summary judgment to the defendant, found estoppel because the copyright holder had "display[ed] inaction in pursuing a claim for copyright infringement."  *Dallal v. New York Times Co.*, 386 F.Supp.2d 319, 323 (S.D.N.Y. 2005) ("*Dallal I*").  The plaintiff was a freelance photographer who received a fixed sum for assignments from the *New York Times*.  He reserved the right to copyright and sell the photographs that he submitted. From 1998 to 2002, he included in his invoices language that stated that all rights not specifically granted in writing, including copyright, remained his property.  In various oral conversations with *Times* employees, he objected to the newspaper's "unauthorized" use of the photographs in its internet edition.  He registered copyrights on his photographs between May 2002 and January 2003. He informed the *Times* of his copyrights in November 2002, and it immediately stopped using them. The court held that the photographer's inaction until November 2002 met the second element of

10

estoppel, based in part on its finding that the *Times* was unaware of the copyright.

The Second Circuit reversed, but it did not hold that the photographer's inaction could not support estoppel; rather, it held that the evidence did not permit resolution of that issue on a motion for summary judgment. *Dallal II* at *1-2. Although the court of appeals found that the *Times* presented a "viable estoppel claim," it noted the warning language on the plaintiff's invoices to the *Times* and his oral objections to the internet use of his photographs. That conduct, according to the court, was sufficient to raise questions of fact as to whether the plaintiff's action was estopped. *Dallal II* at *2.

The Second Circuit then described, with apparent approval, a decision of the Ninth Circuit in which the presence of a visible copyright notice defeated an estoppel claim based on the plaintiff's inaction. *Dallal II* at *2, *citing Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960). In *Hampton*, the plaintiff's assertion of copyright was printed on the film in question. The Ninth Circuit held that the defendant was not entitled to equitable estoppel because he "fail[ed] to use the means at hand to ascertain the extent of the interest asserted." *Id.* This position has been endorsed by a well-known treatise on copyright law: "The mere affixation of the copyright notice on copies of the work, if seen by the defendant, has been held to constitute a sufficient assertion of the plaintiff's right so as to counter an estoppel based upon a passive holding out." 4 *Nimmer on Copyrights* § 13.07 at 13-276 (1993).

That principle, or principles that are virtually the same, has been endorsed by some district courts within this circuit. One court, citing the sentence from *Nimmer* quoted above, held that the defendant's admission that it was aware of the copyright was enough to defeat equitable estoppel. *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, No. 96 Civ. 4126, 2000

WL 1028634, at *17 (S.D.N.Y. July 25, 2000).   Another court held, in dictum, that the party asserting estoppel must have used due care and not failed to inquire as to its rights where that would have been the prudent course of conduct.  *Keane Dealer Servs., Inc. v. Harts*, 968 F.Supp. 944, 947-48 (S.D.N.Y. 1997).  Another court held that inaction does not support estoppel "when the defendant is in a position to ascertain the extent of a competing claim."  *Merchant v. Lymon*, 828 F.Supp. 1048, 1064-65 (S.D.N.Y. 1993); *see also DeCarlo v. Archie Comic Pubs., Inc.*, 127 F.Supp.2d 497, 510 (S.D.N.Y. 2001) (citing *Merchant* for this proposition in dictum).

Some district courts have taken a stronger position, holding that inaction alone can never support estoppel without some duty or relationship between the parties or some responsibility of the plaintiff for the infringement.  One court held that application of equitable estoppel in the copyright context requires "at least partial responsibility of the party seeking recovery for the alleged infringement."  *Broadcast Music, Inc. v. Hearst/ABC Viacom Ent. Servs.*, 746 F.Supp. 320, 329 (S.D.N.Y. 1990).  *See also Steinberg v. Columbia Pictures Indus., Inc.*, 663 F.Supp. 706, 715-16 (S.D.N.Y. 1987) (no estoppel by inaction without a duty or relationship).  Another court, denying an estoppel claim, quoted *Nimmer on Copyrights* for the proposition that "[t]he plaintiff's acquiescence in the defendant's infringing acts may, if continued for a sufficient period of time and *if manifested by overt acts*, result in an abandonment of copyright."  *Basic Books, Inc. v. Kinko's Graphic Corp.*, 758 F.Supp. 1522, 1540 (S.D.N.Y. 1991) (emphasis added).  That decision, however, is arguably inconsistent with *Dallal II*.  In a decision in this district granting equitable estoppel against a copyright claim, such a relationship was present (the plaintiff had been the defendant's employee during the relevant period and had been active in updating the infringing material), although the court did not establish if that fact was necessary for its holding.  *Lab. Corp. of Am. v.*

*Shumann,* No. 3:06-cv-1566, 2009 WL 278859, at *6 (D.Conn. Feb. 4, 2009).

No court in this Circuit has thus far taken the opposite position, *i.e.*, that estoppel was proper based on inaction despite an affixed copyright notice. On two occasions, a court made a statement that might be taken as holding that inaction alone over a sufficient period of time is enough to establish estoppel. *Encyclopedia Brown Prods., Ltd. v. Home Box Office, Inc.*, No. 91 Civ. 4092, 1998 WL 734355, at *14 (S.D.N.Y. Oct. 15, 1998) (asserting in dictum that consent, whether express or implied from long acquiescence with knowledge of the infringement, will prevent relief in equity on the principle of estoppel); *Dallal I* at 323 (the principles of estoppel are most often applied to situations involving implied consent arising from inaction over a long period of time). But neither addressed the significance of an affixed copyright notice.

Thus, while the Second Circuit has not decided the matter, its discussion of *Hampton* and formulation of the test in *Dallal II*, together with the weight of authority among the district courts, suggests that pure inaction does not create estoppel in the face of an affixed copyright notice. The gravamen of many of the decisions cited above is that a defendant that knows that it is infringing a copyright must take reasonable steps to ascertain the copyright holder's position.

Lego, as noted above, provides evidence that copyright notices were affixed to at least some of its minifigures during the relevant period. McNally Decl. § 7; Opp. Memo. at 32. Best-Lock has not effectively rebutted that evidence. Best-Lock has not asserted that it was unaware of Lego's copyrights. Nor has Best-Lock asserted that its estoppel is based on any conduct of Lego's other than inaction. For that reason, Best-Lock has not met the second element of equitable estoppel.

13

### 3.    Best-Lock's Ignorance of the True Facts

The third element of the test for equitable estoppel requires the defendant to show that it was "ignorant of the true facts." *Dallal II* at *1. Lego argues that "the true facts" means the existence of the Minifigure Copyrights. Opp. Memo. at 30-34. Best-Lock provides a different definition of what the "true facts" were: "The 'true facts' are not whether Best-Lock was aware that Lego's minifigures were copyright protected, but that Lego, after years of silence, would actually take action against Best-Lock's figures." Reply Memo. at 4.

The Second Circuit has not established whether the "true facts" are the existence of the copyrights or the plaintiff's intent to enforce the copyrights. At least one district court has definitely endorsed the position that the "true facts" consist of knowledge of the copyright. "[T]here is nothing before the Court to indicate that Defendants were not aware of the true facts. Indeed, Defendants admitted that they were fully aware that [the infringed material] was protected by a registered copyright." *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, No. 96 Civ. 4126, 2000 WL 1028634, at *17 (S.D.N.Y. July 25, 2000). The *Dallal I* court appears to have adopted the same position when it found that the third element was not satisfied because, although the defendant *New York Times* acknowledged complaints from the plaintiff photographer during the relevant period, "these acknowledgments do not constitute an awareness of copyright infringement." *Dallal I* at 323.

Best-Lock cites one decision from this district that arguably takes the opposite position. In *Laboratory Corporation of America v. Shumann,* No. 3:06-cv-1566, 2009 WL 278859, at *6 (D.Conn. Feb. 4, 2009), the court found the third element satisfied with the following explanation: "Because [the copyright holder] did not object to the updating of his manual, the [alleged infringers]

14

had no reason to know that he would later oppose the updating."  However, the court did not find

that the alleged infringers were aware of the subject copyrights, or decide whether their awareness

of the copyrights would have defeated estoppel.

Although this issue is not settled in this Circuit, the weight of authority suggests that a

defendant who was aware of the subject copyright knew the "true facts."  This holding is consistent

with this Court's holding in Part III.A.2. *supra* that copyright affixation defeats a claim of estoppel

based on pure inaction.  For that reason, Best-Lock has not met the third element.

### 4.    Detrimental Reliance

The fourth element of the estoppel test is that the defendant relied on the plaintiff's conduct

to its detriment.  *Dallal II* at *1.  Best-Lock asserts that "[d]uring the past 14 years, Best-Lock has

made substantial investments in creating and expanding its U.S. business including but not limited

to developing and manufacturing molds and machinery to produce its figures."  Reply Decl. ¶ 34.

"Best-Lock has also substantially invested in its offices and workforce and training for its

employees."  *Id.*  Lego does not dispute those assertions, but asserts that expansion and development

of business, even if substantial, are insufficient to establish detrimental reliance.  Opp. Memo. at 34.

Lego cites for that proposition *Basic Books, Inc. v. Kinko's Graphics Corp.,* 758 F.Supp. 1522, 1540

(S.D.N.Y. 1991).  In that case, the court observed that the defendant "convincingly asserts that it has

expended much time and energy in its Professor Publishing business and has continued to expand

its educational photocopying ... over the years in line with its [own] policies and procedures ...

However, this does not reach the level of detrimental reliance."  *Id.*

*Basic Books* supports Lego's position.  However, *Basic Books* is not binding authority for

this Court.  It seems only logical to suppose that an investment of money in developing a line of

products can constitute the necessary detrimental reliance.  If a party invests money in a line of products and then loses the right to sell those products, it has lost at least a portion of its money.  For that reason, the Court finds that Best-Lock has satisfied the fourth element.

Best-Lock must satisfy all four elements of the test for equitable estoppel to establish that Lego is estopped from enforcing its copyrights in this action.  While Best-Lock has satisfied the fourth element, and the first element cannot be decided on the present record, it is clear that Best-Lock has failed to satisfy the second and third elements.  It follows that Best-Lock is not entitled to prevail on the ground of equitable estoppel.

### B.    The Equitable Doctrine of Laches

Because the subjects, while separate, overlap to some degree, I depart from the order of briefing and follow the discussion of equitable estoppel with a consideration of laches.  Best-Lock now asserts both equitable estoppel and laches as bars to Lego's claims against it.

Laches, a traditional principle of equity pleading and practice, is a less complicated concept than that of equitable estoppel.  To sustain a laches defense, only two elements need appear: the plaintiff delayed an unreasonable amount of time in filing suit against the defendant; and the defendant suffered prejudice as the result of that delay.  *See, e.g., Larios v. Victory Carriers*, 316 F.2d 62 (2d Cir. 1963) (Friendly, J.).  A defendant may fail to demonstrate all the elements of equitable estoppel, and still make out the defense of laches.

A number of questions arise from the Court's Order directing supplemental briefing on the doctrine of laches [Doc. 74]; the briefs of counsel filed in obedience to that Order; and the appellate and district court cases cited in the Order and the briefs.  Those questions include:

(1) Does the equitable doctrine of laches apply at all to an action for copyright infringement,

16

such as the one at bar?

(2) Assuming that laches is applicable in principle to this case of copyright infringement, and assuming further that Lego has been guilty of laches, what is the effect in practice of laches upon (a) Lego's equitable claim for an injunction, and (b) its claims at law for damages caused by Best-Lock's infringements?[4]

Best-Lock pled laches as an affirmative defense to the action for copyright infringement Lego filed against Best-Lock on October 14, 2011.  With respect to the first question posed above, and as a general proposition, laches is clearly available to Best-Lock under the law of this circuit.  The court of appeals made that plain over 100 years ago, in *West Pub. Co. v. Edward Thompson Co.*, 176 F. 833 (2d Cir. 1910).  Plaintiff West was then and is now the publisher, known to generations of the nation's lawyers and judges, of reports of cases and legal digests, which "began with the year 1879 the publication of weekly reporters" containing court decisions.  "Each weekly number of Reporters was copyrighted.  Then several such numbers were aggregated into a volume which was copyrighted."  176 F. at 834.  Defendant Thompson "from the year 1887 was the publisher of encyclopedias composed of articles alphabetically arranged intended to cover the whole body of the law, . . . comprising in all 78 volumes."  *Id*. at 835.  In April 1903, the plaintiff filed a "bill" (as the pleading was called in those days) against the defendant, alleging that the defendant's publications infringed the plaintiff's copyrights.  "The bill asks for an injunction and for damages as well as for an accounting."  *Id*. at 839.  The district court held that the defendant's infringement was proven, but rejected the plaintiff's request for an injunction.  The Second Circuit, affirming on that point, said

---

[4]  The disputed proposition that Best-Lock did in fact infringe Lego's copyrights is assumed for the sake of the discussion in this Sub-Part of the Ruling.

at 176 F. 838:

> The complainant knew at least as early as 1893 that its syllabi were being paraphrased or copied by the defendant's writers, or some of them.  Its conduct shows that it must have considered this to have been a fair use of its publications because it did not begin this action until the defendant, after 16 years of labor and immense outlay of money, had published almost its entire work.  The laches of the complainant and the hardship upon the defendant are such that we think the trial judge, "according to the course and principles of courts of equity," was right in refusing an injunction and accounting of profits.

The Second Circuit cited and followed *West* when it arrived at a comparable conclusion in the more contemporaneous case of *New Era Publications International, ApS v. Henry Holt and Company, Inc.*, 873 F.2d 576 (2d Cir. 1989).  Plaintiff New Era, holder by license of certain copyrights bequeathed by the controversial L. Ron Hubbard to the Church of Scientology, sued to enjoin defendant Holt from publishing in this country a book titled *Bare-Faced Messiah: The True Story of L. Ron Hubbard,* an unflattering biography of Hubbard.  New Era did not sue for equitable relief until after Holt had run off and shipped out the first printing of the biography.  District Judge Leval (as he then was) found that, to some degree, the accused biography breached copyright by infringing copyrighted or unpublished material, but refused to grant the permanent injunction prayed for by plaintiff.  Affirming that refusal, the Second Circuit referred to the district court's "rejection of the fair use defense and its finding of infringement," and went on to say:

> Nevertheless, equitable considerations dictate denial of injunctive relief in this action.  The prejudice suffered by Holt as the result of New Era's unreasonable and inexcusable delay in bringing the action invokes the bar of laches.  In initially denying a temporary restraining order, the district court found that New Era had been aware since 1986 that the book would be published in the United States.  Despite this knowledge, and despite lawsuits commenced in 1987 to enjoin publication in England, Canada and Australia, New Era failed to

18

compare Holt's book with the books published abroad; failed to inquire of Holt as to the planned date of publication in this country; and failed to take any steps to enjoin publication of the book until it sought a restraining order in May of 1988. . . . If New Era promptly had sought an adjudication of its rights, the book might have been changed at minimal cost while there was still an opportunity to do so. At this point, however, it appears that a permanent injunction would result in the total destruction of the work since it is not economically feasible to reprint the book after deletion of the offending material. Such severe prejudice, coupled with the unconscionable delay already described, mandates denial of the injunction for laches *and relegation of New Era to its damages remedy*.

873 F.2d at 584-85 (citations omitted).

*West* and *New Era* both address the first of the two questions posited above, and hold that the doctrine of laches may in principle be applied to actions for copyright infringement. I have emphasized the last phrase in this quotation from *New Era* because that language addresses the second of those two questions. To restate that inquiry: May a copyright plaintiff be barred by the equitable doctrine of laches from enjoining a demonstrated infringement, yet still be able to recover money damages at law caused by that infringement? The emphasized observation, taken from Judge Miner's majority opinion for the *New Era* court, clearly answers that question in the affirmative. Chief Judge Oakes wrote a concurring opinion in *New Era* because he did not accept some of the majority's reasoning in applying laches to bar an injunction, but on the availability of damages at law he was in entire agreement, concluding his opinion by saying: "Applying traditional equitable principles, then, I would hold that Judge Leval did not abuse his discretion in declining to issue an injunction against publication of *Messiah*, *leaving New Era a damages claim as to the very little, insignificant material unfairly used*." 873 F.2d at 597-98 (emphasis added).

The sole Second Circuit case Judge Miner cited for the phrase "relegation of New Era to its

damages remedy" was *West*, with a page citation to "176 F. 833, 838." At page 838, the *West* court held the trial judge "was right in refusing an injunction and accounting of profits," and then began a discussion that it is instructive to quote at some length:

> But we also think that the court can give damages in this case by way of compensation. Because Rev. Stat. U.S. Sec. 4921 entitles complainants in equity suits arising out of patents "to recover in addition to the profits to be accounted for by the defendant the damages the complaint [*sic*] has sustained" by the infringement, and there is no similar provision as to equity suits arising out of copyrights, it is sometimes said that damages cannot be awarded in the latter. We think this a misunderstanding of the statute. It applies to all patent cases without distinction and permits damages to be assessed when equitable relief is granted in addition to profits. This should not be construed to impair the power of courts of equity to do justice by allowing the complainant compensation in damages when equitable relief, though it might be given, is for some satisfactory reason withheld.
>
> In such a case, the damages are not given in addition to profits as provided by section 4921. It does not seem to us right to turn the complainant over to a court of law. . . . The bill asks for an injunction and for damages as well as for an accounting. This court, having obtained jurisdiction of the cause and having the power to grant an injunction, has the right to do justice between the parties and to dispose of it finally, even if this involves withholding injunctive relief and awarding damages.
>
> The decree of the Circuit Court, therefore, will be modified by the direction to refer the cause to a master for the purpose of determining what damages the complainant has sustained, or at the option of the complainant the decree may be affirmed, with hosts of this court, without prejudice to its right to proceed at law.

176 F. at 838-39 (citations omitted).

When the Second Circuit's opinions in *West* and *New Era* are read together, as *New Era* clearly intends, we see that the law of this Circuit establishes these propositions: Where a plaintiff's copyrighted work has been infringed by a defendant, the equitable doctrine of laches may, depending

20

on the circumstances of the case, bar the plaintiff from the equitable relief of enjoining the infringement, but may also leave intact the plaintiff's right to recover at law money damages caused by the infringement.

Given the clarity and force of the opinions in *West* and *New Era*, one cannot accept Best-Lock's characterization of *New Era* as "denying injunctive relief based on laches while stating in dicta that damages may be available." Best-Lock's Supplemental Memorandum in Support of its Motion for Preliminary Injunction [Doc. 76] at 14. There is no whiff of dicta in the Second's Circuit's decision mandating "relegation of New Era to its damages remedy." The case clearly holds that denying New Era an injunction did not automatically disentitle it from recovering damages at law. *West* is to the same effect: That a copyright plaintiff may recover damages at law, even if barred by laches from obtaining an injunction, is powerfully articulated by the court of appeals as a matter of policy.

There is one issue squarely presented by the case at bar which the cited decisions do not resolve. Whether laches may in any circumstances bar a legal claim for damages in a copyright infringement case is complicated by the statute of limitations in the Copyright Act, 17 U.S.C. § 507(b), which provides: "No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." For limitations purposes, "each act of infringement is a distinct harm giving rise to an independent claim for relief, although recovery is allowed only for those acts within three years of suit." *Eyal R.D. Corp. v. Jewelex New York, Ltd.*, 576 F.Supp.2d 626, 644 (S.D.N.Y. 2008) (citation and internal quotation marks omitted). In the case at bar, Best-Lock asserts in its supplemental brief [Doc. 76] at 2: "The Best-Lock toy figures accused of infringement in this action have been sold continuously in the United States in their present form

since 1998," a date I accept only for the sake of this discussion.  Lego filed its complaint on October 14, 2011.  Applying  the Act's three-year statute of limitations, Lego's action for damages is timely for any act of infringement occurring between October 14, 2008 and October 14, 2011, and future actions for infringements occurring after October 14, 2011 will be timely if filed within three years of accrual of the claims.

May the equitable doctrine of laches operate to bar an action for copyright damages that was timely filed under the Copyright Act?  Best-Lock appears to argue that laches can have that effect, and should do so in this case.  Case law on this question is divided.  Judge Cedarbaum's comprehensive opinion in *Legislator 1357 Limited v. Metro-Goldwyn-Mayer, Inc.*, 452 F.Supp.2d 382 (S.D.N.Y. 2006), collects some of the conflicting decisions.  She observed: "The courts of appeals that have addressed the application of laches to copyright infringement claims have reached different conclusions.  The Ninth Circuit allows laches to bar copyright infringement claims whether the relief sought is legal or equitable.  The Fourth Circuit has ruled that the doctrine of laches never bars a timely infringement claim.  The Tenth Circuit takes a third approach, ruling that laches is available to bar a timely infringement claim in 'rare cases.'  The Second Circuit has not decided the issue." 452 F.Supp.2d at 392 (citations and some internal quotation marks omitted).  The following year, in *Price v. Fox Entertainment Group, Inc.,* No. 05 Civ. 5259, 2007 WL 241387 (S.D.N.Y. Jan. 26, 2007), at *2, Judge Scheindlin noted the same split in authority: "The parties dispute whether laches is available as a defense in copyright infringement actions that are timely filed under the Copyright Act's express three-year statute of limitations.  The circuits are split on this issue and the Second Circuit's silence has led to some confusion within this district as well." (citations omitted).

If the Second Circuit's decisions offer no guidance on the question, I suppose I am free to

do what I think is right in a case such as this one, namely: It is assumed that Lego delayed unreasonably in seeking to enjoin Best-Lock's infringing conduct (also assumed); and Best-Lock's conduct occurred both after and before the running of the three-year limitations period for a suit at law for damages.  An appealing solution to this puzzle is suggested by Judge Friendly's opinion in *Larios v. Victory Carriers, Inc.*, 316 F.2d 63 (2d Cr. 1963).  The plaintiff was a seaman, injured as the result of a high-seas collision between his vessel and another.  Plaintiff sued the owners of both vessels in the district court for the Southern District of New York, purportedly on the "law" side of the court. He filed his action more than three years after the claim arose, a significant period of time because three years was the period of limitation provided by New York law for personal injuries due to negligence.  The district court dismissed the action on the ground that the statute of limitations had run.

On appeal, the Second Circuit vacated the dismissal and remanded the case for an evidentiary hearing.  Judge Friendly noted that since the plaintiff's claim against the shipowners "was for an injury on the high seas, the applicable principle with respect to his delay in bringing suit is laches and not the statute of limitations," 316 F.2d at 65, although Supreme Court decisions made it plain that "the analogous state statute of limitations is still relevant to the determination of laches in suits on maritime claims," *id*. at 66.  *Larios* was a case, then, where in assessing the timeliness of the action, the district court was required to consider the inter-relationship between the equitable doctrine of laches and the analogous legal statute of limitations.  Judge Friendly instructed district judges about how to do that:

> When the suit has been brought after the expiration of the state limitation period, a court applying maritime law asks why the case should be allowed to proceed; when the suit, although perhaps long

23

> delayed, has nevertheless been brought within the state limitation
> period, the court asks why it should not be.

316 F.2d at 66.

The clear import of the second hypothetical is that an action may be filed within the analogous limitations period, but still be dismissed on the basis of laches, if the plaintiff's delay was unreasonable and the resulting prejudice to the defendant severe. Those two factors, Judge Friendly added, "are not to be viewed independently. A weak excuse may suffice if there has been no prejudice; an exceedingly good one might still do even when there has been some." *Id*. at 67. This was said within the context of a plaintiff "who has delayed bringing suit beyond the analogous state period," *id*., but the soundness of the analysis commends itself equally to a case "although perhaps long delayed, but nevertheless brought within the limitations period." In *Larios*, the Second Circuit concluded that the injured seaman showed sufficient excuse for his delay in suing "that it ought to have been weighed against evidence the defendants might proffer to show prejudice from the delay, through the loss or impairment of evidence as to the collision or as to the release or otherwise. We therefore vacate the judgment dismissing the complaint and remand for the taking of further proof on the issue of laches." *Id*. In

If the protocol articulated in *Larios* were applied to the case at bar, the three-year limitations period for copyright infringement actions would be viewed in conjunction with the equitable doctrine of laches, also applicable to infringement actions under the holdings of *New Era* and *West*. Conceptually, if a copyright owner waited an extended and unreasonable amount of time before suing a defendant for infringement, and plaintiff's delay would cause severe prejudice if the suit was allowed to proceed, laches could bar the action, even if it was filed within the three-year limitations

period.  That is the second of the two hypotheses articulated by *Larios* in the passage I have quoted, and in such a case Judge Friendly instructs district courts to ask why "it should not be" allowed to continue.  The Second Circuit would not have posed that question if it were not possible for a defendant to answer it: to say that in these particular circumstances, and on the ground of laches, the case should not be allowed to proceed, even though commenced within the limitations period.

While the regimen set forth in *Larios* has a powerful appeal, its conceptual applicability to the case at bar may be questioned.  *Larios* held that the doctrine of laches governing a maritime claim could trump a state statute of limitations which applied *only by analogy*.  In the case at bar, Congress included the three-year statute of limitations in the Copyright Act itself, the statute upon which Lego asserts its claim of infringement by Best-Lock.  To say that laches bars a claim for infringement damages that is timely filed under the Act raises the equitable doctrine to a new level, for which there is no present Second Circuit authority directly in point.[5]  Nonetheless, in filing its action, Lego's prayer for an injunction invokes the power of the Chancellor in Equity, whose traditional responsibility is to do what is fair ("equitable") in the circumstances of a particular case.

---

[5]  In *Price*, 2007 WL 241387, at *3, Judge Scheindlin interpreted the Second Circuit's reasoning, if not its holding, in *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997) to mean that "the express statute of limitations in the Copyright Act precludes the use of the laches defense *in toto*, regardless of the relief sought."  She added: "Nevertheless, several decisions in this district have permitted laches to bar a timely filed infringement action," *viz*, cases which "each involved continuous infringement, i.e., although the action was timely because the last act of infringement occurred within the three-year period, the plaintiff had been on notice of its claim long beforehand due to previous acts of infringement that spanned many years."  *Id.* (footnotes omitted).  Having considered those authorities, Judge Scheindlin concluded in *Price* that "laches may not be used to bar timely filed copyright infringement claims, both legal and equitable, *that do not involve ongoing infringement*."  *Id.* (emphasis added).  In the case at bar, Lego appears to complain that its copyrights were infringed by Best-Lock for a number of years prior to the three-year period, and that Best-Lock's infringement is ongoing today.  Thus, the holding in *Price* would support laches as an available defense against all Lego's infringement claims, both equitable and legal.

One of the appellate cases Judge Cedarbaum cited in *Legislator* as illustrative of the split among the circuits on the point is *Jacobsen v. Deseret Book Co.*, 287 F.3d 936 (10th Cir. 2002), a copyright infringement action, where the Tenth Circuit said: "Rather than deciding copyright cases on the issue of laches, courts should generally defer to the three-year statute of limitations, 17 U.S.C. § 507(b), provided by the Copyright Act," but then added: "Although it is possible, in rare cases, that a statute of limitations can be cut short by the doctrine of laches, we see no reason to supplant the statute of limitations in this case."   287 F.3d at 950-51 (citations and internal quotation marks omitted).   The Tenth Circuit reached that conclusion only after examining the underlying facts: "It does not seem unreasonable to allow Dr. Jacobsen three years from the time he should have known of his claim to evaluate the viability of instituting a law-suit or pursue out-of-court remedies. . . . When viewing the record in the light most favorable to Dr. Jacobsen, we conclude his delay in filing suit was reasonable."  *Id.* at 951.

In the case at bar, and in the absence of Second Circuit authority compelling a contrary conclusion, I am not prepared to hold that laches can *never* be a bar to a copyright infringement claim for damages filed within the Act's three-year limitations period.  The existence of laches *vel non* depends upon the facts of each case.  There must be a further factual inquiry in this case.

The need for that inquiry results in large measure from Lego's uninformative briefs on the questions presented.  Whether a claimant unreasonably delayed its infringement action depends principally upon when it learned of the infringement.  Lego argues in its Supplemental Memorandum of Law in Opposition to Best-Lock's Motion for Preliminary Injunction [Doc. 75] at 10 n.6 that "Best-Lock has produced no evidence that the LEGO Group knew of its Infringing Figurines prior to 2011," the year suit was filed.  There is a considerable body of evidence from which Lego's

26

familiarity with Best-Lock's competing products could fairly be inferred, but the existence and extent of particular knowledge Lego acquired at a particular time about particular products of Best-Lock are best known to Lego, not Best-Lock.

It is consistently held in copyright and patent infringement cases that a party's knowledge on such issues is a fair subject of discovery. *See, e.g., Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc.*, No. 08 Civ. 1533, 2011 WL 2623458 (S.D.N.Y. June 21, 2011); *DR Systems, Inc. v. Eastman Kodak Co.*, No. 08cv669, 2009 WL 2973008 (S.D. Cal. Sept. 14, 2009); *Intervet, Inc. v. Merial Ltd.*, 256 F.R.D. 229 (D.D.C. 2009).

In *Gary Friedrich*, an action for copyright infringement alleging that the defendants' movie infringed the plaintiffs' characters and story elements, the defendants raised defenses based on the statute of limitations and laches, and moved "to compel the production of time records showing work performed by attorneys for the plaintiffs prior to April 4, 2007, the date that this lawsuit was commenced." 2011 WL 2623458, at *2. The magistrate judge granted that discovery as germane to those defenses, reasoning that "any contention that Mr. Friedrich [plaintiff] had reason to know of his potential claims only shortly before filing the complaint would be undermined by a showing that he had long before engaged in extensive consultations with counsel about his rights." *Id.* at *3.

In *DR Systems*, plaintiff DR sought declarations that defendant Kodak's "'811 patent" was invalid, and that DR did not infringe it by selling certain "Accused Products." DR, asserting that Kodak's enforcement of the '811 patent against DR was barred by laches, noticed a Rule 30(b)(6) deposition of Kodak and included, among the topics on which the deponent must be prepared to testify, some related to its laches argument: "the date when Kodak first learned of the Accused Products . . . [and] the facts and circumstances relating to Kodak's first knowledge of the Accused

Products." The initial deponent designated by Kodak was unable to answer those questions, and DR sought to depose a higher-level executive who could do so. The magistrate judge, rejecting Kodak's motion to quash that second deposition notice, held that DR was entitled to depose a Kodak executive about his knowledge concerning those particular topics.

In *Intervet*, the case arose on objections to pre-trial interrogatories. Plaintiff Intervet sought a declaration that it did not infringe defendant Merial's '601 patent on a vaccine, and that the patent was invalid. Merial had alleged that "Intervet willfully infringed the patent, and that Intervet induced others to infringe as well." 256 F.R.D. at 232. As the magistrate judge observed: "These both require proof of intent to infringe, which necessarily requires that Intervet be familiar with the patent." *Id*. Merial filed an interrogatory asking Intervet to "identify the date(s) on which Intervet first became aware of the '601 patent, identify the person(s) who became aware of the '601 patent, and explain the circumstances under which the '601 patent came to Intervet's attention." 26 F.R.D. at 231. The magistrate judge held that Intervet must respond fully to that interrogatory, amending it solely to require Intervet to "identify the person(s) who became aware of the patent when Intervet first became aware of the patent." *Id*. at 232. The magistrate judge held that "information about how and when Intervet discovered Merial's patent, and what happened thereafter is highly relevant to the issues in this case." 256 F.R.D. at 232. The judge reasoned that "to establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent," and in consequence: "Everything hinges on when Intervet knew about Merial's patent rights and what it did after it found out." *Id*. The court concluded that Merial was entitled to discovery into these issues, by interrogatories and depositions.

28

The cited circuit and district court cases, while not binding on this Court, are instructive when this Court comes to consider the present posture of the case at bar.  Lego claims that Best-Lock's figures infringe Lego's copyrighted figures.  On October 14, 2011, Lego filed this action against Best-Lock for the purpose, *inter alia,* of enjoining that perceived infringement.  The present record does not reveal when Lego first learned of the existence of a Best-Lock figure or figures that Lego accuses as infringing.  The governing principles of equity did not require that Lego, a purported victim of infringement, seek an injunction on the same day it learned of Best-Lock's perceived copyright violation.  Some delay is inherent in the realities of life: factual inquiries, consultations with counsel, and the like.[6]  However, the doctrine of laches requires Lego to show that any delay "in filing suit was reasonable," *Jacobsen*, 287 F.3d at 951.  To paraphrase *Intervet*, 256 F.R.D. at 232: "Everything hinges on when Lego knew about Best-Lock's infringement and what it did after it found out."

In the case at bar, and focusing upon the first of the two laches elements (unreasonable delay on the part of Lego in suing for copyright infringement), the strongest case for Best-Lock in establishing the defense would be made out if Best-Lock's allegedly infringing figures first appeared in domestic commerce in 1998; during the succeeding years were marketed in competition with and close proximity to Lego's copyrighted figures; and Lego's officers and employees were aware of the Best-Lock figures in the marketplace from the time of their first appearance.  In those circumstances, Lego's waiting until 2011 to sue to enjoin the Best-Lock figures would be problematic, and unfair

---

[6]  Those practical realities of life are distilled in Fed. R. Civ. P. 11(b), which provides that in presenting a pleading to a court, an attorney or unrepresented party "certifies that to the best of the person's knowledge, information and belief, formed after an inquiry *reasonable under the circumstances*," the pleading's legal and factual contentions are warranted by existing law and have evidentiary support.  (emphasis added).

29

prejudice to Best-Lock in being enjoined would seem plausible.

By way of contrast, if Best-Lock did not introduce and market the allegedly infringing figures until 2011, and Lego's suit was filed within the three-year limitations period in the Copyright Act, a Best-Lock defense against being enjoined based on laches, while arguably still possible, would be more difficult. In that circumstance, the Court would ask, as did Judge Friendly in *Larios*: Why should the case not be allowed to proceed? Assuming for the sake of discussion that Best-Lock first introduced the accused figures in mid-January 2011 and Lego promptly became aware of them, Lego filed suit to enjoin infringement nine months later – the sort of delay condemned by laches as unreasonable is usually made of sterner stuff than this.

The problem is that the present record does not reveal with sufficient clarity when Best-Lock first introduced into commerce the allegedly infringing figures, or when Lego first became aware of them. Surely, Lego's artful and studied briefs shed little light on these crucial facts; Lego's contention, distilled to its essence, is that Best-Lock has not proved what Lego knew and when it knew it. The cases cited *supra* make it plain that these are factual areas where discovery of Lego by Best-Lock is both appropriate and necessary, as indeed is discovery of Best-Lock by Lego on other questions related to that one. Until that discovery has been completed, the Court will not be in a position to adjudicate the question of whether Lego delayed unreasonably in filing its action against Best-Lock.

If the time elapsing between Lego's awareness of Best-Lock's accused conduct and Lego's filing suit was reasonable in duration, the first element of laches cannot be shown, and the defense fails. If Lego delayed unreasonably between learning of Best-Lock's perceived infringement and suing to enjoin it, the first element of laches is established, and the second element arises: whether

Best-Lock was unfairly prejudiced by the delay.  The Chancellor in Equity must consider all these issues.  Discovery is necessary to explicate them.

### C.    Validity of the Minifigure Copyrights

#### 1.    The Test for Functionality

Best-Lock argues that the Minifigure Copyrights are invalid because the elements in question are "functional" rather than "sculptural."  Supp. Memo. at 17-18.  The Copyright Act establishes that "pictorial, graphic or sculptural works" are eligible for copyright protection.  17 U.S.C. § 102(a)(5).  Such works include "works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned."  17 U.S.C. § 101.   "The Act, however, excludes any 'useful article' –  defined as "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information' – from copyright eligibility."  *Chosun*, 413 F.3d at 327 (citing § 101).  *Id.* The design of a useful article is considered a pictorial, graphic or sculptural work "only if, and to the extent that, such design incorporates pictorial, graphic or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article."  § 101.

The Second Circuit has established that toys can be "pictorial, graphic or sculptural works." *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir. 1985).  In *Hasbro Bradley*, "changeable robotic action figures" were held to be "pictorial, graphic or sculptural."  *Id.* at 191-92. That court has also held that design elements can be protected if they are either physically or conceptually separable from the underlying product.  *See, e.g., Brandir Int'l, Inc. v. Cascade Pacific Lumber Co.*, 834 F.2d 1142, 1145 (2d Cir. 1987); *Chosun Int'l, Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324 (2d Cir. 2005).  Because Lego does not assert physical separability in support of the claim

31

that its figurines contain copyrightable elements, the case turns upon conceptual separability.

The Second Circuit's formulation of "conceptual separability" in the copyright context has given rise to some criticism and disagreement in other quarters. An earlier explication of "conceptual separability" appears in *Brandir*, where the Second Circuit held that a bicycle rack made of bent tubing was not copyrightable. During its analysis, the court of appeals said that "if design elements reflect a merger of aesthetic and functional considerations, the artistic aspects of a work cannot be said to be conceptually separable from the utilitarian elements. Conversely, where design elements can be identified as reflecting the designer's artistic judgment exercised independently of functional influences, conceptual separability exists." 834 F.2d at 1145. Expanding on those perceptions, the *Brandir* court said later in its opinion: "It seems clear that the form of the rack is influenced in significant measure by utilitarian concerns and thus any aesthetic elements cannot be said to be conceptually separable from the utilitarian elements." *Id*. at 1146-47. In *Brandir*, the Second Circuit found support for its analysis in its prior decision in *Kieselstein-Cord v. Accessories by Pearl, Inc.*, 696 F.2d 989, 993 (2d Cir. 1980), where according to *Brandir* "this court accepted the idea that copyrightability can adhere in the 'conceptual' separation of an artistic element. Indeed, the court went on to find such conceptual separation in reference to ornate belt buckles that could be and were worn separately as jewelry." 834 F.2d at 1144.

The Fourth Circuit has observed that the question of whether "designs are conceptually separable from the utilitarian aspects of furniture" depends upon "a nebulous standard with which the [district] court was obliged to grapple." *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 431 (4th Cir. 2010). In *Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 633, 670 (3d Cir. 1990), the Third Circuit acknowledged: "If we were forced to separate

32

the nose masks' functional aspects from their sculptural aspects, we admit that this would be a difficult if not impossible task," and added: "Courts have twisted themselves into knots trying to create a test to effectively ascertain whether the artistic aspects of a useful article can be identified separately from and exist independently of the article's utilitarian function."  In a footnote following that unflattering reference, the Third Circuit identifies the only court it perceives as a self-contortionist: the Second Circuit, in *Brandir* and an earlier case, *Carol Barnhart, Inc. v. Economy Cover Corp.*, 773 F.2d 411 (2d Cir. 1985).   Another court commented that the conceptual separability analysis "often sounds more like metaphysics than law." *Bonazoli v. R.S.V.P. Int'l, Inc.*, 353 F.Supp.2d 218, 224 (D.R.I. 2005).

Accordingly, it cannot be said that the Second Circuit's conception of conceptual separability in copyright cases has found widespread acceptance in other circuits.  Closer to home, in the *Chosun* case, on its way to the Second Circuit via an opinion by District Judge Wood, No. 02-CV-7918, 2004 WL 962906 (March 24, 2004), where the parties were competing manufacturers of Halloween costumes, Judge Wood quoted *Brandir*'s methodology for determining whether a copyrightable conceptual separability exists, and declined to engage in the exercise.  She said: "These tests have proven extremely difficult to apply. ... Attempting to judge the copyrightability of Halloween costumes reveals the incoherence of these tests. ... It is impossible to say whether the utilitarian predominates over the artistic, or vice-versa.   Until a more coherent distinction is drawn by Congress, district courts can do little more than attempt to be consistent with precedent." 2004 WL 962906, at *3.  Applying that pragmatic test, Judge Wood observed that three courts in the District had concluded that Halloween costumes were not copyrightable, and reached the same result in the case before her, granting the defendant's motion to dismiss the plaintiff's infringement action under

33

Rule 12(b)(6) for failure to state a claim.

On the inevitable appeal, and perhaps equally inevitable reversal, 413 F.3d 324, the Second Circuit restated its adherence to conceptual separability.   Circuit Judge Calabresi's opinion, presumably striving for enhanced coherence, paraphrased the Copyright Act, 17 U.S.C. § 101, as providing that "if a useful article incorporates a design element that is physically or conceptually separable from the underlying product, the element is eligible for copyright protection"; observed that "the cases in our circuit have recognized the same distinction"; and gave guidance to district courts on how to apply the conceptual separability test in a particular case; advice that it is useful to quote and mandatory to obey:

> [W]e cannot say that Chosun's allegations of copyright infringement are insufficient.   It is at least possible that elements of Chosun's plush sculpted animal costumes are separable from the overall design of the costume, and hence eligible for protection under the Copyright Act.  It might, for example, be the case that the sculpted "heads"of these designs are physically separable from the overall costume, in that they could be removed from the costume without adversely impacting the wearer's ability to cover his or her body.  Similarly, it could be that the sculpted "heads" (and perhaps "hands") are *conceptually* separable.  That is, Chosun may be able to show that they invoke in the viewer a concept separate from that of the costume's "clothing" function, and that their addition to the costume was not motivated by a desire to enhance the costume's functionality *qua* clothing.  It is, of course, possible that at any of several later stages Chosun will have failed, as a matter of law, to prove that such separability exists.  But that possibility cannot justify dismissal of Chosun's complaint now on a Rule 12(b)(6) motion.

413 F.3d at 329-330 (footnotes omitted, emphases in original).

The Second Circuit vacated the court's order of dismissal in *Chosun* and remanded the case to the district court for further proceedings "not inconsistent with this opinion."  *Id*. at 330.  The court of appeals' specific criticism of the district court was that it "did not, at any point in its order,

determine whether elements of Chosun's costumes were physically or conceptually separable from their overall design." *Id.* at 327.  In order to conduct further proceedings on remand were consistent with the court of appeals' opinion, the district court was required to make such determinations, presumably following an evidentiary hearing.

While one may admire the intellectual courage Judge Wood displayed in *Chosun* by declining to consider conceptual separability, I do not enlist under her banner, which proclaimed the incoherence and unworkability of conceptual separability in copyright cases.  The Second Circuit has effectively shredded that banner.  In *Brandir,* the court of appeals proclaimed: "'Conceptual separability' is thus alive and well, at least in this circuit."  834 F.2d at 1144.  That proclamation is restated and reinforced by *Chosun*.  The question that arises in the case at bar is the applicability and effect of conceptual separability to and upon the facts of the case, a question that impacts upon the existence and boundaries of Lego's copyright protection with respect to its toy minifigures.

In this legal context, the present Motion raises an interesting question: What is the utilitarian function of a toy?  The question of function is more easily answered for other products.  For example, the function of a mannequin is to display clothes, and its functional elements are those necessary for the display of clothes.  *Carol Barnhart* at 419.  The function of a bicycle rack is to provide "a safe, secure and maintenance-free system of parking bicycles and mopeds," and its functional elements are those that contribute to that purpose.  *Brandir* at 1147.  In *Chosun*, the Second Circuit defined the "utilitarian function" of the subject costumes as "the wearer's ability to cover his or her body" and as their "'clothing' function."  *Chosun* at 329-30.

The Second Circuit has not, however, defined the "utilitarian function" of toys.  Does a toy even have a utilitarian function?  One court of appeals has held that it does not.  The Sixth Circuit

held that a toy airplane has no utilitarian function other than to portray a real airplane.  *Gay Toys, Inc. v. Buddy L Corp.*, 703 F.2d 970, 973 (6th Cir. 1983); *see also Innovative Concepts in Entertainment, Inc. v. Entertainment Enters., Inc.*, 576 F.Supp. 457, 462 (E.D.N.Y. 1983) ("it is doubtful that [miniature toy] hockey players are 'utilitarian' articles within the meaning of the section at all").  In this view, a toy is never a "useful article" and is always subject to copyright.

At the other extreme, one could instead define the function of a toy as its capacity to inspire imagination and play in a child, as the overruled district court did in *Gay Toys, Inc. v. Buddy L Corp.*, 522 F.Supp. 622, 625 (E.D. Mich. 1981) ("[a] toy airplane is useful and possesses utilitarian and functional characteristics in that it permits a child to dream and to let his or her imagination soar").  However, that definition of a toy's function would eliminate copyright protection for toys completely, in violation of the Second Circuit's holding in *Hasbro Bradley* that toys can be subject to copyright.

There is, however, another way of defining "function" in the toy context.  Most courts in this circuit appear to define the "functional" aspects of a toy implicitly as those aspects that involve movement or attachment.   These courts may be influenced by the use of the word "mechanical" in the Copyright Act.  Thus, 17 U.S.C. § 101 provides in respect of copyrightable "pictorial, graphic and sculptural works" that "[s]uch works shall include works of artistic craftsmanship insofar as their form *but not their mechanical* or utilitarian aspects are concerned . . . ."  (emphasis added.)

For example, discussing wind-up plastic figures that are capable of locomotion, the Second Circuit referred to "the wind-up mechanisms which enable the figures to move" as "the functional, non-artistic aspects of the toys."  *Durham Indus. Inc. v. Tomy Corp.*, 630 F.2d 905, 909 n.3 (2d Cir. 1980).  Discussing a plush toy in the shape of an animal that unfolds into a flat pillow, a district court

36

stated that the purely functional aspects of the toy were not copyrightable, and gave, as its only example of those purely functional aspects, "the Velcro straps that effect the toy's transformation from pillow to sculpture." *CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F.Supp.2d 127, 143 (E.D.N.Y. 2011).  Another district court, discussing toy bird marionettes, held that "[t]he weighting, flexibility and extended length of the marionettes' legs and feet, which enable the puppets to 'walk,' and the positioning of strings enabling the puppeteer to control the walk are driven by purely functional aims." *Great Am. Fun Corp. v. Hosung N.Y. Trading, Inc.*, 960 F.Supp. 815, 819 (S.D.N.Y. 1997).  Another district court found that the "functional elements" of a bubble-blowing, Santa-Claus-shaped Christmas tree ornament were "a pivoting arm holding a bubble wand, which arm is capable of dipping the wand into a reservoir of bubble fluid and bringing the wand to a round hole in Santa's mouth." *Kurt S. Adler, Inc. v. World Bazaars, Inc.*, 897 F.Supp. 92, 95 (S.D.N.Y. 1995).

    Moreover, the parties to this action apparently agree that attachment is functional.  Best-Lock describes the minifigures as functional because they have features "specifically configured for being able to be attached to or cooperate with other figures, other body parts, and with toy construction blocks sold by Lego, Best-Lock and other suppliers of similar toy figures and blocks."  Supp. Memo. at 18.  Lego, listing twelve elements of the minifigures which it claims are protectable, omits any mention of those that relate to movement or attachment, such as the studs in the bases of the feet. Opp. Memo. at 10-11.  Lego distinguishes between those elements of the minifigures that promote the mounting of such figures on base plates, which it accepts as functional, and "the aesthetic features of the Minifigure figurine, the shape of the individual components (other than the connective pieces on its legs as described above), the proportions of the body parts to each other, [and] its

37

overall look and feel."  Opp. Memo. at 19.

Following this approach, the "functional" aspects of the minifigures are those that enable the attachment of one piece to another or movements such as the movement of the legs relative to the torso.  While moving and attaching are not the only functions of a toy, they can be seen as utilitarian in a way that the capacity to inspire play is not.  The majority view in the courts supports that idea. I think it is correct, and adopt that concept of functionality with respect to the toy figures that are the subject matter of this litigation.

### 2.      Application to the Minifigure Copyrights

As noted, the parties' briefs imply agreement with the general principle that some elements of the minifigures are functional and some are not.  It also appears that Lego does not dispute the functionality of elements that enable attachment; and even if Lego does not concede the point, I reach that conclusion as a matter of law.    Best-Lock has at least to some extent conceded that the two-dimensional drawings on the faces and torsos of the minifigures are not functional: "The only features that might be subject to infringement are the surface decorations on the face and torso." Reply Memo. at 8.  Best-Lock nowhere argues that the two-dimensional drawings *are* functional; and in law, they are not.

Thus, the core question is not whether the minifigures as a whole are functional, but rather which elements of the minifigures, if any, are functional.  This position is consistent with the notion of "conceptual separability" endorsed by the Second Circuit and discussed above. *See*, *e.g.*, *Chosun,* 413 F.3d at 324-29 (suggesting manners in which district judges might develop at a hearing whether aspects of an object are functional or artistic).  If the minifigures' capacity to attach to other toys is functional, while their capacity to inspire imagination or play are not, then the drawings on the face

38

and torso are clearly conceptually separable, since they do not affect attachability and are not, in the language of the *Chosun* court, "motivated by a desire to enhance the [minifigures'] functionality." Id. at 330.  These two-dimensional features of the minifigures would, it seems likely, evoke in the viewer a concept distinct from that of attaching the figure to something else.

Breaking down the elements of the minifigures, the battle lines are drawn as follows:

1.      The parties effectively agree that the two-dimensional drawings on the face and torso are non-functional.

2.      The parties effectively agree that the studs in the base of the feet and other elements that facilitate attachment are functional.

3.      The parties disagree about whether the three-dimensional elements of the shape of the minifigures (such as the cylindrical shape of the head and the trapezoidal shape of the torso) are functional.

Lego provides a list of twelve "protectable elements" of the three-dimensional shape of the minifigures that are shared by Best-Lock's products and its own.  Opp. Memo. at 10-11.  The Certificates of Registration and Copies of Deposit for the Minifigure Copyrights (Quigley Decl. Ex. A, C) do not describe these elements verbally.  Quigley Decl. Ex. A, C.  However, as discussed more fully *infra*, the photographs in the Copies of Deposit display each of these elements.  Best-Lock does not dispute that the two sets of minifigures have these elements in common, but asserts that these similarities are "in actuality a comparison on functionality."  Reply Memo. at 6.

The potential functionality of each of these twelve elements can be considered separately. The question in each case, under *Brandir* and *Chosun*, is whether that element is dictated by utilitarian considerations or, to put it another way, whether the element could be changed without

39

affecting the functionality (*i.e.*, capacity for movement and attachment) of the minifigure.   In describing the minifigures, the Court relies primarily on the minifigures that were entered as Court Exhibits Two (Lego's minifigure) and Three (Best-Lock's minifigure) at the Hearing.   *See* Transcript of the Hearing ("Hearing Trans.") at 32-33, 64.   At the Hearing, both parties accepted Court Exhibits Two and Three as accurate representatives of their respective minifigures, and they are consistent with the appearance of the minifigures in the photographs that the parties have submitted to the Court as Geller Decl. Ex. C-4, Opp. Memo. 11-12 and Reply Decl. Ex. A.   The Court also refers at some points to the set of minifigures manufactured by Hasbro ("KRE-O minifigures") and Mega Brands ("Mega Bloks minifigures") that were presented at the Hearing and entered collectively as Court Exhibit One.

The question that *Chosun* and other precedents pose is whether each of the following elements of the minifigures is influenced "in significant measure" by functional considerations. *Chosun,* 413 F.3d at 329.

1.      *Cylindrical shape of head*.   The head of each minifigure is cylindrical in shape.   Best-Lock argues that the shapes of various body parts, including the cylindrical head, are so configured to allow the parts to be interchangeable from one figure to another figure.   Supp. Memo. at 7; Geller Decl. ¶ 5.   While the peg on top of the head is certainly intended to facilitate attachment to other blocks or figures, Best-Lock has not explained why the head must be cylindrical in shape for this purpose.

Best-Lock's counsel suggested possible functions of the cylindrical shape at the Hearing:

> MR. FABER:  Cylindrical shape serves several functions.
> Number one, it can be, for example, a tree trunk.  Number
> two, you can orient the head in any particular orientation,

should you choose.  You can rotate it around, it's cylindrical.
It doesn't look strange to have it in any particular orientation.

Hearing Trans. at 99.

To be sure, the cylindrical head of a Lego minifigure, once attached to the torso, rotates upon

the torsos.  But this does not make the cylindrical shape of head "functional," as that adjective is

used in the cited copyright cases.  The assertion that the cylindrical shape makes it possible to rotate

the head without creating a strange appearance in any orientation is unconvincing because the

minifigures have facial features painted on them.  Whatever the shape of the head, it will seem

unrealistic if it is not facing forward.  Also, equally functional heads that are not cylindrical appear

in some of the compatible Mega Bloks minifigures.  *See* Court Exhibit One; Opp. Memo. at 19-20.

The cylindrical shape is conceptually separable because it would be possible to construct a head that

is equally functional, *i.e.*, attachable, that is not cylindrical.  Because Best-Lock has not demonstrated

that the cylindrical shape is functional, the Court will take it as a "sculptural" element.

2.     *Curvature at top and bottom of head.*  Best-Lock's argument that this element is

"functional" is that "it's in the patent."  Hearing Trans. at 99.  The patent in question is U.S. Patent

No. 4,205,482, which is Exhibit G to the Quigley Declaration.  Assuming without deciding that the

patent is relevant to the separability analysis, the facts do not support this argument.  While the

curvature is shown in drawings that accompany the '482 patent, it is not one of the claimed elements

in that patent.  *See* the section of the third page of Exhibit G beginning "What is claimed is ...."

Best-Lock has provided no explanation of why this curvature is necessary to enable the

minifigures to attach to base plates or other toys or to enable movement.  Also, Court Exhibit One

reveals that the Mega Bloks minifigures function without that element.  The curvature is sculptural.

41

3.  *Cylindrical neck, which is slightly narrower than the head.*  Best-Lock's argument on this element is that "the neck cooperates with the pin on the body."  Hearing Trans. at 99-100. Even if it is necessary for the neck to be cylindrical to cooperate with the pin on the body, that does not determine the exact diameter of the neck, so that the shape of the neck is at least partly sculptural.

4.  *Trapezoidal shape of torso.*    Best-Lock makes four arguments about this element. First, the torso must be shaped as a trapezoid to connect both to the neck at the top and to the pair of legs at the bottom.  Hearing Trans. at 100.  However, all four of the Mega Bloks and KRE-O minifigures submitted as Court Exhibit One accomplish the same purpose with roughly square torsos.  *See* Court Exhibit One; Opp. Memo. at 19-20.  Second, "the shoulders would not look very attractive if you had shoulders as wide as the bottom."  *Id.*  Attractiveness to the human eye is almost the definition, the very essence, of a design consideration, as opposed to a functional consideration. Third, this shape is in the patent.  *Id.*  However, though the trapezoidal shape is visible in drawings contained in the '482 patent, it is not one of the claimed elements in that patent.  Fourth, it "enables you to make interesting tops for the top of a building."  *Id.*  However, in the hands of children, whose interests, flights of fancy, and powers of imagination are not yet constrained by the conventions and other tyrannies of adulthood, non-trapezoidal shapes could also make interesting tops for the top of a building.  The trapezoidal shape is sculptural.

5.  *Torso which is wider at the bottom and narrower at the top*.  This element is covered within Element #4.

6.  *Square, block-like set of shoulders*.  Best-Lock argues that the shoulders are square to make it easier for the user to place the pin in the arm into the hole in the body.  Hearing Trans. at

101.  However, it is not evident that the arms of the square-shouldered minifigures manufactured by Lego and Best-Lock are more easily attached than those of the round-shouldered Mega Bloks minifigures.  This element is sculptural.

      7.      *Arms extending from upper side of trunk, slightly below where shoulder starts*.  All four of the Mega Bloks and KRE-O minifigures have arms that extend from the level of the shoulders, rather than just below them, as the arms of Lego's and Best-Lock's minifigures do.  Best-Lock has not provided a reason to believe that the Mega Bloks and KRE-O minifigures are for that reason less attachable.  The slight distance from the top of the shoulder to the top of the arm is evidently sculptural.

      8.      *Arms slightly bent at the elbows*.  Best-Lock argues that the arms must be bent at the elbows because that is the logical way for the minifigure to carry something, such as a spear or gun. Hearing Trans. at 102-03.  Lego, on the other hand, observes that one of the KRE-O minifigures, depicting a member of a SWAT team, has straight arms, though members of SWAT teams presumably sometimes carry weapons.  *Id.* at 109-10; Court Exhibit One.  Moreover, the user may wish to have the minifigure perform some action with its arm other than carrying objects, such as pushing an object, which would be better suited to straight arms.  No reason has been presented why the bend at the elbows affects attachability or movement.  Thus, that element is also sculptural.

      9.      *Straight legs*.  Best-Lock asserts that the legs of the minifigures must be straight so that the user can rest the minifigures on base blocks.  Hearing Trans. at 103.  Lego has not provided any counter-argument that minifigures without straight legs can also rest on base blocks.  This element is functional.

      10.     *Square feet*.  Best-Lock asserts that square feet are necessary to enable the minifigure

to attach to the base block.  Hearing Trans. at 103-04.  It is likely true that the feet must have some shape similar to a square in order to attach to the block.  However, it is not necessary for the feet to be absolutely square, as in Lego's and Best-Lock's minifigures.  The Mega Bloks minifigures, in keeping with their overall rounded form, have feet that are rounded at the front.  *See* Court Exhibit One.  They nevertheless attach to the base plate.  Thus, the square shape of the feet is sculptural.

11.    *Size and dimensions of each of the above figures*.  Best-Lock argues that the minifigures must have these elements so that they can be used in combination with blocks and base plates.  Hearing Trans. at 104-05.  That position makes sense and Lego has not countered it.  Size is, indeed, one of the things that all of the minifigures submitted in evidence have in common.  This element is functional.

12.    *Proportions of each of those features both standing alone and in relation to the figure as a whole*.  Best-Lock argues that these proportions are necessary for the pieces to fit together.  Hearing Trans. at 104-05.  It is true that the relative proportions of the pieces of each minifigure– head, torso, and legs– are either identical or nearly identical.  It is also true that the legs, at least, must be the same size to attach horizontally (as well as vertically) to the base plate.  From this record, it is not clear whether the relative length of the head and torso could be changed without affecting attachability.  This element is at least partly functional.

Most of these elements are sculptural rather than functional.  While the size, proportions and straightness of the legs of the minifigures may not be protectable, most of the three-dimensional elements of the minifigures are.  The Minifigure Copyrights are valid at least as to those elements.

Consequently, Best-Lock has not shown that it is likely to prevail on the merits with respect to functionality.  Likewise, Best-Lock has failed to show the existence of "sufficiently serious

questions going to the merits" on this issue to make them a fair ground for litigation. Thus, it is not necessary for the Court to decide, in determining whether the first element of the test is met, whether the balance of hardships tilts decidedly in Best-Lock's favor.

### 3.    Fraud

Best-Lock also alleges that the Minifigure Copyrights are invalid because Lego, in applying for those copyrights, committed fraud on the Copyright Office. Supp. Memo. at 23-27. It alleges two failures to disclose: (1) Lego did not disclose that the material sought to be copyrighted was "functional" and thus not copyrightable; and (2) Lego did not disclose the existence of two patents, Utility Patent No. 4,205,482 and Design Patent No. 253,711, covering the same elements. *Id.*

"It is the law of this Circuit that the knowing failure to advise the Copyright Office of facts which might have occasioned the rejection of the application constitutes reason for holding the registration invalid and thus incapable of supporting an infringement action." *Whimsicality, Inc. v. Rubie's Costume Co, Inc.*, 891 F.2d 452, 456 (2d Cir. 1989) (citations and internal quotation marks omitted). "A party seeking to establish a fraud on the Copyright Office, and thereby rebut the presumption of copyright validity, bears a heavy burden ... The party asserting fraud must establish that the application for copyright registration is factually inaccurate ... that the inaccuracies were willful or deliberate, and that the Copyright Office relied on those misrepresentations." *Lennon v. Seaman*, 84 F.Supp.2d 522, 535 (S.D.N.Y. 2000).

Best-Lock has not satisfied any of these elements. First, Best-Lock has not established that the applications were factually inaccurate. Best-Lock alleges omissions rather than misstatements. Omissions can constitute fraud on the Copyright Office only if what is omitted are "facts which might have occasioned a rejection of the application." *Shady Records, Inc. v. Source Enters.*, 73

45

USPQ2d 1954, 1964 (S.D.N.Y. 2004).  The principal focus of Best-Lock's argument is the assertion that Lego failed to disclose the alleged "functionality" of elements of the minifigures.  Supp. Memo. at 24.  As noted above, most of the elements at issue are not functional.  Best-Lock has provided no reason to believe that a mention of the functionality of the minifigures' size or the square feet would have occasioned a rejection of the applications.

Best-Lock also argues that Lego failed to disclose the existence of the '482 and '711 patents, which it alleges were "preexisting works" subject to the disclosure requirement of Section 6(a) of the copyright application.  Supp. Memo. at 24.  However, the three-dimensional elements at issue were not among the matter claimed in the patents.  The features of the minifigures that were claimed in the patents are the plurality of coupling studs, the recesses in the soles of the feet for mounting the figure on the base plate, and others that Lego does not claim are sculptural.  *See* Quigley Decl. Ex. G, H.

Second,  Best-Lock has certainly not shown that the failure to mention "functionality" in the applications was willfully or deliberately inaccurate.  Even if the Court found the elements at issue to be functional, it would certainly not be so obvious that they are functional that Lego must be assumed to have known that fact.

Third, Best-Lock has not provided any evidence at all to show that the Copyright Office relied on Lego's failure to label the material "functional" rather than examining the material for functionality itself.   Best-Lock's claim of fraud on the Copyright Office is rejected.  Taking the functionality and fraud issues together, Best-Lock has not shown a likelihood of success on the merits of its claim that the Minifigure Copyrights are invalid.

### D.       Infringement

Best-Lock argues that it will also succeed on the merits because it has not infringed Lego's copyrights.  Supp. Memo. at 19-23.  It does not deny that its minifigures are very similar to Lego's minifigures.  However, Best-Lock makes four arguments to show the absence of infringement.  *Id.*

Best-Lock's first argument is that the elements at issue are not contained in Lego's copyright deposits.  Supp. Memo. at 19-20.   The deposits for the '104 and '230 copyrights are attached to the Quigley Declaration as Exhibits A and C respectively.  The first page of the '104 deposit consists of photographs, which are blurry at least in the submitted copy, of two minifigures.  However, some of the elements at issue in this action are visible in one or another of those photographs: (1) the trapezoidal torso, (2) the bent arms, (3) the square shoulders, and (4) the curvature at the top and bottom of the head.  The second page of the deposit is a relatively clear color photograph of a set of Lego's toys including a minifigure in walking position.  In that photograph, other elements at issue are visible: (1) the cylindrical head, (2) the cylindrical neck, (3) the arms extending from a point slightly below the shoulders, (4) the straight legs, and (5) the square feet.

The first page of the '230 deposit consists of a photograph of a minifigure; the photograph is so blurry, at least in this copy, that it is hard to make much of it. The second page consists of a color photograph, relatively clear, showing a set of Lego's toys, including two minifigures, one in walking position and one standing behind a toy counter.  From the walking figure, all of the elements shown in the '104 copyright are visible, except perhaps the trapezoidal shape of the torso, which is hard to judge at the angle shown.  The bent arms and placement of the beginning of the arms below the shoulders are particularly visible.  Best-Lock's first argument thus fails.

Best-Lock's second argument is that its minifigures differ from Lego's in certain respects:

47

skin color, clothing design on torso, eyeglasses, eyebrows, molded mouth, molded nose and molded eyes.  Supp. Memo. at 20.  But those are not the elements of Best-Lock's minifigures that Lego claims are infringing.  Opp. Memo. at 14 n. 2 ("features such as the skin color and clothing design painted on the figurines do not negate the similarity of the three-dimensional elements protected by the Minifigure Copyrights").

Best-Lock's third argument repeats the functionality argument.  Supp. Memo. at 20-21.  That argument adds nothing to the arguments discussed and rejected *supra*.

Best-Lock's fourth argument is that the common elements are in the public domain.  Supp. Memo. at 21-22.  It cites for this proposition the Second Circuit's opinion in *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133 (2d Cir. 2004).  In *Mattel*, the Second Circuit applied the notoriously difficult distinction between unprotectable "ideas" and protectable "particularized expressions."  The court found that the upturned nose, bow lips and widely spaced eyes of the Barbie doll were "ideas" and in the public domain.  *Id.* at 136.  However, the court of appeals also concluded that the eyes, nose and mouth of the Barbie doll were protected by Mattel's copyright:

> There are innumerable ways of making upturned noses, bow lips, and
> widely spaced eyes.  Even if the record had shown that many dolls
> possess upturned noses, bow lips, and widely spaced eyes, it would not
> follow that each such doll–assuming it was independently created and not
> copied from others–would not enjoy protection from copying.

*Id.* at 135.  The court did not explain why upturned noses, etc., are "ideas" while the Barbie doll's nose, face and mouth are "particularized expressions."  It did, however, suggest an answer to this question in a footnote.  "We see no reason to believe that Barbie's facial features are necessary to convey the idea of a young adult female fashion doll."  *Id.* at 136 n. 3.  The implication is that the idea at issue is the idea of a young adult female fashion doll, and anything more specific than that

48

is a particularized expression.  Presumably, the Second Circuit concluded that an upturned nose, bow lips and widely spaced eyes *are* necessary to convey the idea of a young adult female fashion doll.

In this case, the question is whether the existence of toys manufactured by toymakers other than Lego and Best-Lock that share some or all of the common elements establishes that those elements are in the public domain.  Among the third-party minifigures submitted to the Court as Court Exhibit One, the KRE-O minifigures share nearly all the elements at issue, the main differences being the square rather than trapezoidal torso and the shape of the arms and shoulders. Are the shared elements analogous to the Barbie doll's upturned nose, bow lips and widely spaced eyes or to its eyes, nose and mouth?

Perhaps the best analogy to the idea of a young adult female fashion doll in this instance is the idea of a minifigure that can be connected to similar toys within the studded "Lego" family. Elements as specific as the trapezoidal torso and cylindrical head are not necessary parts of this idea, as illustrated by the fact that the compatible Mega Bloks minifigures differ with respect to many of those elements.  Once the functionality argument is rejected as to most of the twelve elements discussed above, it is not clear what the difference is between the surface decorations on the face and torso, which Best-Lock concedes are "possibly protectable," Supp. Memo. at 23, and the three-dimensional elements, such as the cylindrical shape of the head, the trapezoidal shape of the torso, and the square shape of the shoulders.  The main difference is that the former are two-dimensional, while the latter are three-dimensional.  But that difference cannot constitute the difference between idea and expression.  Thus, this argument also does not suffice to show the absence of infringement.

Because Best-Lock's arguments on the subject of infringement are unavailing, it has failed to establish a likelihood of success on the merits or "sufficiently serious questions" about the merits

49

on this subject.

**E.    CUTPA Claim**

Finally, Best-Lock argues that Lego's CUTPA claim is wholly unsupported and subject to dismissal.  Supp. Memo. at 27.  However, the Court does not need to address that issue in this Ruling.  Because Best-Lock has not shown a likelihood of success on the merits of the copyright claim, it does not have the overall likelihood of success on the merits of this action that would support a preliminary injunction.

**IV.    Irreparable Injury**

Best-Lock argues that it will suffer injury that cannot be redressed by money damages if the injunction is not granted, because the uncertain delivery of its minifigures will destroy its goodwill with its customers.  Supp. Memo. at 27-28.  Loss of goodwill with customers as a result of interruption of deliveries may constitute irreparable injury supporting an injunction.  *Country Fare LLC v. Lucerne Farms*, No. 3:11cv822, 2011 WL 2222315, at *4 (D.Conn. June 7, 2011).  This is the case because it is generally difficult for a court to quantify such losses for the purpose of awarding money damages.  *Id.*

Lego, however, points to the six-month delay between the time when CBP started to seize Best-Lock's products and the time Best-Lock filed its motion for a preliminary injunction.  Opp. Memo. at 36.  Such a delay may, standing alone, preclude the granting of preliminary injunctive relief, because "failure to act sooner undercuts the urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."  *Tough Traveler, Ltd. v. Outbound Prods.,* 60 F.3d 964, 969 (2d Cir. 1995), *quoting Citibank, N.A. v. Cititrust*, 756 F.2d 273, 277 (2d Cir. 1985).  In deciding whether delay defeated the presumption of irreparable injury from

50

infringement, a context similar though not identical to the present context, the Second Circuit found a delay of ten weeks too long where it was unexplained, *Citibank* at 276-77, but found delays of five and six months not too long where the movant was actively dealing with the problem in the meantime.  *Fisher-Price Inc. v. Well-made Toy Mfg. Corp.*, 25 F.3d 119, 125 (2d Cir. 1994) (five months); *Weight Watchers Intern. v. Luigino's, Inc.*, 423 F.3d 137, 144-45 (2d Cir. 2005) (six months).

Here, Best-Lock asserts, and Lego does not deny, the following facts:

– Best-Lock first learned that CBP had seized a shipment of its products shortly after July 14, 2011.  Geller Decl. ¶ 16.

– Seizures have continued since that time.  *Id.*

– By letter dated August 10, 2011, Best-Lock asked CBP to "issue the seizure notice immediately so that we may begin meaningful discussions with your office and/or the Intellectual Property Branch at CBP Headquarters in Washington regarding the prompt release of the instant merchandise and the revision of CBP's Intellectual Property Rights Recordation (IPRR) database to avoid unwarranted inconvenience to Best-Lock and its customers."  Desiderio Decl. Ex. M at 2.

– By letter dated September 28, 2011, Best-Lock's counsel demanded that Lego issue a written statement stating, in effect, that there is no infringement and no justification for seizures of Best-Lock's products.  *Id.* Ex. N.

– By letter dated October 14, 2011, Lego's counsel told Best-Lock's counsel that it would not do so.  *Id.* Ex. O.

– Further correspondence between the parties followed in November 2011.  *Id.* Ex. S, T.

– By letter dated January 19, 2012, CBP denied Best-Lock's petition.  *Id.* Ex. P.

51

– On February 6, 2012, Best-Lock filed the present Motion.

While the fact that Best-Lock did not turn to a preliminary injunction as a means of preventing the seizures for roughly six months suggests that this is not a particularly powerful case of irreparable injury, Best-Lock has not been inactive over that period.   The Court finds that Best-Lock has satisfied the "irreparable injury" requirement.

## V.      Balance of Hardships

As noted above, the Court must also consider the balance of hardships and issue the injunction only if the balance tips in the movant's favor.   *See Salinger v. Colting*, 607 F.3d 68, 77, 80 (2d Cir. 2010).   Both parties face hardships: Best-Lock faces a potential loss of the goodwill of its customers, Supp. Memo. at 30, while Lego faces loss of business and potential damage from customer confusion, Opp. Memo. at 37-40.   However, while Best-Lock has been suffering its hardship for six months, it seems likely (depending upon a further development of the facts, *see* Part III.B., *supra*) that Lego has been suffering a comparable hardship for thirteen years without, until recently, feeling the need to address it through litigation.   If Best-Lock's delay undercuts its claim about the degree of its hardship, as Lego suggests, Opp. Memo. at 36, Lego's delay undercuts its claim about the degree of its hardship to a greater extent.   The balance tips, however lightly, in Best-Lock's favor.

## VI.     Public Interest

Under the *eBay/Salinger* test, the court finally "must ensure that the public interest would not be disserved by the issuance of a preliminary injunction."   *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010).   The Second Circuit observed in *Salinger* that in the past it has rarely considered the public's interest before deciding whether an injunction should issue.   *Id.* at 79 n. 8 (2d Cir. 2010).

Both parties agree that the public interest factor favors whichever party has shown a likelihood of success on the merits.  Supp. Memo. at 31; Opp. Memo. at 38.  In the similar "Pillow Pets" case, the court essentially agreed: Having found that the plaintiff was likely to prevail on the merits, it held that the public interest favored the plaintiff's position.  *CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F.Supp.2d 127, 146 (E.D.N.Y. 2011).  "[T]here exists a strong policy in favor of enforcing copyrights."  *Id.*  Here, as in *CJ Products*, Lego is likely to prevail on the merits and the public interest favors enforcing their copyrights.  Nor can the Court conclude, from the present record, that CBP is incorrect in its judgment that the seizures serve the public interest.  On balance the public interest would be disserved by issuance of the requested injunction.

## VII.    Conclusion

Best-Lock has satisfied only two of the elements of the test for a preliminary injunction, the requirement of irreparable injury and the required showing with respect to the balance of hardships. Most importantly, Best-Lock has failed to satisfy the requirement that it show a likelihood of success with respect to questions of fact and law upon which Best-Lock's entitlement to injunctive relief depends.  Consequently, Best-Lock's motion for a preliminary injunction [Doc. 37] is DENIED, without prejudice to renewal if further discovery demonstrates grounds for doing so.

As noted during the course of this Ruling, Lego included in its complaint, filed on October 14, 2011, a prayer for a preliminary and permanent injunction against Best-Lock.  Lego has not moved for an Order of injunction or a hearing for that purpose.  The motion addressed by the Hearing and this Ruling is that of Best-Lock for the injunction it seeks.  Given the overall nature of the case, Lego's prayer for an injunction against Best-Lock, and Best-Lock's prayer for an injunction against Lego, mirror each other.  In facts and law, these two prayers for equitable relief – one brought

forward by motion, the other lying dormant in the procedural sense – are the two sides of the same coin.

In these circumstances, the Court deems Lego's submissions to date to be the functional equivalent of a motion for the preliminary injunction Lego prays for in its Complaint.  This procedural *legerdemain* has the advantage of recognizing the present posture of the case for what it is: cross-motions for preliminary injunctions arising out of the same nexus of facts, with the granting of one motion precluding granting the other.

For the reasons stated in this Ruling, the present record is insufficient to allow full consideration of Best-Lock's motion for a preliminary injunction.  That is equally true of what is now deemed by the Court to be Lego's cross-motion.  This Ruling provides specifically for discovery into Lego's possible laches: a question common to both motions.  However, the purpose and intent of this Ruling is to have both parties engage in such discovery on all issues and questions presented by the cross-motions as to allow the Court, at the end of the discovery process, to make a fully informed decision.  Whether the completion of discovery will be followed by an evidentiary hearing before the Court remains to be seen.  Certainly, there will be further oral argument by counsel, preceded by a further round of briefs.

The parties are directed to proceed forthwith with discovery consistent with this Ruling. Counsel are directed to confer with each other, and to send letters to the Court, with copies to each other, setting forth an outline of intended discovery and when counsel believe that discovery can be concluded.

It is the Court's preliminary view that discovery should be completed by August 17,  2012.

The Court should receive these letters from counsel no later than July 18, 2012.  Depending on their

content, the Court may arrange a status conference with counsel.

It is SO ORDERED.
Dated: New Haven, Connecticut
July 11, 2012

　　　　　　　　　　　　　　　　　　/s/ Charles S. Haight, Jr.　　　　　　　
　　　　　　　　　　　　　　　　　Charles S. Haight, Jr.
　　　　　　　　　　　　　　　　　Senior United States District Judge

55