LEGO A/S and LEGO SYSTEMS, INC.,

        Plaintiffs,

 v.

BEST-LOCK CONSTRUCTION TOYS, INC.,
and BEST-LOCK LIMITED, HONG-KONG,

        Defendants.

3:11-cv-01586 (CSH)

BEST-LOCK CONSTRUCTION TOYS, INC.,
BEST-LOCK LIMITED, HONG-KONG, and
BEST-LOCK GROUP LIMITED,

        Counterclaim Plaintiffs,
v.

LEGO A/S and LEGO SYSTEMS, INC.,

        Counterclaim Defendants.

**July 25, 2019**

## RULING ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**HAIGHT, Senior District Judge:**

Plaintiffs LEGO A/S and Lego Systems, Inc. (collectively, "Lego" or "Plaintiffs") brought

this action against Defendants Best-Lock Construction Toys, Inc. and Best-Lock Limited, Hong

Kong (collectively, "Best-Lock" or "Defendants"), principally alleging that Best-Lock is producing

and selling figurines that infringe on Lego's copyrighted minifigure design. Before the Court are

cross-motions for summary judgment: Plaintiffs' motion for summary judgment on their claim for

copyright infringement as well as several of Defendants' affirmative defenses and counterclaims, and Defendants' cross-motion for summary judgment on Plaintiffs' claim of copyright infringement.

For the reasons discussed below, Plaintiffs' motion for summary judgment is granted in part but denied as to Defendants' affirmative defense of equitable estoppel. Defendants' motion for summary judgment is denied.

## I.    BACKGROUND[1]

Lego has manufactured "minifigure" figurines – small, three-dimensional toys depicting people – since 1978 ("Lego minifigures"). Doc. 43-1 ¶ 4. Lego minifigures are designed so that a user can disassemble them and attach them to other figurines or studded blocks produced by Lego. Each Lego minifigure may vary in its two-dimensional representation of clothing and facial features, but has the same basic shape, including "'(1) cylindrical shape of head, (2) curvature at the top and bottom of head, (3) cylindrical neck, which is slightly narrower than the head, (4) trapezoidal shape or [sic] torso, (5) torso which is wider at the bottom and narrower at the top, (6) square, block-like set of shoulders, (7) arms extending from upper side of trunk, slightly below where shoulder starts, (8) arms slightly bent at the elbows, and (9) square feet.'" Doc. 164-2 ("BL MSJ SOF") ¶ 13 (quoting Doc. 131 at 11).

---

[1] Familiarity is assumed with the Court's prior decisions in this matter, reported at: 874 F. Supp. 2d 75 (2012) (ruling on the parties' cross-motions for preliminary injunctions); 886 F. Supp. 2d 65 (2012) (ruling on Lego's motion to amend its complaint); 2012 WL 6156129 (ruling on the parties' requests for a protective order); 2013 WL 1611462 (ruling on the motion for reconsideration of the ruling on the protective order); 319 F.R.D. 440 (2017) (ruling on Defendants' motion to dismiss and on Plaintiffs' motion for reconsideration of the Court's Order staying its motion for partial summary judgment); and 2017 WL 6540268 (denying Defendants' motion to defer consideration of Lego's motion for partial summary judgment).

As Lego became increasingly successful, a number of companies began manufacturing similar looking toys capable of attachment to Lego's minifigures and studded blocks. Doc. 37-2 ("Geller Decl. I") ¶ 13.[2] Many of these competitors are still operational and have expanded to international, multimillion dollar businesses, including Mega Bloks, Cobi S.A., Kre-O, and the Defendants in the present litigation, Best-Lock. *Id.* ¶ 11. Best-Lock was founded in 1997, and has been selling its own minifigures (the "Best-Lock minifigures") in the United States since 1998. Geller Decl. I ¶ 3. These minifigures are also designed to be disassembled and attached to other figurines and studded blocks – including minifigures and studded blocks produced by Lego. *Id.* ¶¶ 4, 5, 13. Best-Lock has advertised the "well known interchangeability of Best-Lock figures and their body parts with Lego's." Doc. 132 ("Lego MSJ SOF") ¶ 5. Best-Lock's minifigures are the same size as Lego's, and also have cylindrical heads, cylindrical necks, trapezoidal torsos, bent arms, hooked hands, and square, block-like feet. The Best-Lock minifigures, however, may differ in their surface adornments, including color, facial features, hairstyles, or clothing, from Lego minifigures. Doc. 52-1 ("Geller Decl. II") ¶ 3. For example, unlike Lego's minifigures, Best-Lock's minifigures have molded noses, molded mouths, and molded eyes. Geller Decl. I ¶ 7. As of February 2012, Best-Lock estimated that it had sold product sets containing more than 18 million Best-Lock minifigures in the United States. Geller Decl. I ¶ 12. These product sales have generated over $50 million in revenues from more than 50,000 stores throughout the country, including major retailers such as Wal-Mart, Sears, Target, FAO Schwartz, Amazon, Walgreens, Family Dollar, and K-Mart.

---

[2] The reference is to Torsten Geller, the CEO and founder of Best-Lock, who has sworn to four declarations in the record, designated "Geller Decl. I," "Geller Decl. II," "Geller Decl. III," and "Geller Decl. IV."

*Id.* ¶¶ 8, 12.  Lego minifigures are sold in many of the same stores.  *Id.*  Best-Lock and Lego have also appeared in many of the same trade publications and trade shows.  Geller Decl. I ¶ 14.

Historically, Lego's minifigures were protected by a design patent[3] and a utility patent,[4] which were issued in 1979 and 1980, respectively.  BL MSJ SOF ¶¶ 1-2.  In January 1994, approximately one month after the design patent expired and three years before the utility patent was set to expire, Lego's predecessor, Interlego A/G ("Interlego") filed two applications with the United States Copyright Office (the "Copyright Office") to protect its minifigures: Registration No. VA0000655104 (the "'104 Copyright"), titled "Basic Minifigures," and Registration No. VA0000655230 (the "'230 Copyright"), titled "Figure With Brown Hair" (collectively, the "Asserted Copyrights").  *See* Doc. 164-4 ("BL MSJ Ex. B"); Doc. 164-5 ("BL MSJ Ex. C").  Both were registered by the Copyright Office, effective as of January 21, 1994.  *See* BL MSJ Exs. B & C.  The '104 Copyright registration stated that the work was first published in 1978, and did not represent that the work was a "derivative work."  *See* BL MSJ Ex. B.  The '230 Copyright registration stated that the work was first published in 1979, and represented that it was a "derivative work" incorporating preexisting "leg, face, and torso design," with newly added "hair decoration."  *See* BL MSJ Ex. C.  The Asserted Copyrights were subsequently assigned to Lego from Interlego in 2007.  Doc. 132-2 ("Hecht Decl.") ¶ 4, Ex. 1.[5]

---

[3]  United States Design Patent No. D253,711 (the "'711 Patent").

[4]  United States Utility Patent No. 4,205,482 (the "'482 Patent").

[5]  The parties dispute Lego's affixation of a copyright notice to the Lego minifigures:  while Lego contends that the Lego Minifigure figurines "have continuously included a copyright notice in the plastic" since at least as early as 1998, Hecht Decl. ¶ 8, Best-Lock CEO Torsten Geller has submitted an affidavit stating that he did "not recall ever seeing a copyright notice on Lego's minifigures,"  Geller Decl. II ¶ 9.  He also attached a photograph depicting the lower half of two Lego minifigures that do not appear to display a copyright notice, and stated that he "did not locate

Lego representatives and Best-Lock representatives have interacted frequently at various toy shows.[6] Prior to filing this suit, no Lego representative had contacted any principal of Best-Lock to express copyright-related concerns or otherwise voice an objection concerning the design or configuration of Best-Lock products in the United States. Lego MSJ SOF ¶¶ 9-10. Nor had Lego ever threatened or initiated litigation against Best-Lock in the United States prior to this lawsuit. Geller Decl. II ¶ 12. Outside of the United States, though, the relationship between the parties prior to 2011 was considerably more fraught. Geller stated that "since 1998, outside the United States, I do not recall there being a single year when Best-Lock and Lego's lawyers have not been involved in litigation or threats of litigation concerning Best-Lock's products." *Id.* ¶ 11 (emphasis in original). Indeed, Lego has commenced or threatened litigation concerning the "designs of some of the elements of Best-Lock's product sets" in the UK, Belgium, Canada, Austria, and Germany. *Id.* ¶ 13; Doc. 180 ("Geller Decl. IV") ¶ 5; Geller Decl. IV, Ex. A. However, Lego had never previously claimed that its minifigures were infringed by Best-Lock. Geller Decl. II ¶ 13; Geller Decl. I ¶ 21.

On or about July 14, 2011, U.S. Customs and Border Protection (CBP) carried out the first of a series of seizures of shipments from abroad of Best-Lock's toy blocks and minifigures. *Id.* ¶ 16.

---

a copyright notice on any other part of these minifigures." *Id.*; *id.*, Ex. E.

[6] Geller cites the following examples of his interactions with Lego representatives. On February 2, 1999, Hanne Stenger Thompson from Lego's Legal Department, Product Infringement and Patents for the Lego Foundation, visited Best-Lock's exhibition stand at the International Nuremberg Toy Fair in Germany and gave Best-Lock CEO Torsten Geller her business card. Geller Decl. III ¶ 6. Geller also met Lego corporate counsel Henrik G. Jacobson and Lego attorney Peter Strandgaard at the 2002 International Nuremberg Toy Fair, and Lego executive Mads Nipper during multiple years of the International Nuremberg Toy Fair. *Id.* ¶¶ 7-8. He met Lego president and CEO Kjeld Kirk Kristiansen at a toy fair in 1998, and received business cards from Lego personnel Mike Ganderton, Anne R. Boye-Meller, and Lene Bjerregaard Bonde at other toy fairs. *Id.* ¶¶ 9-10. Geller alleges that Best-Lock "always exhibited toy sets and models that contained and showed Best-Lock's minifigures" at these toy fairs. *Id.* ¶ 11.

CBP sent Best-Lock's counsel a letter dated August 17, 2011, in which it asserted that it was carrying out the seizures because the minifigures infringed the '104 Copyright. Hecht Decl., Ex. L. Lego had not previously attempted to stop Best-Lock's sale of its blocks and figures in the United States, and had not issued any warning or given Best-Lock any notice that it believed Best-Lock's minifigures infringed any Lego copyrights. Geller Decl. I ¶ 21. Best-Lock petitioned CBP to cease the seizures, and requested that Lego assist in doing so, to no avail. *See* Geller Decl. II ¶¶ 18, 20; Doc. 37-25.

Three months later, on October 14, 2011, Lego filed the present action alleging, *inter alia*, that Best-Lock infringed the Asserted Copyrights in violation of 17 U.S.C. § 101, *et seq.*, by producing and selling the Best-Lock minifigures. *See* Doc. 84 (Second Amended Complaint). Lego also asserted claims against Best-Lock for defamation and violation of the Connecticut Unfair Trade Practices Act ("CUPTA"), Conn. Gen. Stat. § 42-110a, *et seq. See id.* Lego seeks to enjoin and restrain Best-Lock from manufacturing or selling its minifigures, and asserts claims for actual damages sustained due to the alleged infringement. *See id.* at 10-11.

In response, Best-Lock asserted affirmative defenses and counterclaims, claiming, *inter alia*, that: (1) the Asserted Copyrights are invalid and unenforceable; (2) Best-Lock is entitled to a declaratory judgment that the sale of Best-Lock's minifigures does not infringe on the Asserted Copyrights; and (3) Best-Lock is entitled to an injunction requiring Lego to consent to the importation and delivery of Best-Lock's goods in the United States. *See* Doc. 86 ("Am. Answer").

The case is now before the Court on cross-motions for partial summary judgment. Lego moves for summary judgment on its copyright infringement claim, as well as summary judgment on many of Best-Lock's affirmative defenses and counterclaims. *See* Doc. 131. Best-Lock resists

those motions, and cross-moves for summary judgment on Lego's claim for copyright infringement. *See* Doc. 164.

## II.    STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact" and "the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 533 (2d Cir. 2016). "[A] fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Put differently, the court must determine whether the evidence can reasonably support a verdict in the moving party's favor. *See James v. New York Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000). In assessing a motion for summary judgment, a court must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party. *Rogoz v. City of Hartford*, 796 F.3d 236, 245-46 (2d Cir. 2015). However, "[m]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996) (citing *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990)).

The moving party bears the initial burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986); *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013). "Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense — on which the defendant bears the burden of proof at trial — a plaintiff 'may satisfy its Rule 56

burden by showing that there is an absence of evidence to support [an essential element of] the [non-moving party's] case.'" *Fed. Deposit Ins. Corp. v. Giammettei*, 34 F.3d 51, 54-5 (2d Cir. 1994) (quoting *DiCola v. SwissRe Holding* (*North America*), *Inc.*, 996 F.2d 30, 32 (2d Cir. 1993). If the movant is able to satisfy its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). The nonmoving party "may not rely solely on 'the allegations of the pleadings, or on conclusory statements, or on mere assertions that affidavits supporting the motion for summary judgment are not credible.'" *Robertson v. Wells Fargo Bank*, *N.A.*, No. 3:14-cv-01861, 2017 WL 326317, at *7 (D. Conn. Jan. 23, 2017) (quoting *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)). Rather, it must present significant probative evidence from the record to establish the absence of a genuine dispute. *Marczeski v. Gavitt*, 354 F. Supp. 2d 190, 193 (D. Conn. 2005) (citing *Celotex Corp.*, 477 U.S. at 327).[7]

## III.   DISCUSSION

Pending before the Court are cross-motions for summary judgment. Lego seeks judgment as to liability on Count I of its Second Amended Complaint for copyright infringement. *See* Doc. 131 ("Lego MSJ Br.") at 4-12. Lego claims that it holds certain valid copyrights that cover the sculpture of its minifigures; that Best-Lock has copied the protectable elements of the minifigures; and that such copying is illegal, in that there is a substantial similarity between Best-Lock's figures

---

[7] This standard applies uniformly where, as here, the Court is presented with cross-motions for summary judgment. *Larsen v. Prudential Ins. Co. of Am.*, 151 F. Supp. 2d 167, 171 (D. Conn. 2001) (citing *Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir. 1988)). "The movant's burden does not shift when cross-motions for summary judgment are before the Court. Rather, each motion must be judged on its own merits." *Id.* (citing *Ass'n of Int'l Auto. Mfrs., Inc. v. Abrams*, 84 F.3d 602, 611 (2d Cir. 1996)).

and the protectable elements of Lego's minifigures. *See id.* at 11-18. Lego also asserts that it is entitled to summary judgment dismissing Best-Lock's affirmative defenses of invalidity, laches, and equitable estoppel, as well as summary judgment on several of Best-Lock's related counterclaims, which assert the invalidity of the copyrights, non-infringement of the copyrights, and fraud. *See id.* at 12-35. Best-Lock subsequently filed its own motion for partial summary judgment on Lego's claim for copyright infringement. *See* Doc. 164.

A copyright provides for the exclusive right "to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). Anyone who violates any of those exclusive rights is an infringer of the copyright of the author, and the legal or beneficial owner of the exclusive right is entitled to sue for infringement under 17 U.S.C. § 501(a)-(b). To establish copyright infringement, a plaintiff must show: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *see also Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011).

For the following reasons, the Court concludes that on the evidentiary record, there is no genuine dispute that Plaintiffs satisfy both elements of the *Feist* test. That is to say: Lego is entitled to summary judgment that it owned valid copyrights in the Lego minifigures, and Best-Lock copied the original constituent elements of the copyrighted minifigures. However, genuine issues of material fact preclude summary judgment in Lego's favor on Best-Lock's affirmative defense of equitable estoppel, which, if sustained, would bar Lego's claim for infringement.

I consider these several issues in order.

## A.    Lego's Ownership of a Valid Copyright

The first part of the *Feist* test asks whether Lego owns a valid copyright in the Minifigures. The gravamen of Defendants' argument is that the Asserted Copyrights are invalid for four reasons: (1) they cover the same subject matter as previously issued patents, in contravention of a then-existing statute; (2) the elements in question are functional; (3) the underlying applications for the Asserted Copyrights fraudulently failed to disclose that the material seeking copyright protection was functional and that patents covered the same subject matter; and (4) the registration of the '104 Copyright asserts copyrights in a collection, but the work does not qualify as a published collection pursuant to Copyright Office regulations.  Defendants also argue that Lego has failed to prove ownership of the Asserted Copyrights.

None of these claims has merit.  Plaintiffs are therefore entitled to summary judgment dismissing Defendants' fifth affirmative defense (invalidity of copyright), sixth affirmative defense (invalidity due to fraud), first counterclaim (invalidity due to functionality), third counterclaim (fraud), and the denial of Defendants' cross-motion for summary judgment.  The Court also grants summary judgment for the Plaintiffs on the issue of ownership of a valid copyright.

### 1.    Presumption of Validity

As a threshold matter, the parties dispute whether Lego is entitled to a presumption of validity based on the certificates of registration assigned to the Asserted Copyright.

The Copyright Act provides that a certificate of a registration "shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."  17 U.S.C. § 410(c).  This presumption "orders the burdens of proof," relieving a purported copyright owner of any duty "'in the first instance to prove all of the multitude of facts that underline the validity of the

copyright unless the [alleged infringer], by effectively challenging them, shifts the burden of doing so to the [purported owner].'" *Carol Barnhart Inc. v. Econ. Cover Corp.*, 773 F.2d 411, 414 (2d Cir. 1985) (quoting H. REP. NO. 1476, 94th Cong., 2d Sess. 157).[8] The provision also establishes a time limit for entitlement to the statutory presumption of validity: the certificate of registration must have been made "before or within five years after first publication of the [registered] work." 17 U.S.C. § 410(c); *see also Telerate Sys., Inc. v. Caro*, 689 F. Supp. 221, 227 (S.D.N.Y. 1988) ("The 1976 Act added the five-year requirement because 'the longer the lapse of time between publication and registration the less likely to be reliable are the facts stated in the certificate.'" (citation omitted)).

Lego's Asserted Copyrights were not registered within five years of first publication of the underlying minifigures.[9] Defendants are therefore correct that Lego is not entitled to a statutory presumption of validity. But the Court's analysis does not end there. For registrations made more than five years after first publication of the work, the "evidentiary weight to be accorded the certificate . . . shall be within the discretion of the court." 17 U.S.C. § 410(c). "Most courts conclude that untimely certificates [of registration] constitute prima facie evidence." *Brighton Collectibles, Inc. v. RK Tex. Leather Mfg.*, No. 10-CV-419-GPC (WVG), 2012 WL 6553403, at *3 (S.D. Cal. Dec. 13, 2012); *see also Graphic Design Mktg., Inc. v. Xtreme Enters., Inc.*, 772 F. Supp. 2d 1029, 1033 (E.D. Wis. 2011) ("While [plaintiff] obtained Certificate of Registration VA

---

[8] The presumption of validity may be rebutted by "other evidence in the record [that] casts doubt on the question." *Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997) (citation omitted). This includes evidence that the work at issue was copied from the public domain, or that the work is a non-copyrightable utilitarian article. *Id.*

[9] On its applications for the Asserted Copyrights, Lego stated that the '104 Copyright was first published in 1978 and the '230 Copyright was first published in 1979—approximately fifteen years before Lego applied for copyright protection in 1994. *See* BL MSJ Exs. B & C.

1-750-576 more than five years after first publication, courts typically extend the presumption to later obtained registrations."), *adhered to*, 2011 WL 534337 (E.D. Wis. Feb. 8, 2011).

Best-Lock has not offered any evidence tending to show that the certificates of registration provided by Lego are invalid or otherwise unreliable, nor does it proffer evidence challenging Lego's ownership of the copyrights in the minifigures covered by those registrations. The Court therefore, in its discretion, holds that these registrations give rise to a rebuttable presumption that Lego owns valid copyrights in the Lego minifigures. That presumption of validity is grounded in the clear weight of authority. *See, e.g.*, *Stern v. Lavender*, 319 F. Supp. 3d 650, 671 (S.D.N.Y. 2018) (treating as prima facie evidence of copyright validity a registration made twenty-one years after first publication); *CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 143 (E.D.N.Y. 2011) (treating registration certificates issued more than five years after first publication as prima facie evidence of copyright validity "[i]n light of the totality of admissible evidence presented on this motion for preliminary injunction" (internal quotation marks and citation omitted)); *Yurman Design, Inc. v. Golden Treasure Imps., Inc.*, 275 F. Supp. 2d 506, 515-16 (S.D.N.Y. 2003) (certificates of registration issued more than five years after works were first published were prima facie evidence of valid copyrights, because defendants did not come forward with any evidence that "would raise any question as to the validity of the copyrights covered by the registration certificates"); *Michael Grecco Photography, Inc. v. Everett Collection, Inc.*, 589 F. Supp. 2d 375, 382 (S.D.N.Y. 2008) (certificates of registration issued more than five years after publication constituted prima facie evidence of valid copyrights because defendants did not offer "any evidence tending to show that the certificates of registration" were invalid or that plaintiff did not in fact own the copyrights); *Telerate Sys.*, 689 F. Supp. at 227 n.7 ("Even if the certificate were . . . issued more than five years

after the actual date of first publication, the court would be inclined to give the certificate the weight of prima facie evidence, as permitted under Section 410(c)."); *Brighton Collectibles*, 2012 WL 6553403, at *3 (treating as prima facie evidence of copyright validity a registration made more than thirteen years after first publication); *Graphic Design*, 772 F. Supp. 2d at 1033 (treating as prima facie evidence of copyright validity a registration made ten years after first publication).

### 2. Invalidity Due to Patents on the Same Subject Matter

The Court must next determine whether Best-Lock has come forward with sufficient evidence to rebut the presumption (adopted for the foregoing reasons) that Lego owned valid copyrights in the minifigures.

In its motion for summary judgment, Best-Lock argues that the Asserted Copyrights are rendered invalid by Lego's patents on the same minifigures. *See* Doc. 164-1 ("BL MSJ Br."). The existence of those patents, Best-Lock asserts, means that the registrations for the Asserted Copyrights should not have issued in the first instance, and Lego should not have been permitted to file suit for infringement.

Between 1956 and 1995, United States Copyright Office Rule 37 C.F.R. § 202.10 directed, in relevant part, that:

> The potential availability of protection under the design patent law will not affect the registrability of a work of art, but *a copyright claim in a patented design or in the drawings or photographs in a patent application will not be registered after the patent has been issued.*

37 C.F.R. § 202.10(b) (1956) (emphasis added).[10]

---

[10] Between 1956 and 1995, the section was re-numbered from (b) to (a) and the phrase "work of art" was changed to "pictorial, graphic, or sculptural work." *See* 46 Fed. Reg. 33248; 43 Fed. Reg. 966. The relevant substance of the section, however, has remained consistent.

The Rule was revised effective April 24, 1995, however, and now explicitly provides that the existence of a patent on a work does *not* affect its eligibility for copyright protection. *See* 37 C.F.R. § 202.10(a), as amended by 60 Fed. Reg. 15605, 15606 (Mar. 24, 1995) ("The availability of protection or grant of protection under the law for a utility or design patent will not affect the registrability of a claim in an original work of pictorial, graphic, or sculptural authorship.").

It is undisputed that when the minifigure copyright applications were filed on January 21, 1994, the previous version of 37 C.F.R. § 202.10 was in effect. It is also undisputed that the minifigure copyrights covered the same subject matter as the minifigure patents. *See* Doc. 171 at 9-10. But those facts alone do not compel the conclusion that Lego's Asserted Copyright registrations are invalid.

Copyright registration is generally a prerequisite to bringing a civil copyright infringement action. The subject is governed by the Copyright Act, which provides in 17 U.S.C. § 411(a) that, with some exceptions not relevant here, "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title." Registration is a straightforward process. It requires delivery of only three items to the Copyright Office: a brief, two-page application, deposit copies of the work, and a filing fee. *See* 17 U.S.C. § 408(a). The Copyright Office then "typically registers about 99 percent of the claims submitted to it." 2 NIMMER ON COPYRIGHT § 7.16 (citing Brief for the United States as *Amicus Curiae Supporting Vacatur & Remand, Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 2009 WL 1601031, at *4 n.2 (2010)).

Consistent with that permissive approach to registration, the Prioritizing Resources and Organization for Intellectual Property Act of 2008 (the "PRO IP Act"), which amended the Copyright Act, provides in 17 U.S.C. §411(b)(1):

> A certificate of registration satisfies the requirements of [section 411] and section 412, *regardless of whether the certificate contains any inaccurate information*, unless –
>
> > (A)    the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and
> >
> >  (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.

17 U.S.C. §411(b)(1) (emphasis added).  § 411(b)(2) further instructs that:

> In any case in which inaccurate information described under paragraph (1) is alleged, the court shall request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration.

17 U.S.C. §411(b)(2).

The PRO IP Act codified an approach that was already well-established within the Second Circuit.  In *Eckes v. Card Prices Update*, 736 F.2d 859, 861-62 (2d Cir. 1984),  the Second Circuit foreshadowed the language of the PRO IP Act in holding that "[o]nly the 'knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitute[s] reason for holding the registration invalid, and thus incapable of supporting an infringement action....'" (citing and quoting *Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc.*, 482 F. Supp. 980, 988 (S.D.N.Y. 1980)).  Subsequent decisions in this Circuit have consistently followed the same approach.  *See Klauber Bros. v. Target Corp.*, No. 14 CIV. 2125, 2015 WL 4393091, at *2 (S.D.N.Y. July 16, 2015) ("[W]here a plaintiff fails to disclose facts to the Copyright Office, a

copyright may not be invalidated unless (1) the failure was knowing and willful, and (2) the omitted information might have caused the Copyright Office to reject the registration."); *Dynamic Sols., Inc. v. Planning & Control, Inc*., 646 F. Supp. 1329, 1341 (S.D.N.Y. 1986) ("Errors on the registration application do not affect plaintiff's right to sue for infringement unless they are knowing and might have caused the Copyright Office to reject the application.").

Best-Lock attempts to circumvent the PRO IP Act and *Eckes* by relying heavily on a single case from the Southern District of New York, *Family Dollar Stores, Inc. v. United Fabrics Int'l, Inc*., 896 F. Supp. 2d 223 (S.D.N.Y. 2012). In *Family Dollar*, plaintiff registered a collection of fabric designs as unpublished that, in fact, included 13 previously-published designs. *Id.* at 225. In holding the copyright registration invalid, the court concluded that a "showing of fraud" is required to invalidate a copyright registration "only where a party seeks to invalidate a copyright based on simple technical errors in a registration application." *Id.* at 231. "The fraud requirement does not come into play when material omissions or errors were made in the registration application." *Id.* The court also stated that the PRO IP Act, 17 U.S.C. § 411(b)(1), did not apply at all because the inaccuracy was material. *Id.* at 233 (the PRO IP Act "solely concerns technical and minor errors with copyright registrations").

Three subsequent decisions in this Circuit have explicitly rejected the holding in *Family Dollar*. *See Sohm v. Scholastic Inc.*, No. 16-CV-7098 (JPO), 2018 WL 1605214, at *7 (S.D.N.Y. Mar. 29, 2018); *Archie MD, Inc. v. Elsevier, Inc*., 261 F. Supp. 3d 512, 518-20 (S.D.N.Y. 2017); *Palmer/Kane LLC v. Gareth Stevens Publ'g* ("*Palmer II*"), No. 1:15-CV-7404-GHW, 2017 WL 3973957, at *14 (S.D.N.Y. Sept. 7, 2017). These cases have reasoned that "the *Family Dollar* approach, which turns on a purported distinction between 'material' and 'technical' errors, is

'inconsistent with the clear language of the statute.'" *Sohm*, 2018 WL 1605214, at *7 (citing *Palmer II*, 2017 WL 3973957, at *14). As Judge Rakoff explained in *Archie MD*:

> *Family Dollar*'s conclusion, that the PRO IP Act did not apply because the error in question would have caused the Copyright Office to refuse registration, is hard to square with § 411(b)(1). Family Dollar finds that the condition in clause (B), *i.e.*, the materiality of the inaccuracy, is satisfied, but then takes that conclusion to entail that the condition in clause (A), *i.e.*, the knowledge of the inaccuracy, is irrelevant. But Section 411(b) (1) presents a conjunctive test: both conditions must be satisfied in order for an inaccuracy in a registration to defeat a claim.

261 F. Supp. 3d at 518-19. Judge Rakoff concluded that "in order to comply with the clear directive in § 411(b)(1), a copyright infringement claim should not be dismissed on account of inaccurate information that was inadvertently included in the copyright registration, whether or not the inaccurate information is material." *Id.*

*Palmer/Kane LLC v. Gareth Stevens Publ'g* ("*Palmer I*"), No. 1:15-CV-7404-GHW, 2016 WL 6238612, at *4 n.2 (S.D.N.Y. Oct. 24, 2016)) is to the same effect. The district judge explicitly declined to follow Family Dollar because its "proposition that a showing of fraud is required only when the error is technical rather than material appears to be irreconcilable with the § 411(b)(2) requirement that the Register of Copyrights be consulted regarding whether the inaccuracy is material"; the *Family Dollar* court's reading of § 411(b) "seems to be inconsistent with the statute's requirement that the Register of Copyrights weigh in on the issue of materiality in *all* cases." 2016 WL 6238612, at *4 n. 2 (emphasis added).

The criticisms of *Family Dollar*'s holding by the cited cases are persuasive, and bolstered by the plain language of the PRO IP Act and other case law within this Circuit. I therefore decline to follow *Family Dollar*.[11]

### i. Knowing Inaccuracies

Having determined that 17 U.S.C. § 411(b)(1) and *Eckes* provide the relevant legal framework on this aspect of the case, the Court turns to the remaining relevant issues: (1) whether Lego included inaccurate or misleading information in its copyright registration, and (2) whether, if the registration included inaccurate or misleading information, Lego included the information "with knowledge that it was inaccurate," 17 U.S.C. § 411(b)(1)(A). Only if I hold for Best-Lock on both questions must I turn to the final question: whether the knowledge was material, which is to say, whether knowledge of that information would have caused the Register of Copyrights to refuse registration.

As to the first question, Best-Lock presents no evidence that Lego withheld or misstated information about its patents on the minifigures. To the contrary, the Asserted Copyright applications appear thorough, complete, and consistent with the undisputed facts on record. The

---

[11] The other cases cited by Best-Lock are also unavailing. *Masquerade Novelty, Inc. v. Unique Indus. Inc.*, 912 F.2d 663 (3d Cir. 1990) was decided before enactment of the PRO IP Act. In any event, the Third Circuit observed that the "view that an inadvertent omission from a registration application will render a plaintiff's copyright incapable of supporting an infringement action has not gained acceptance with the courts[,]" and suggested that the correct approach in situations "where there has been a material, but inadvertent omission" may be to deprive the plaintiff of the benefits of the presumption of validity set forth in § 401(c) – not to invalidate the copyright registration. 912 F.2d at 668 n.5. In *Morris v. Bus. Concepts, Inc.*, 259 F.3d 65, 72 (2d Cir. 2001), the court found that the errors in a copyright registration application had rendered the registrations "completely inaccurate." 259 F.3d at 72 (2d Cir. 2001) ("The registrations contained *none* of the information required by § 409 for proper registration of the articles . . . ."). That is plainly not the case here.

brief, two-page copyright application did not ask whether Lego had sought or obtained patents or other intellectual property. Nor did it provide any catchall space in which to disclose other relevant information. Consequently, Lego had no obligation to disclose its existing patents on the application, and its failure to do so was neither "misleading" nor an "omission."

Best-Lock contends that the Lego minifigures are derivative of the drawings from the '711 and '402 patents, and therefore should have been disclosed in Section 6(a) of the application, instructing applicants for registration of a "derivative work" to "[i]dentify any preexisting work or works that this work is based on or incorporates." BL Ex. B at 2.[12] This argument is dismissed for a fundamental reason: the Lego minifigure covered by the Registration was created in 1977—the year *before* either Lego patent was filed. *Id.* at 1. As Lego observes, "[i]f anything, the drawing submitted in the patent applications was derivative of the sculptural work." Lego MSJ Br. at 10 n.5.

But even if the minifigure sculpture had been created after the patent drawings, Best-Lock's argument fails for two reasons. First, the sculptural form of the minifigures does not constitute a copyrightable derivative work, independent of the minifigure drawings. By Best-Lock's own (undisputed) account, the subject matter of the patents and the copyrights are the same — *i.e.*, apart from the medium in which they are conveyed, there are no material differences between the Lego minifigure sculptures and the patent drawings. The Second Circuit has squarely held that mere translation of a work to a different medium does not demonstrate sufficient originality to warrant copyright protection. *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 491 (2d Cir. 1976) (because

_____

[12] "Derivative work" is defined as "a work based upon one or more preexisting works, such as [an] art reproduction, abridgment . . . or any other form in which a work may be recast, transformed, or adapted . . . ." 17 U.S.C. § 101.

"translation [of a work of art] to a different medium" is "merely a trivial variation," creating a plastic version of a cast iron "Uncle Sam" toy coin bank in the public domain lacked the originality to support a copyright); *see also Earth Flag, Ltd. v. Alamo Flag Co.*, 153 F. Supp. 2d 349, 354 (S.D.N.Y. 2001) (transfer of a public domain photograph from paper to a fabric article of clothing was not entitled to copyright protection because "a copyright claimant's production of a work of art in a different medium cannot by itself constitute the originality required for copyright protection[.]"). A "derivative work," similarly, "must incorporate some or all of a 'preexisting work' *and add new original copyrightable authorship to that work*." UNITED STATES COPYRIGHT OFFICE, COPYRIGHT IN DERIVATIVE WORKS AND COMPILATIONS (2013), https://www.copyright.gov/circs/circ14.pdf (emphasis added). The shift from patent drawing to sculpture does not have the requisite originality to constitute a derivative work.

This conclusion is further bolstered by a body of case law holding that a copyright registrant need not disclose preexisting works of its own creation. *See, e.g.*, *Yurman Design, Inc. v. Chaindom Enters.*, No. 99 Civ. 9307 (JFK), 2002 WL 31358991, at *10-11 (S.D.N.Y. Sept. 30, 2002) (rejecting the "false premise" that "a copyright applicant must disclose that its work is derived from another work the applicant has created [on a copyright application]"); *Frank Betz Assocs. v. J.O. Clark Constr.*, *L.L.C*, No. 3:08-cv-159, 2010 WL 2253541, at *11 (M.D. Tenn. May 30, 2010) (where evidence indicates that plaintiff created derivative designs based on its own original designs "the concerns that § 409(9) raises are not implicated"); *Robert L. Stark Enters. v. Neptune Design Grp.*, *LLC*, No. 1:16 CV 264, 2017 WL 1345195, at *9 (N.D. Ohio Apr. 12, 2017) ("As the copyright would have simply incorporated plans created by defendant, its failure to identify those plans as pre-existing materials does not implicate Section 409(9) of the Copyright Act."). As Judge Rakoff

explained in *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *6 (S.D.N.Y. Sept. 6, 2013), this sensible approach avoids the "wasteful and impractical" requirement that a copyright owner "separately register every draft or version of an evolving work." Thus, "even where the registered work is an independently copyrightable derivative work, 'when the same party owns the derivative . . . work plus the underlying elements incorporated therein, its registration of the former is sufficient to permit an infringement action on the underlying parts, whether they be new or preexisting.'" *Id.* (quoting 3-12 NIMMER ON COPYRIGHT § 7.16(B)(5)(c)). The court in *Peterson* held that "even if . . . the intermediate 'rough cut' of the [plaintiffs'] recordings and/or the final version somehow qualify as derivative works distinct from the original unedited takes, plaintiffs' registration of the final version is still sufficient to support this infringement action." *Id.* The same conclusion applies here. For purposes of copyright law, Lego's minifigure sculptures are not derivative work and were not required to be reported as such. Thus, no reasonable trier of fact could find that the Asserted Copyright applications were factually inaccurate as to the existence of the minifigure patents, much less knowingly so.[13]

### ii. Materiality

I need not address the materiality of the allegedly omitted information under 17 U.S.C. § 411(b), as failure to demonstrate knowing misrepresentation by Lego is fatal to Best-Lock's summary judgment motion. In the interest of completeness, however, and particularly in light of the parties' extensive briefing on the issue, the Court notes that even if Best-Lock had established

---

[13] Indeed, Best-Lock has provided no evidence that the alleged material omissions were made "knowingly." Instead, it relies on exclusively on the *Family Dollar* line of cases, which I have discussed and declined to follow *supra*, to argue that "knowledge" is not a necessary element. This deficiency, standing alone, is fatal to its claim.

that Lego knowingly misrepresented information about its minifigure patents, based on the current record it could not prevail on summary judgment as to materiality of the omitted information as a matter of law.

Before a court invalidates a copyright registration under 17 U.S.C. § 411(b), it must request that "the Register of Copyrights advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration." 17 U.S.C. § 411(b)(2);[14] *Palmer/Kane LLC v. Rosen Book Works LLC*, 188 F. Supp. 3d 347, 348 (S.D.N.Y. 2016) ("[C]ourts are in agreement that the provision is *mandatory in nature*, requiring district courts to solicit the advice of the Copyright Office when the statutory conditions are satisfied." (emphasis added))."[15]

---

[14] This requirement was not addressed in either party's (otherwise strong) briefing.

[15] A court may, however, dismiss a claim of copyright invalidity under 17 U.S.C. § 411(b) without input from the Register of Copyrights (as the Court does here). Although on its face the provision requires involvement of the Register of Copyrights any time that inaccurate information in a copyright application is "alleged," the majority of courts have concluded that "the Court should employ this mechanism only when necessary, after the party establishes that the application for registration included inaccurate information and that the registrant knowingly included the inaccuracy." *Design Ideas, Ltd. v. Meijer, Inc.*, No. 15-CV-03093, 2016 WL 4487830, at *13 (C.D. Ill. Aug. 25, 2016) (citing *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 623-24 (7th Cir. 2013)); *see also Palmer I*, 2016 WL 6238612, at *2 ("[C]ourts generally agree that they may first require the party seeking invalidation to establish as a factual matter that the applicant included inaccurate information on the registration application with knowledge that it was inaccurate"); *DeliverMed*, 734 F.3d at 625 (rather than immediately refer a matter to the Register of Copyrights, "courts can demand that the party seeking invalidation first establish that the other preconditions to invalidity are satisfied before obtaining the Register's advice on materiality"). Indeed, the Register of Copyrights has endorsed this approach, stating that "before asking the Register of Copyrights whether she would have refused to register a copyright . . . a court should feel free to determine whether there is in fact a misstatement of fact." *DeliverMed*, 734 F.3d at 625 (citing Response of the Register of Copyrights to Request Pursuant to 17 U.S.C. § 411(b)(2) in *Olem Shoe Corp. v. Wash. Shoe Co.*, No. 09-cv-23494, 2010 WL 3505100, at *3 n.4 (S.D. Fla. Sep. 3, 2010)).

This requirement applies even if the court's conclusion appears indisputably sound. In *Argento v. Santiago for Love of Ramon, LLC*, for example, the court determined that the plaintiff had knowingly included inaccurate information on his copyright registration application — specifically, the false claim that plaintiff was the author of an artistic design that had, in fact, been created by another individual roughly a decade before the creation date listed on plaintiff's application. No. 16-CV-6172-FPG-MWP, 2019 WL 948186, at *4 (W.D.N.Y. Dec. 18, 2017). Notwithstanding the seemingly obvious answer – one would naturally conclude the Copyright Office would not issue a copyright registration to someone falsely claiming authorship of a deceased individual's work – the court nonetheless deferred its decision on defendant's motion for summary judgment on plaintiff's copyright invalidity until the parties had asked for and received a response from the Register of Copyrights regarding the materiality of the misrepresentation. *Id.*; *see also Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC*, No. LA CV16-00339 JAK (FFMx), 2017 WL 2903180, at *12 (C.D. Cal. Mar. 24, 2017) (deferring decision on defendant's motion for summary judgment because a "request to the Register of Copyright . . . *must* [ ] precede a determination whether the Copyright Office would have refused registration of the copyright at issue in this action" (emphasis added)). Similarly, in *DeliverMed* — the only appellate decision to address § 411(b)(2) in depth — the plaintiff falsely represented in his copyright registration application that the artist had transferred ownership to him by written agreement, knowing that the information was untrue. 734 F.3d at 623. Following a two-week bench trial, the district court entered a declaratory judgment invalidating the plaintiff's copyright registration under 17 U.S.C. § 411(b). *Id.* The Seventh Circuit reversed and remanded. *Id.* Although "the district court's reasoning seem[ed] consistent with the Register's practice," the Seventh Circuit nonetheless concluded that "under

section 411(b)(2), a court still must request a response from the Register before coming to a conclusion as to the materiality of a particular mis-representation. By granting a declaratory judgment invalidating DeliverMed's copyright registration without following the statutorily mandated procedure, the district court made a legal error." *Id.* at 623-24.

On this record, therefore, these challenges by Best-Lock to the validity of Lego's copyrights fail, and do not militate against Lego's right to summary judgment.[16]

### 3. Invalidity Due to Functionality

Best-Lock's argument that the Asserted Copyrights are invalid because certain design elements in question are functional is similarly unavailing.

As I have previously held in this case, certain elements of the Lego minifigures are, indeed, functional. *See* 874 F. Supp. 2d at 95-102. But the mere fact that some elements of the Lego

___

[16] The Court also notes that, even if the copyright here were invalid the appropriate remedy would be dismissal *without prejudice to renewal* after receipt of a valid copyright registration. *See Determined Prods., Inc. v. Koster*, No. 92-1697, 1993 WL 120463, at *1 (N.D. Ill. May 15, 1997) (dismissing the case for lack of a valid copyright, but without prejudice "to its being revived after valid copyright registrations are obtained."). Even *Family Dollar*, the case most heavily relied upon by Plaintiff, advised that the "normal" course of action would be dismissal without prejudice to renewal after the company had obtained a valid copyright registration. F. Supp. 2d at 234; *see also Senisi v. John Wiley & Sons, Inc.*, No. 13CV3314-LTS-AJP, 2016 WL 1045560, at *3 (S.D.N.Y. Mar. 15, 2016) (granting plaintiff's motion for reconsideration of dismissal with prejudice where "[c]ourts within this Circuit have consistently held that failing to meet a statutory precondition to suit precludes adjudication on the merits and warrants dismissal without prejudice," and "denying [plaintiff] redress for her [potentially] meritorious claims based on a technical default in her copyright registration would constitute a manifest injustice that reconsideration of the Jan. 7 Order would avoid." (internal citation and quotation marks omitted)); *cf. Bldg. & Const. Trades Council of Buffalo & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 158 (2d Cir. 2006) (concluding that an action barred for failure to comply with pre-suit statutory notice requirement must be dismissed without prejudice). Thus, even if the Court were to find Best-Lock's argument for summary judgment on this count meritorious — which it does not — the practical effect would *not* be a verdict in Best-Lock's favor.

Minifigures are functional does not render the entire sculptural work uncopyrightable. *See, e.g.*, *Kurt S. Adler, Inc. v. World Bazaars*, 897 F. Supp. 92, 95-6 (S.D.N.Y. 1995) (finding defendant had infringed plaintiff's valid copyright in case involving bubble-blowing Santa Claus ornaments, despite functional aspects of the protected work such as a pivoting arm holding a bubble wand). Because Best-Lock concedes, as it must, that certain elements of the Lego minifigures are purely sculptural, its argument goes to the *scope* of the copyrights (discussed in Section III(B)(2)(I)) — not underlying validity of the copyrights. *Klauber Bros.*, 2015 WL 4393091, at *3 (rejecting defendants' argument that plaintiff's registration of a copyrighted design was unenforceable because plaintiff failed to disclose to the Copyright Office, *inter alia*, that the scalloped edges of a copyrighted design were a functional technique; that fact did "not establish that the [ ] design is unprotectable in its entirety.").

Best-Lock has also failed to demonstrate that any allegedly inaccurate information "was included on the application for copyright registration with knowledge that it was inaccurate," as it must under the PRO IP Act. *See* 17 U.S.C. § 411(b)(1). For that second independent reason, Best-Lock's claim fails.

### 3. Invalidity Due to Fraud

Best-Lock's related argument, that Lego fraudulently failed to disclose that the minifigures it was registering were functional and previously patented, is also meritless. "A party seeking to establish a fraud on the Copyright Office . . . bears a heavy burden." *Lennon v. Seaman*, 84 F. Supp. 2d 522, 525 (S.D.N.Y. 2000). The party "must show at a minimum that the author's application for copyright registration [was] factually inaccurate, that the inaccuracies were willful or deliberate, and that the Copyright Office relied on those misrepresentations." *King-Devick Test Inc. v. NYU*

*Langone Hosps.*, No. 17-CV-9307 (JPO), 2019 WL 78986, at *6 (S.D.N.Y. Jan. 2, 2019) (internal quotation marks and citation omitted).

As discussed, Best-Lock has presented no evidence of factual inaccuracies on Lego's copyright applications. And even if, *arguendo*, Lego should have disclosed its patents or functionality of the minifigures on its application, Best-Lock has not presented any evidence to support a conclusion that Lego failed to do so with an intent to deceive the Copyright Office. Indeed, it is far more plausible that the information was not included because it was not explicitly requested. Accordingly, Lego is entitled to summary judgment dismissing Best-Lock's affirmative defense and counterclaim sounding in fraud.

### 4. Invalidity of Copyright Registration as a Collection

Best-Lock next argues that Lego's registration of the '104 Copyright is invalid because it asserts copyrights in a collection, but does not meet the requirements for establishing that the works qualify as a "published collection" pursuant to Copyright Office regulations.

Registration as a "published collection" requires that all of the "constituent elements of the collection have been published together as a collection." *L.A. Printex Indus. v. Le Chateau, Inc.*, No. 11 Civ. 4248 (LTS), 2012 WL 987590, at *3 (S.D.N.Y. Mar. 23, 2012); *see also United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1259 (9th Cir. 2011) ("When one registers a collection of works in a single copyright, it can be registered either as a 'published' or an 'unpublished' collection. A necessary element of a published collection copyright is that the collection is sold, distributed, or offered for sale concurrently."). Best-Lock contends that Lego has failed to provide evidence that "all of the Lego sets, including the various figures shown in the deposit materials" were published concurrently on January 7, 1978, *i.e.*, the date of first publication listed on the '104

Copyright application. BL Opp. Br. at 10 (citing *United Fabrics*, 630 F.3d at 1259 and 37 C.F.R. 202.3(b)(3)(A) (1994)[17]). It therefore contends that Lego's copyright registration is invalid.

Best-Lock again provides no evidence that any information provided to the Copyright Office was incorrect, much less that "the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate." 17 U.S.C. § 411(b)(1) ("A certificate of registration satisfies the [registration requirement], regardless of whether the certificate contains any inaccurate information," unless, *inter alia*, "the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate."). In *L.A. Printex*, on a motion for summary judgment the court rejected defendant's analogous argument that plaintiff's registration of a textile design was invalid because all of the designs that had been registered as a "published collection" had not been published at the same time. 2012 WL 987590, at *2. In declining to invalidate plaintiff's copyright registration, the court reasoned that, *inter alia*, defendant had failed to proffer "any evidence that any misstatement in [plaintiff's] original registration application was made in bad faith." *Id.* at *4. *See also Cipes v. Mikasa, Inc.*, 346 F. Supp. 2d 371, 373 (D. Mass. 2004) (plaintiff's registration of photographs published over the course of multiple years as a "published collection" was not invalid where the error was inadvertent); *Lumos, Inc. v. LifeStrength, LLC*, No. 2:12–cv–1196–TC, 2014 WL 4355451, at *6-7 (D. Ut. Sept. 3, 2014) (erroneous registration of videos published at different times as a published collection "in itself does not invalidate the registration or render the certificate of registration incapable of supporting an infringement action" because "the record does not demonstrate that [plaintiff] knowingly included the [non-concurrently published] video in its application for copyright registration such that the error

---

[17] Then 37 C.F.R. 202.3(b)(3)(A) is presently 37 C.F.R. 202.3(b)(4)(A).

was anything other than an inadvertent mistake or that [plaintiff] intended to defraud the Copyright Office").

Even assuming that Lego erroneously registered the '104 Copyright as a published collection, which Lego appears to dispute, absent any evidence of knowing misstatements or misrepresentations in the application, Lego's certificates of registration for the Asserted Copyrights satisfy the registration requirement, "regardless of whether the certificate contain[ed] any inaccurate information." 17 U.S.C. § 411(b)(1). Nor does Best-Lock's argument raise any triable issue of material fact, as Best-Lock has offered only speculation that the registered works may not have been published concurrently. The Court declines to invalidate Lego's copyright on this basis.

### 5. Ownership

Finally, Best-Lock advances two specific arguments challenging Lego's ownership of the Asserted Copyrights. First, it argues that Lego has failed to produce any documentation to demonstrate that Lego Futura Aps did, in fact, obtain ownership of the copyrights through a Work for Hire from the individual(s) who created the minifigures, as indicated on the copyright registrations. BL Opp. Br. at 8. Second, Best-Lock contends that Lego "has failed to provide evidence that Lego Futura Aps assigned the copyrights to Interlego A.G., the entity that ultimately applied for the copyright registrations and subsequently assigned the copyrights to Lego." *Id.* at 9.

For the reasons discussed *supra*, Lego is entitled to the presumption of ownership. Best-Lock has provided no specific evidence challenging Lego's ownership — only vague speculation that the chain of title may be invalid. *See* BL Opp. Br. at 8-9. General conjecture of this sort, entirely devoid of factual support in the record, cannot overcome the presumption that Lego is the valid holder of the Asserted Copyrights. *TeeVee Toons, Inc. v. DM Records, Inc.*, No. 05 Civ.

5602 (JGK), 2007 WL 2851218, at *5 (S.D.N.Y. Sept. 27, 2007) ("While the defendants question whether Smith was really the author of the Compositions, there is no basis for that challenge.").

But even absent the statutory presumption of validity, Lego has presented sufficient evidence to establish its ownership of the Asserted Copyrights. The copyright registrations indicate that Lego Futura Aps obtained ownership of the copyright through a Work for Hire from the employee(s) who created the minifigures, subsequently transferred the copyrights to Interlego, who in turn transferred them to Lego in 2007. I am authorized to use my discretion in determining the weight to accord such representations, and find no reason to reject these as unreliable. *See, e.g.*, *id.* (rejecting defendants' challenge to plaintiff's authorship of copyrighted work where "defendants do not present any reasonable basis to challenge the reliability of the Copyright Registration Certificates" listing plaintiff as author).

Indeed, the sequence of events documented in the copyright registrations is not only entirely unremarkable, it is also consistent with other portions of the record. The application for the '711 patent, for example, was filed in 1978 and reports that Godtfred K. Christiansen and Jens N. Knudsen of Denmark invented the Lego minifigure. *See* Doc. 164-6 at 2. A report issued by Lego confirms that Godtfred K. Christiansen was a Lego executive (and the son of Lego's founder), and Jens N. Knudsen was a product designer employed by Lego. *See* Doc. 150-13 at 3, 6. These facts are entirely consistent with Lego's representations in the Asserted Copyright registrations that the Lego minifigures were works for hire created in 1978 by authors domiciled in Denmark.

The '711 patent also denotes the transfer of ownership from the minifigure inventors to Interlego, *see* Doc. 164-6 at 2, and Lego has produced documentation of the assignment from Interlego to Lego, *see* Doc. 132-2, Ex. 1. While the record contains no specific documentation of

the assignment of the Asserted Copyrights from Lego Futura Aps to Interlego, the Court sees no reason to question that fact in light of the demonstrated relationship between the transferor and transferee,[18] and Best-Lock's failure to provide any countervailing evidence.

In the totality of these circumstances, the Court concludes that there are no issues of material fact with respect to Lego's ownership of valid copyrights. Lego is entitled to summary judgment on those issues because no reasonable juror could find that Lego did not own valid copyrights in the minifigures in suit.

## B. Illegal Copying of Original Protectable Work

To succeed on an action for infringement, Lego must also show that (1) Best-Lock actually copied its original protected work and (2) the copying was illegal because substantial similarity existed between the Defendants' work and the protectable elements of the Plaintiffs' work. *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010). Actual copying may be established "either by direct evidence of copying or by indirect evidence." *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 140 (2d Cir. 1992). However, "not all copying results in copyright infringement, even if the plaintiff has a valid copyright," *Boisson v. Banian, Ltd.*, 273 F.3d 262, 268 (2d Cir. 2001), and the plaintiff is required to additionally demonstrate that "substantial similarity to protected material exists between the two works," *Laureyssens*, 964 F.2d at 140. To that ends, *Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.*, 25 F.3d 119, 123 (2d Cir. 1994) draws an important distinction: "In the context of deciding whether the defendant copied at all (as

---

[18] As Lego notes, Interlego and LEGO Futura Aps are related companies, and "the chances that Interlego was improperly and illegally claiming transfer from its sister company in registering the works is quite small." Lego Reply Br. at 7, n.12.

distinguished from whether it *illegally* copied), 'similarity' relates to the entire work, not just the protectable elements."

For the reasons set forth below, Lego is entitled to summary judgment in its favor on those issues as well. Having considered the extensive record in the case, I conclude that a reasonable trier of fact, properly instructed on the law, would be bound to find that Best-Lock copied the Lego copyrighted minifigures in suit, and that substantial similarities exist between the Best-Lock minifigures and the protectable elements of Lego's minifigures.

### 1. Actual Copying

To succeed on its infringement claim, Lego must show that Best-Lock actually copied Lego's minifigures. *Boisson*, 273 F.3d at 267. Occasionally, a case "presents the rare scenario where there is direct evidence of copying." *Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992). More commonly, it is the conjunction of (1) access to the copyrighted work and (2) probative similarity that lead to the inference of actual copying. *See Procter & Gamble Co. v. Colgate-Palmolive Co.*, 199 F.3d 74, 77 (2d Cir. 1999); *Muller v. Anderson*, 501 F. App'x 81, 83 (2d Cir. 2012) ("A plaintiff may establish actual copying circumstantially by demonstrating (a) that the defendant had access to the copyrighted material and (b) that the two works exhibit 'similarities probative of copying.'") (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003)). That form of indirect proof requires "a showing of defendant's opportunity to come into contact with plaintiff's work and such similarities between the works which, under all the circumstances, make independent creation unlikely." *Laureyssens*, 964 F.2d at 140.

#### i. Access to the Work

A defendant's access to a plaintiff's work "may be established directly or inferred from the fact that a work was widely disseminated or that a party had a reasonable possibility of viewing the

prior work." *Boisson*, 273 F.3d at 270. Proof of access may also be inferred where "two works are so strikingly similar as to preclude the possibility of independent creation." *Lipton v. Nature Co.*, 71 F.3d 464, 471 (2d Cir. 1992).

Applying these principles to the case at bar, I note first it is beyond dispute that Best-Lock had access to Lego's copyrighted work. To prove access, plaintiff need only show that the work was "widely disseminated" or that there was a "reasonable possibility" that defendant could have examined plaintiff's work; proof that defendant actually viewed it is unnecessary." *Boisson*, 273 F.3d at 270. Lego's minifigures are among the most universally recognized toys in the world. That fact alone suffices to demonstrate Best-Lock's access. *See, e.g.*, *Saban Entm't, Inc. v. 222 World Corp.*, 865 F. Supp. 1047, 1050 (S.D.N.Y. 1994) (popularity of Power Rangers and their derivative products in the United States established that defendant had access to plaintiff's copyrighted Power Ranger figures); *Conan Props. v. Mattel, Inc.*, 712 F. Supp. 353, 360 (S.D.N.Y. 1989) ("The inference of access is easily drawn from evidence of the sales figures of [plaintiff's] Conan comics.").

The record also includes rather striking evidence of the Best-Lock CEO's direct and personal knowledge of and access to Lego's minifigures. I refer to the interview Torsten Geller gave to the *Hartford Courant,* which that newspaper reported in January 2012. *See* Doc. 132-11. According to Geller, as a child growing up in Germany he had admired LEGO toys, but later discovered, as a young father in England, that Lego itself had copied "the bricks invented by a British psychologist in the 1940s." *Id.* Geller professed to disapprove of that, and recounted that he formed Best-Lock and "decided to become a LEGO competitor in part because he thought it was unethical that the Danish firm copied the British bricks." *Id.* The *Courant* recites: "[Geller] acknowledged the similarities between the shapes of Best-Lock's figures and LEGO's. 'I did the figures because I want

32

to piss them off,' he said." *Id.* Geller then asserted that the figures were not sufficiently similar to constitute copyright infringement, the core defensive position for Best-Lock in this litigation, *id.*, and has claimed subsequently that his statement about wanting to "piss [Lego] off" was "tongue-in-cheek," Geller Decl. IV ¶ 4. Be that as it may, Geller's *Courant* interview shows at the very least that Best-Lock had access to (and directly reacted to) Lego's copyrighted minifigures. One also notes, on the issue of access, Best-Lock's advertisements highlighting the interchangeability of parts between Best-Lock's minifigures and Lego's minifigures. The manufacturer of the former group of minifigures clearly had access to the latter group. Under these circumstances, no reasonable trier of fact could conclude that Best-Lock did not have access to Lego's minifigures.

    ii. *Probative Similarity*

    In addition to access to the work, Lego must also show probative similarity between the protected work (the Lego minifigure) and the allegedly infringing figurine (the Best-Lock minifigure). Probative similarity is a "less demanding test than" substantial similarity, and requires "only that there are similarities between the two works that would not be expected to arise if the works had been independently created." *Michael Grecco Prods., Inc. v. Valuewalk, LLC*, 354 F. Supp. 3d 482, 500 (S.D.N.Y. 2018) (internal quotation marks and citation omitted). When comparing works for the purpose of determining probative similarity, protectable and unprotectable elements need not be differentiated. *Fisher-Price*, 25 F.3d at 123.

    Visual examination of the products at issue in this case reveals that they are not just "probatively similar," but indistinguishable in most respects. *See also* Section III(B)(2)(ii), *infra*. Minor differences in surface adornments do not detract from the overwhelming number of similarities that, beyond a reasonable dispute, "would not be expected to arise if the works had been

independently created." *Michael Grecco*, 345 F. Supp. 3d at 500. Best-Lock's claim that "there is no probative similarity of the entire work" [BL Opp. Br. at 14] thus rings hollow.

Best-Lock claims that four issues of material fact preclude summary judgment on the issue of actual copying. As discussed, Best-Lock's claim that there is an issue of fact as to the probative similarity of the minifigures is baseless. The remaining issues of material fact raised by Best-Lock — the meaning of Mr. Geller's statement to the Hartford Courant that he created the Best-Lock minifigures "to piss [Lego] off," the effect of interchangeability of Best-Lock's figures with Lego's, and the significance of the marking on the bottom of Best-Lock's figures — are all challenged only insofar as they provide *direct evidence* of actual copying. *See* BL Opp. Br. at 13-14. But, as discussed, the Court need not make a determination of actual copying based on direct evidence, and declines to do so here. *See Jorgensen*, 351 F.3d at 51 (2d Cir. 1992) ("Actual copying may be established by direct or indirect evidence."). In consequence, summary judgment would not be precluded by disputes on those particular issues. Based on the indirect evidence before the Court — Best-Lock's indisputable access to Lego's minifigures, the probative similarities between the Lego minifigure and the Best-Lock minifigure, and Best-Lock's failure to provide credible evidence of independent creation[19] — no reasonable trier of fact could determine that Best-Lock did not actually copy Lego.

### 2. Substantial Similarity

It is not enough, however, that Best-Lock actually copied Lego's minifigures. Lego must also show that Best-Lock's copying was improper. *Webb v. Stallone*, 555 F. App'x 31, 32 (2d Cir. 2014). This requirement recognizes that "[p]arrotry does not always mean piracy"; to succeed, a

---

[19] Best-Lock does not argue that its minifigures were independently created, and the record contains no evidence that would support such an inference.

plaintiff alleging infringement "must also show illegality, and this requires a sharper focus: the court must find a substantial similarity between the *protectable* elements of the two works." *Fisher-Price,* 25 F.3d at 123. That principle gives rise to the oft-stated rule that an infringement plaintiff "must show that the defendant appropriated the plaintiff's particular means of expressing an idea, not merely that he expressed the same idea." *Id.*

"Substantial similarity does not require literally identical copying of every detail." *Koons*, 960 F.2d at 307. Rather, as articulated by the Second Circuit in *Koons*, substantial similarity may be determined by the ordinary observer test: "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." 960 F.2d at 307. Alternatively, when an allegedly infringing work incorporates both protectable and unprotectable elements, courts apply a "more discerning observer" test, which excludes the unprotectable elements from consideration and compares only the protectable elements for substantial similarity. *See Boisson*, 273 F.3d at 272 (internal quotation marks omitted). The Second Circuit has cautioned, however, that the "more discerning ordinary observer test" is not an invitation to dissect works into their constituent elements or engage in piecemeal comparison of each protectable element with its putative imitation.[20] *See Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 134 (2d Cir. 2003) ("[W]hile the infringement analysis must begin by dissecting the copyrighted work into its component parts in order to clarify precisely what is not original,

---

[20] The Second Circuit has explained the rationale behind its disavowal of a piecemeal approach: "[T]he defendant may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art — the excerpting, modifying, and arranging of [unprotectable components] . . . — are considered in relation to one another." *Tufenkian*, 338 F.3d at 134.

infringement analysis is not simply a matter of ascertaining similarity between components viewed in isolation.").  Rather, as with the "ordinary observer test", the court must compare the works' "total concept and overall feel . . . as instructed by our good eyes and common sense." *Gaito*, 602 F.3d at 66 (internal quotation marks omitted).  "[I]n the end, [the] inquiry necessarily focuses on whether the alleged infringer has misappropriated 'the original way in which the author has selected, coordinated, and arranged the elements of his or her work." *Id.* (quoting *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1004 (2d Cir. 1995)).

Although the question of substantial similarity is usually one of fact, it is entirely appropriate for a district court to resolve substantial similarity as a matter of law if the similarities are so striking that no reasonable juror could find that the alleged infringer did not copy the plaintiff's protected works.  *Id.*  Conversely, a district court may summarily resolve the question against an infringement plaintiff "either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar."  *Gaito*, 602 F.3d at 63 (citation and internal quotation marks omitted).[21]

---

[21] *Koons,* 960 F.2d at 307 illustrates the availability of summary judgment on substantial similarity:

> [E]ven were such direct evidence of copying unavailable, the district court's decision could be upheld in this case on the basis that defendant Koons' access to the copyrighted work is conceded, and the accused work is so substantially similar to the copyrighted work that reasonable jurors could not differ on the issue. . . . Koons used the identical expression of the idea that Rogers created; the composition, the poses, and the expressions were all incorporated into the sculpture to the extent that, under the ordinary observer test, we conclude that no reasonable jury could have differed on the issue of substantial similarity.  For this reason, the district court properly held that Koons "copied" the original.

*i. Scope of Protectable Work*

The first step is determining which, if any, elements of the Lego minifigure are unprotectable. Best-Lock argues that "[t]he elements of Lego's figures that are protected by the alleged copyrights are limited to elements of the figures shown in the deposit materials, non-functional elements, original creative elements, and elements not found in Lego's patents." BL Opp. Br. at 15-16. When impermissible elements are subtracted from consideration, Best-Lock continues, "the remaining distinguishing features of the Lego Minifigures, the decoration of faces and torsos, become the only allegedly original creative elements and the substantial differences in appearance between the Lego Minifigures and the Best-Lock Minifigures avoid substantial similarity of those elements." *Id.* at 16.

Best-Lock overreaches in claiming that the Asserted Copyrights cannot cover the same elements as Lego's now-defunct patents. That proposition is contradicted by overwhelming authority, including federal regulations and case law. *See, e.g.*, 37 C.F.R. § 202.10(a) ("The availability of protection or grant of protection under the law for a utility or design patent will not affect the registrability of a claim in an original work o pictorial, graphic, or sculptural authorship."); *Dam Things from Denmark v. Russ Berrie & Co.*, 173 F. Supp. 2d 277, 284 (D.N.J. 2001) ("This Court is convinced that the election doctrine, with respect to [choosing between] copyright and design patent [protection], is not good law now and doubts whether it ever actually was."), *vacated on unrelated grounds sub nom. Dam Things from Denmark, a/k/a Troll Co. ApS, v. Russ Berrie & Co.*, Inc., 290 F.3d 548 (3d Cir. 2002); *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1015 (2017) ("[W]e have long held that design patent and copyright are not mutually

exclusive." (citing *Mazer v. Stein*, 347 U.S. 201, 207 (1954)); *In re Yardley*, 493 F.2d 1389, 1394 (C.C.P.A. 1974) ("Congress has not provided that an author inventor must elect between securing a copyright or securing a design patent."). Best-Lock's appeals to cherry-picked dicta and vague statements that "design patent and copyright protect different aspects of a work," *see* BL MSJ Br. at 22 (citing *Dam*, 173 F. Supp. 2d at 284), do not alter this conclusion: Best-Lock misinterprets such declarations as literal directives to divide the elements of a work into those protected by design patents and those protected by copyright when, in fact, they are reminders that copyright and patent law offer substantively different types of protection for the same elements and are most effective when working in tandem. *See Dam*, 173 F. Supp. 2d at 284 ("'If a work otherwise meets the requirements of copyrightability it should not be denied such simply because the claimant happens to be entitled to supplementary protection under other legislation.'" (quoting 60 Fed. Reg. 15605)). It is clear that the same elements of a work protected under patent law are also eligible for copyright protection.

Best-Lock also argues that Lego's registration pertains only to the specific figures shown in the deposit materials, and not to figure designs that do not appear in the Registrations' deposit materials. Specifically, Best-Lock takes issue with photographs depicting the minifigures in Lego's Motion for Summary Judgment, Complaint, and submission to the CBP, contending that "Lego has neither established nor authenticated who designed the non-deposit figures or when they were designed," and that "[t]he only evidence of what is covered by a copyright of a three-dimensional object is its depiction in the deposit submitted to the Copyright Office." BL Opp. Br. at 16. The parties have not cited, nor has the Court located, any Second Circuit opinion addressing whether the deposit copy of a work defines the scope of copyright protection. But the Court need not decide that issue. The deposit images submitted with the Asserted Copyright applications are low quality, but

38

plainly show the elements at issue in this litigation. The disputed photographs from the Motion, Complaint, and CBP submission include the same elements. Indeed, there are no material differences between the photographs submitted to the CBP and the deposit photographs.[22] While the images included in the Motion and Complaint appear to depict different costumes and facial characteristics than the photographs in the deposit materials, as this Court previously explained "those are not the elements of Best-Lock's minifigures that Lego claims are infringing." 874 F. Supp. 2d at 104.

Next, while Best-Lock correctly contends that the scope of the Asserted Copyrights excludes unoriginal and functional elements, its assessment of the metes and bounds of the "unoriginal and functional elements" of Lego's minifigures is overbroad.

With respect to *functionality*, the Copyright Act establishes that "pictorial, graphic, and sculptural works" — including toys, *see, e.g.*, *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir. 1985) — are eligible for copyright protection. 17 U.S.C. § 102(a)(5). Useful articles, however, which have a "intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information," are protected "if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." *Id.* § 101. Such separability may be physical, meaning that the design can be physically detached from the useful article and sold separately. *See Chosun Int'l, Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324,

---

[22] Best-Lock identifies three purported differences between the photographs submitted to the CBP and the deposit images: (1) absence of helmets on some of the figures wearing helmets in the deposit images; (2) the relative spacing between the images; and (3) the positions of the figures. BL Opp. Br. at 18. None of these differences is material, and they primarily pertain to the arrangement of the photograph, not the sculptural work itself.

329 (2d Cir. 2005). Alternatively, a design may evince "conceptual" separability, meaning that it has identifiable features that were designed independent of functional considerations and which are capable of existing apart from the useful article. *Id.*

Best-Lock contends that at least three of the nine elements of the Lego minifigures are purely utilitarian, and therefore fall outside the scope of Lego's copyright.[23] Best-Lock first argues that the "trapezoidal shape of torso" and the "torso which is wider at the bottom and narrower at the top" are functional. BL Opp. Br. at 19-20. Best-Lock has (unsuccessfully) argued the functionality of the torso shape in the past, but this time bases its claim on a newly discovered Lego document that states that "[t]he shoulders [of the minifigures] are narrower than the hips . . . allowing the hands to come closer together when the figure lifts its arms." *Id.* Best-Lock characterizes this as a feature that "enables movement," and is therefore functional. *Id.* at 20.

This argument falls short. As Lego correctly notes, it is the minifigure *joints* — not the shape of the torso — that enable movement. Lego Reply Br. at 5. Merely having some incidental effect on the nature of that movement, without more, does not make an element "functional." If, for example, the hands coming closer together enabled the minifigure to attach to different pieces they would otherwise not be able to, the shape of the torso may be functional. But there is no evidence here that the distance between the hands when the arms are lifted is anything more than an aesthetic feature. The shape of the torso is therefore sculptural.

---

[23] In its Preliminary Injunction Ruling, this Court discussed the tests for functionality and conceptual separability at length, as well as their application to the elements of the Lego minifigures at issue in this case. 874 F. Supp. 2d at 95-102. I assume familiarity with that discussion and, to the extent Best-Lock seeks to challenge elements of the minifigures not specifically addressed in its summary judgment briefing, the Court adheres to the conclusions in its prior Ruling.

Best-Lock also argues that the Lego minifigures' square feet and square legs are functional. Specifically, Best-Lock contends that the square-shaped feet enable the figure to stand in light of its widened mid-section by establishing "a broader base than if the figures had rounded, oval feet more closely resembling human anatomy." BL Opp. Br. at 20. The square-shaped feet and legs, Best-Lock further contends, ease reception of a stud into a connecting hole in the figure compared to rounded or oval feet or legs. *Id.*

Best-Lock's effort to characterize the minifigures' feet and legs as "functional" fails to persuade. Best-Lock has proffered no evidence that or explanation why the square shaped feet enable the figure to stand. Indeed, the design of comparable minifigures such as KRE-O and Mega Bloks, which stand upright on rounded feet, suggest otherwise. Even if the Lego minifigures' widened mid-section changes the center of gravity compared to KRE-O or Mega Bloks figurines, as Best-Lock argues, common sense says that the square shape is not necessary to allow the figure to stand; larger feet would achieve the same purpose by also creating a "broader base." Nor is it plausible that rounding the edges of the legs or feet, which, as Best-Lock notes, would more accurately reflect human anatomy, would fundamentally change the stability of the Best-Lock minifigures.

Best-Lock's argument that the square feet and legs are functional because they "ease reception" of studs is similarly unavailing. As the Court explained in its Preliminary Injunction Ruling, "it is not necessary for the feet to be absolutely square," to attach to the base block, as evidenced by the Mega Bloks minifigures, which, "in keeping with their overall rounded form, have feet that are rounded at the front" but "nevertheless attach to the base plate." 874 F. Supp. 2d at 102. That conclusion remains valid. Thus, the square shape of the feet and legs are entirely separable from any functional aspects of the product, and no reasonable fact-finder could find otherwise.

With respect to *originality*, Best-Lock argues that "[m]any of the elements on Lego's list of nine protectable elements of the figures are common features of toy dolls and figures, as well as other sculptural works depicting the human form, that have been made and used for decades, and therefore cannot properly be considered part of the scope of the asserted copyrights." BL Opp. Br. at 21. Specifically, Best-Lock challenges the originality of (1) "human heads, which are generally cylindrical in shape and which . . . curve at the top and bottom"; (2) "human necks, which are "cylindrical" in shape and "slightly narrower than the [human] head"; (3) "square shoulders with ... '[h]uman arms [that] extend from the upper side of the torso,'"; and (4) "human arms bent slightly at the elbows." *Id.*

While copyright protection is limited to the original aspects of a registrant's works, the Copyright Act does not require a high degree of originality. The Supreme Court explained in *Feist*, 499 U.S. at 345:

> The *sine qua non* of copyright is originality. To qualify for copyright protection, a work must be original to the author. Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be. Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.

(citations and internal quotation marks omitted). *See also Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905 (2d Cir. 1980) ("Although novelty, uniqueness and ingenuity are not required, independent creation is."); *Boisson*, 273 F.3d at 268 ("Originality does not mean that the work for which copyright protection is sought must be either novel or unique. . . .").

As a corollary, material that is selected, coordinated, or arranged in a way that "render[s] the work as a whole original" can be copyrighted, even if the component elements are unoriginal. *Feist*, 499 U.S. at 358 (explaining that components of the phone book were ineligible for copyright protection but "if the selection and arrangement are original, these elements of the work are eligible for copyright protection"). The Second Circuit, for example, found valid the copyright of a photo of a couple and their puppies because the choice of subjects, lighting, angle, selection of film and camera, and subjects' expression were all "the product of plaintiff's artistic creation," even though the subject matter was not novel or unique. *See Koons*, 960 F.2d at 307; *see also Ets-Hokin v. Skyy Spirits, Inc.,* 225 F.3d 1068, 1077 (9th Cir. 2000) (plaintiff's choice of "lighting, sharing, angle, background, and so forth" were sufficient to warrant copyright protection for a photo of a vodka bottle). By contrast, a geometric shape alone is not eligible for copyright protection. *See Kitchens of Sara Lee*, 266 F.2d 541, 545 (2d Cir. 1959).

An important limitation relevant to the originality analysis stems from the fundamental (and notoriously challenging) principle in copyright law that protection of a copyrightable work extends only to the particular expression of an idea, but not to the idea itself. *See Fisher-Price*, 25 F.3d at 123 ("[T]he plaintiff must show that the defendant appropriated the plaintiff's particular means of expressing an idea, not merely that he expressed the same idea." (citations omitted)). Separating the unprotected idea from the protected expression is often a challenging undertaking. As Judge Hand recognized, "no principle can be stated as to when an imitator has gone beyond copying the 'idea' and has borrowed its 'expression.' Decisions must therefore inevitably be ad hoc." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d at 489.

Examples are useful in applying these abstract principles. In *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133 (2d Cir. 2004), the Second Circuit concluded that the upturned nose, bow

lips and widely spaced eyes of Barbie doll were the "idea of a certain type of doll face" and in the public domain. *Id.* at 136. Nonetheless, it was careful to note that Mattel's particularized expression of that idea would "bar a competitor from copying Mattel's realization of the Barbie's features." *Id.* at 135. "Even if the record had shown that many dolls possess upturned noses, bow lips, and widely spaced eyes, it would not follow that each such doll — assuming it was independently created and not copied from others — would not enjoy protection from copying." *Id.* at 135.

In *Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*, 724 F.2d 357, 360 (2d Cir. 1983) (per curiam), the Second Circuit found that a 5 ½ inch Warlord doll did not infringe upon a 5 ½ inch Masters of the Universe doll because, though the dolls looked remarkably similar, the similarities all were attributable to the unprotectable idea of "a superhuman muscleman crouching in what since Neanderthal times has been a traditional fighting pose . . . . [O]nly the particularized expression of that idea, for example, the particular form created by the decision to accentuate certain muscle groups relative to others, can be protected." Similarly, in *Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498, 500 (2d Cir. 1982), the court concluded that two similarly sized snowmen with black button eyes, V-shaped mouths, black noses, two red buttons, and a hat and scarf were not substantially similar. Observing that the snowmen had slightly different shapes, proportions, and coloring, the court reasoned that any similarity "would appear to the ordinary observer to result solely from the fact that both are snowmen." *Id.*

In *Fisher Price*, by contrast, toy manufacturer Fisher-Price brought a copyright infringement action against competitor Well-Made. 25 F.3d at 123. The allegedly infringing toys were a stuffed human doll and a stuffed mouse doll. The district court entered a preliminary injunction against Well-Made as to both dolls. Well-Made appealed, arguing that the district court had erred in finding that the dolls were substantially similar because the court had compared unprotectable elements

common to all dolls. *Id.* The Second Circuit affirmed the injunction as to the human dolls. It reasoned:

> Our de novo comparison of the dolls' protectable features convinces us that an ordinary observer would consider them substantially similar. Both sport the same bright, painted eyes, the same skyward gaze, the same knobby nose, and the same cherubic smile. Both have oversized heads that feature soft vinyl faces and curly tufts of hair peeking out beneath lace-frilled hoods. These dolls do not merely share features that are common to all dolls; they contain virtually identical expressions of those features. In short, Baby Dolly Mine expresses the idea of "doll" in a way that is almost indistinguishable from the expression in the Puffalump Kids doll.

*Id.* The court thus affirmed the injunction as to the human dolls. *Id.* However, it reversed the injunction as to the mouse dolls "because their protectable elements are substantially *dissimilar.* While these dolls have similar body types, the artistic work on the faces is entirely distinct." 25 F.3d at 124 (emphasis in original). In consequence, the district court erred in finding that the defendant's mouse infringed plaintiff's copyrighted mouse. *Id.* Taken together, the holdings in *Fisher-Price,* affirm the general principle that "expressions that are standard, stock, or common to a particular subject matter or medium are not protectable under copyright law," and when one subtracts from a copyrighted object the unoriginal and unprotected elements, the copyright owner is "left with a thin copyright, which protects only against virtually identical copying." *Satava v. Lowry,* 323 F.3d 805, 810-12 (9th Cir. 2003) (citations and internal quotation marks omitted).

Applying these principles to the minifigures arrayed before this Court in the case at bar, the basic features at issue — heads, necks, shoulders, and arms — constitute unprotectable "ideas" of the human form in the abstract. *See, e.g.*, *Blehm v. Jacobs*, 702 F.3d 1193, 1204 (10th Cir. 2012) ("[C]ommon anatomical features such as arms, legs, faces, and fingers . . . are not protectable elements."). However, the Best-Lock minifigures and Lego minifigures "contain virtually identical expressions of those features," *Fisher-Price*, 25 F.3d at 124, in their placement, shape, and

45

proportions. The means of expression also goes well beyond generic representations of the human form. The cylindrical head and square-shaped shoulders of a Lego minifigure, for example, are not realistic anatomical depictions, but plainly the product of artistic judgment. While the neck shape and arm position of Lego's minifigures more closely resemble human anatomy, Best-Lock has exactly replicated the arrangement, size, and positioning of those features. Under these circumstances, Best-Lock's minifigures "do not merely share features that are common to all" figurines in the human form; instead, they virtually replicate Lego's expression of those features. *Fisher-Price*, 25 F.3d at 124.

### ii.   *Comparison of the Minifigures*

A comparison of the works makes clear that Best-Lock has copied protectable, expressive elements that are original to Lego and covered by the Asserted Copyrights. In most respects, Best-Lock's minifigures are not just similar to Lego's minifigures—they are identical. Indeed, the dimensions, positioning, shape, and proportions of the features at issue are visually indistinguishable. These similarities are particularly striking given the diminutive stature of the minifigures: on a 1 ½ inch figurine, the product's overall aesthetic appeal comes primarily from the broad, three-dimensional contours of the figure rather than variations in surface adornment.

Defendants have placed great emphasis on the fact that the Best-Lock minifigures' faces are three-dimensional, featuring molded protruding noses, slightly protruding lips, and eyes in molded recesses or sockets. But it has long been the law that no infringer may "excuse the wrong by showing how much of his work he did not pirate." *See Sheldon v. Metro–Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936) (L. Hand, J.), *cert. denied*, 298 U.S. 669 (1936); *Koons*, 960 F.2d at 307 ("[S]ubstantial similarity does not require literally identical copying of every detail"). Thus, where substantial similarity is found, small changes here and there made by the copier are

unavailing. "It is only where the points of dissimilarity exceed those that are similar and those similar are—when compared to the original work—of small import quantitatively or qualitatively that a finding of no infringement is appropriate." *Koons*, 960 F.2d at 308. That is not this case. The differences between the minifigures in suit are dwarfed by the commonalities. Any observer — either ordinary or discerning, child or adult — would conclude that Best-Lock "co-opted the total concept and feel" of Lego's minifigures.[24]

Accordingly, there is no genuine issue of material fact that Best-Lock unlawfully copied Lego's minifigures. And, as demonstrated *supra*, there is no genuine issue as to Lego's ownership of the copyrights in question and the validity of those copyrights. Thus, no reasonable trier of fact could find that Best-Lock did not infringe Lego's valid copyrights.

## C.  Laches

Lego filed its infringement complaint against Best-Lock in 2011. In the earlier motion stages of the litigation, Best-Lock contended that Lego's infringement claims were barred by each of the equitable doctrines of laches and equitable estoppel. In 2014, the Supreme Court decided *Petrella v. Metro-Goldwyn-Mayer*, 572 U.S. 663 (2014), a copyright infringement case where the alleged infringer moved to dismiss the complaint solely on the basis of plaintiff's laches in filing suit. The

---

[24]  Best-Lock argues that Lego's motion to dismiss offers "no proof of who is an 'ordinary observer' of the figures," and suggests that a typical child may be more inclined to notice facial features and costumes than a typical adult. *See* BL Opp. Br. at 23. However, Best-Lock offers no authority suggesting that the "ordinary observer" inquiry must be subdivided by demographic particulars. In any event, the similarities between the minifigures are so pronounced that the age group of the "ordinary observer" is irrelevant — they would be immediately apparent to anyone. The global popularity of these toys evidences their broad appeal to and acceptance by a universe of bright, energetic, intelligent, creative children. If children using these products to construct their imaginary worlds thought about the question at all, they would think that the Lego and Best-Lock products were made by the same company or were copies of each other — the latter being a correct conclusion because Best-Lock copied Lego's minifigures.

Ninth Circuit granted that motion. The Supreme Court reversed, holding that laches cannot be invoked as a bar to a claim for copyright infringement brought within the three-year statute of limitations contained in the Copyright Act.

In light of the Supreme Court's decision in *Petrella*, Best-Lock has withdrawn its defense of laches. *See* BL Opp. Br. at 29. Accordingly, Lego is entitled to summary judgment on that issue.

## D. Estoppel

The Court turns now to Best-Lock's remaining affirmative defense, equitable estoppel, which Lego moves to dismiss summarily.

As a preliminary matter, while the Supreme Court's holding in *Petrella* is limited to the preclusive effect of the Copyright Act statute of limitations upon the availability of laches as a defense, the Court in *Petrella* had this to say about estoppel, an additional and separate doctrine also available to Chancellors in Equity:

> [W]hen a copyright owner engages in intentionally misleading representations concerning his abstention from suit, and the alleged infringer detrimentally relies on the copyright owner's deception, the doctrine of estoppel may bar the copyright owner's claims completely, eliminating all potential remedies. The test for estoppel is more exacting than the test for laches, and the two defenses are differently oriented. The gravamen of estoppel, a defense long recognized as available in actions at law, is misleading and consequent loss. Delay may be involved, but is not an element of the defense. For laches, timeliness is the essential element.

572 U.S. at 684-685.

This passage makes it plain that, notwithstanding *Petrella*'s rejection of *laches* as a defense to a claim for copyright infringement, *equitable estoppel*, "a defense long recognized as available in actions at law," remains available to defendants charged with copyright infringement (as in

*Petrella* and the case at bar). Equitable estoppel is also available (as it has always been) as a defense against patent infringement (as in the cases cited *infra*).

The parties at bar recognize this evolution of the law. Accordingly, the present briefs of counsel focus upon equitable estoppel. Lego acknowledges that the defense of equitable estoppel remains available to Best-Lock in principle, but contends that in practice it is entitled to summary judgment dismissing the defense. Best-Lock contends that its defense of equitable estoppel presents triable issues of fact which preclude summary judgment. I turn to applicable case law.

The leading Second Circuit case on equitable estoppel is *Dallal v. New York Times Co.*, in which the Second Circuit articulated the standard for equitable estoppel of a copyright infringement claim as follows:

> To prevail on an estoppel defense in the copyright context, a defendant must show that: (1) plaintiff had knowledge of defendant's infringing acts, (2) the plaintiff either intended that defendant rely on his acts or omissions or acted or failed to act in such a manner that defendant had a right to believe that it was intended to rely on plaintiff's conduct, (3) the defendant was ignorant of the true facts; and (4) the defendant relied on plaintiffs conduct to its detriment.

No. 05-2924, 2006 WL 463386, at *1 (2d Cir. Feb. 17, 2006).

The Federal Circuit, which has exclusive nationwide jurisdiction over appeals in civil patent and trademark cases,[25] has also rendered a number of instructive decisions. A leading case is *Aukerman v. R.L. Chaides Construction Co.*, 960 F.2d 1020 (Fed. Cir. 1992), where the Federal Circuit's Chief Judge introduces his lengthy opinion by saying that the court "has taken this case *in banc* to clarify and apply principles of laches and equitable estoppel which have been raised as defense in this patent infringement suit." 960 F.2d at 1028. I will quote the Federal Circuit's

---

[25] This authority is exercised pursuant to 28 U.S.C. § 1295(a).

analysis of the defense at some length because it is equally instructive in the present copyright context: the elements and circumstances relevant to the equitable estoppel defense are much the same in copyright and patent cases, and the Federal Circuit's 1992 analysis of equitable estoppel in *Aukerman* (patents) in 1992 presages those of the Second Circuit in *Dallal* in 2006 and the Supreme Court in *Petrella* (copyright) in 2014.

The Federal Circuit said in *Aukerman*:

> Equitable estoppel to assert a claim is another defense addressed to the sound discretion of the trial court. Where equitable estoppel is established, all relief on a claim may be barred. Like laches, equitable estoppel is not limited to a particular factual situation nor subject to resolution by simple or hard and fast rules. . . . .
>
> An equitable estoppel case has three important elements. (1) The actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence. (2) The other relies upon that communication. (3) And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct.
>
> . . . . Unlike laches, equitable estoppel does not require the passage of an unreasonable period of time in filing suit. . . . Delay in filing suit may be evidence which influences the assessment of whether the patentee's conduct is misleading but it is not a requirement of equitable estoppel. Even where such delay is present, the concepts of equitable estoppel and laches are distinct from one another.
>
> The first element of equitable estoppel concerns the statements or conduct of the patentee which must "communicate something in a misleading way." The "something" with which this case, as well as the vast majority of equitable estoppel cases in the patent field is concerned, is that the accused infringer will not be disturbed by the plaintiff patentee in the activities in which the former is currently engaged. The patentee's conduct must have supported an inference that the patentee did not intend to press an infringement claim against the alleged infringer. . . . [E]quitable estoppel may arise where, coupled with other factors, a patentee's "misleading conduct" is essentially misleading *inaction*. However, plaintiff's inaction must be combined with other facts respecting the relationship between the

50

parties to give rise to the necessary inference that the claim against the defendant is abandoned.

The second element, reliance, is not a requirement of laches but is essential to equitable estoppel. The accused infringer must show that, in fact, it substantially relied on the misleading conduct of the patentee in connection with taking some action. Reliance is not the same as prejudice or harm, although frequently confused. . . . To show reliance, the infringer must have had a relationship with the plaintiff which lulls the infringer into a sense of security in going ahead" with [the infringer's own action, now claimed by the plaintiff to be infringing].

[T]he accused infringer must establish that it would be materially prejudiced if the patentee is now permitted to proceed. As with laches, the prejudice may be a change of economic position or loss of evidence.

Finally, the trial court must, even where the three elements of equitable estoppel are established, take into consideration any other evidence and facts respecting the equities of the parties in exercising its discretion and deciding whether to allow the defense of equitable estoppel to bar the suit.

960 F.2d at 1041-1043 (citations and internal quotation marks omitted).

*Aukerman* is frequently cited by courts in this Circuit, as well as elsewhere (not surprisingly, given the Federal Circuit's nationwide appellate jurisdiction). In *Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, for instance, District Judge Chin (as he then was) dismissed a patent infringement claim on summary judgment under the doctrine of equitable estoppel. No. 07 Civ. 2373, 2008 WL 5049744 (S.D.N.Y. Nov. 26, 2008), *aff'd,* 605 F.3d 1305 (Fed. Cir. 2010). In so doing, he first recognized that "[e]quitable estoppel is a defense to patent infringement and may serve as an absolute bar to a patentee's claim of infringement." *Id.* at *4. He then applied the elements of an equitable estoppel defense as set forth in *Aukerman* to the case before him. *Id.* The Federal Circuit subsequently affirmed. 605 F.3d 1305 (Fed. Cir. 2010). *See also, e.g.*, *Wafer Shave, Inc. v. Gillette Co.*, 857 F. Supp. 112, 119 (D. Mass. 1993) ("In order to succeed on a defense of equitable estoppel,

Gillette must show that Wafer Shave's misleading conduct led Gillette to reasonably infer that Wafer Shave had abandoned its claim, that Gillette reasonably relied on Wafer Save's misleading conduct, and that Gillette will now suffer material prejudice as a result of its reliance if Wafer Save is permitted to proceed.") (citing *Aukerman*, 960 F.2d at 1043). In the copyright context, courts have also looked to *Aukerman* for guidance. *See, e.g.*, *Compaq Computer Corp. v. Ergonome Inc.*, 210 F. Supp. 2d 845, 849 (S.D. Tex. 2002), *aff'd in part, rev'd in part on different grounds*, 387 F.3d 403 (5th Cir. 2004); *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 746 (D. Md. 2003); *Synopsys, Inc. v. ATopTech, Inc.*, No. 13-CV-02965-MMC, 2016 WL 6158216, at *1 (N.D. Cal. Oct. 24, 2016).

"Whether equitable estoppel applies in a given case is ultimately a question of fact." *Kosakow v. New Rochelle Radiology Associates, P.C.* , 274 F.3d 706, 725 (2d Cir. 2001) (citation omitted); *see also Dunlop-McCullen v. Pascarella*, No. 97 Civ. 195, 2002 WL 31521012, at *15 (S.D.N.Y. Nov. 13, 2002) ("Estoppel is usually a question of fact inappropriate for summary judgment."). Notwithstanding that general rule, the availability or effect of equitable estoppel may in appropriate circumstances be decided summarily. Thus, in *Aspex Eyeware,* Judge Chin, after remarking that the defense, being equitable, "is to be decided by the court and not a jury," added that "the court is fully empowered to grant summary judgment if there are no triable fact issues and the court concludes equitable relief is warranted." 2008 WL 5049744, at *5.

In the case at bar, Plaintiff Lego moves for summary judgment dismissing Best-Lock's affirmative defense of equitable estoppel. Lego assumes, for purposes of summary judgment only, that Best-Lock can satisfy the first element of the defense, *i.e.*, that Lego had knowledge of Best-Lock's alleged continuing, historical infringement. Lego MSJ Br. at 45. Nonetheless, Lego argues, Best-Lock cannot prove the other elements of the defense because (1) Best-Lock cannot

show that Lego acted in a manner that would justify Best-Lock's belief that Lego would not take legal action; (2) Lego's affixation of a copyright notice on the minifigures would have shown Best-Lock that the they were protected by copyright; and (3) Best-Lock cannot prove that it detrimentally relied on Lego's conduct or inaction. *Id.* at 26-35. I will address each of these arguments in turn.

### 1. Lego's Conduct

As preliminary matter, Lego claims that the Supreme Court's decision in *Petrella* forecloses any equitable estoppel claim based on inaction alone. I addressed this argument in some depth in the Court's Preliminary Injunction Ruling, *see* 874 F. Supp. 2d at 83-4, and concluded that, "while the Second Circuit has not decided the matter, its discussion of *Hampton* and formulation of the test in *Dallal II*, together with the weight of authority among the district courts, suggests that pure inaction does not create estoppel in the face of an affixed copyright notice."

The Court's prior conclusion, and Lego's argument, are no longer applicable here. This is no longer a case involving mere silence or inaction on the part of the copyrightholder. Rather, Best-Lock has argued that many of Lego's affirmative actions — including ongoing communications, international litigation, and international legal threats — gave Best-Lock the right to believe that Lego would not pursue legal action in the United States. It is well-established in this Circuit that an infringement plaintiff's inaction, if accompanied by overt acts of particular characteristics, may combine to support the defense of equitable estoppel. *See, e.g.*, *Masterson v. New York Fusion Merch.*, *LLC*, 300 F.R.D. 201, 207 (S.D.N.Y. 2014) ("[E]quitable estoppel does not require an unreasonable delay, though delay may be used as evidence of misleading conduct."); 4 Nimmer on Copyright § 13.07 (2019) ("Plaintiff's acquiescence in defendant's infringing acts

may, if continued for a sufficient period of time and if manifested by overt acts, result in an abandonment of copyright.").

Turning to that aspect of the case, I am required by precedent to consider whether Lego "either intended that [Best-Lock] rely on [its] acts or omissions or acted or failed to act in such a manner that [Best-Lock] had a right to believe that it was intended to rely on [Lego's] conduct." *Dallal,* 2006 WL 463386, at *1. Put differently, I must assess whether Lego "either intended to convey its acquiescence to" Best-Lock's behavior, or "acted in such a way that [Best-Lock] reasonably believed [it] had the right" to continue selling its minifigures in the United States without recourse. *Tolliver v. McCants*, 684 F. Supp. 2d 343, 348 (S.D.N.Y. 2010).

Best-Lock offers no evidence of Lego's explicit and specific intent that Best-Lock not be regarded as an infringer in this country. In consequence, the case turns on evidence of conduct on Lego's part, commission or omission, from which Best-Lock could draw the reasonable and justifiable inference that Lego did not intend to assert the infringement claims against Best-Lock that it is now pursuing in this action. Best-Lock must demonstrate that element to establish the defense of equitable estoppel.

Best-Lock asserts that "Lego's actions and direct communications with Best-Lock abroad, including in the form of lawsuits and multinatonal threats and warnings, coupled with its legal inaction in the U.S., misled Best-Lock into believing that Lego would not sue Best-Lock in the U.S. for copyright infringement." BL Opp. Br. at 32. Specifically, Best-Lock has presented evidence establishing that Lego's counsel in the UK, Belgium, and Canada wrote letters to Best-Lock threatening legal action for violation of Lego's intellectual property rights. *See* Doc. 180-1. All such

letters in the record appear to have been sent *prior to 2005*.[26]  *See id.*; 180-2; 180-3.  Lego also

commenced litigation against Best-Lock in Germany *in 1999*, which has been ongoing.  Geller Decl.

IV ¶ 7.  Yet Lego did not file the instant United States action against Best-Lock until *2011*.  From

this litigation history, Best-Lock argues, "a reasonable fact finder could readily find that Lego's

inaction in the U.S., coupled with its enforcement campaign outside of the U.S., gave Best-Lock

reason to believe that it would not be sued by Lego in the U.S."[27]  *Id.* at 34-35.

On one hand, none of Lego's pre-2011 actions or inaction cited by Best-Lock, standing alone, could lead

a reasonable juror to rule in Best-Lock's favor on this element.  However, this chain of conduct,

considered in the aggregate, raises a genuine issue of material fact as to whether Best-Lock was

"misled into reasonably and justifiably believing" that Lego "would not pursue its claims."

*Merchant v. Lymon*, 828 F. Supp. 1048, 1064 (S.D.N.Y. 1993).  The issue turns on the proper

interpretation to be placed on the facts before the Court.

On one hand, the communications in the record suggest that Lego initiated or threatened

infringement actions against Best-Lock in foreign jurisdictions between 1998 and 2004, but

subsequently ceased new legal action for nearly seven years before filling its first American action

in 2011.  Best-Lock contends it was therefore entitled to believe that Lego had abandoned its claims,

at least under the United States Copyright Act:  "[t]he most common case of equitable estoppel

arises when the [copyright holder] specifically objects to the allegedly infringing activities and then

---

[26]  It is possible that additional correspondence between the parties threatening or initiating
legal action occurred after 2004.  However, the communications in the record before the Court are
limited to 1998-2004.

[27]  Of course, this comforting illusion was shattered in July 2011 when the CBP, at Lego's
instigation, seized the first Best-Lock shipments to an American port, followed by the filing of
Lego's present action in October 2011.

fails to follow up for years." *Encomp, Inc. v. L-com, Inc.*, 999 F. Supp. 264, 267 (D. Conn. 1998); *see also Byron v. Chevrolet Motor Div. of Gen. Motors Corp.*, No. 93 Civ. 1116 (AJP), 1995 WL 465130, at *10 n.11 (S.D.N.Y. Aug. 7, 1995) (copyright claimant who sent two cease and desist letters and then did not file suit for six years was barred by estoppel); *Naxon Telesign Corp. v. Bunker Ramo Corp.*, 686 F.2d 1258, 1266 (7th Cir. 1982) (patentee who sent letter threatening suit and then delayed filing for 58 months was barred by estoppel); *Adelberg Labs., Inc. v. Miles, Inc.*, 921 F.2d 1267, 1274 (Fed. Cir. 1990) ("This long [10-year] period of silence by Adelberg and Abbott after first affirmatively asserting patent infringement [based on the patent in suit] suffices to support the conclusion that Adelberg and Abbott reasonably induced Cutter to believe that Adelberg had abandoned its claim.").  In Best-Lock's view, this domestic inaction on Lego's part is compounded by the length of Lego's delay prior to filing suit, during which time senior Best-Lock and Lego representatives communicated on numerous occasions.  *See Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1540 (S.D.N.Y. 1991) ("The plaintiff's acquiescence in the defendant's infringing acts may, if continued for a sufficient period of time and if manifested by overt acts, result in an abandonment of copyright." (citing 4 Nimmer § 13.07)); *Aspex*, 605 F.3d at 1305 (whether silence and inaction are misleading must be evaluated "in the context of the specific interaction between the parties"); *Encomp.*, 999 F. Supp. at 267 ("[D]elay in filing suit may be relevant to proving whether the patentee's conduct is misleading.").

The competing interpretation urged by Lego is that Lego's international litigation and cease and desist letters put Best-Lock on notice of the risk it ran of being sued for copyright infringement, in American as well as foreign courts.  *See AP v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 566 (S.D.N.Y. 2013) (dismissing equitable estoppel defense where "the evidence submitted on these motions also indicates that Meltwater was on notice of the risk it ran of being sued by AP for

copyright infringement").  The copyright notice on at least some Lego minifigures, as well as lawsuits against other competitors, further provided affirmative notice that Lego did not intend for Best-Lock to continue to manufacture the minifigures.

Whether Best-Lock reasonably inferred that it would not be sued by Lego in the United States for copyright infringement is a fact-intensive inquiry, implicating, *inter alia*, the contents of correspondence between the parties, the nature and timing of past international litigation and legal communications, and Lego's rationale for the delay in commencing the instant domestic action.  The present record does not allow the Court to conclude that a reasonable trier of fact would be bound to accept either interpretation.  This issue weighs against Lego's motion for a summary rejection of Best-Lock's equitable estoppel defense.

### 2.  Best-Lock's Ignorance of the True Facts

Best-Lock must also demonstrate that it was "ignorant of the true facts."  *Dallal* at *1.  Here, the "true fact" at issue is Lego's ownership of the Asserted Copyrights.[28]  A copyright notice on the

---

[28]    The Court's Preliminary Injunction Ruling considered whether "the true facts" at issue here were the existence of the Asserted Copyrights, as Lego claimed, or Best-Lock's awareness that Lego intended to enforce the Asserted Copyrights after years of inaction, as Best-Lock argued.  874 F. Supp. 2d at 85-6.  I concluded that although "[t]he Second Circuit has not established whether the 'true facts' are existence of the copyrights or the plaintiff's intent to enforce the copyrights," based on the weight of authority "a defendant who was aware of the subject copyright knew the 'true facts.'"  *Id.*  Subsequent authority provides no definitive resolution of this issue, and I adhere to that prior conclusion, in light of the relevant caselaw.  *See HGI Assocs. v. Wetmore Printing Co.*, 427 F.3d 867, 875 (11th Cir. 2005) (ignorance of true facts shown where alleged copyright infringer was "legitimately ignorant of the fact it might be infringing Microsoft's rights"); *Carson v. Dynegy, Inc.*, 344 F.3d 446, 453 (5th Cir. 2003) (ignorance of true facts shown where alleged copyright infringer was "ignorant" of the fact that plaintiff owned copyrighted material); *DeCarlo v. Archie Comic Publ'ns, Inc.*, 127 F. Supp. 2d 497, 511 (S.D.N.Y. 2001) ("Finally, ACP plainly was ignorant of the facts now alleged by DeCarlo, *i.e.*, that he claims ownership in the Josie characters."); *Lottie Joplin Thomas Tr. v. Crown Publrs., Inc.*, 456 F. Supp. 531, 535 (S.D.N.Y. 1977) ("defendants were, in fact, ignorant of the 'true facts,' plaintiff's claim of copyright proprietorship"); *Tolliver v. McCants*, 684 F. Supp. 2d 343, 349 (S.D.N.Y. 2010) ("There can be no question that Defendant has always known of [the true facts,] Plaintiff's rights in the Composition.").

work creates, at a minimum, "a triable issue of fact whether defendants were 'ignorant of the true facts,'" but it is not conclusive evidence that a defendant was aware that the plaintiff owned the copyright. *See, e.g.*, *Pavlica v. Behr*, 397 F. Supp. 2d 519, 527 (S.D.N.Y. 2005) (finding "triable issue of fact" about whether defendant was ignorant of the true facts where copy of the allegedly infringed material had a notice on the first page identifying plaintiff as the copyright owner and stating "any reproduction is prohibited unless permission is granted by the author"). Additionally, a party asserting estoppel must "use due care and not fail to inquire as to rights where that would be the prudent course of conduct." *Cooley v. Penguin Group (USA), Inc.*, 31 F. Supp. 3d 599, 613 (S.D.N.Y. 2014) (quoting *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 948 (S.D.N.Y. 1997)).

Best-Lock contends that there are issues of fact as to whether Best-Lock was aware of Lego's alleged copyright interest in the Lego minifigures. Specifically, Torsten Geller, Best-Lock's CEO, averred in his Declaration in support of Best-Lock's motion for preliminary injunction that he not only "never had knowledge of any copyright registrations for any of Lego's minifigures," he also "did not believe that a copyright could be obtained for the same subject matter that had been in a patent." BL MSJ SOF ¶17. Geller further stated that he did "not recall ever seeing a copyright notice on Lego's minifigures." *Id.* ¶18. Geller also produced photographs of the lower body elements of two Lego minifigures that do not appear to display a copyright notice, and stated that he had not been able to locate a copyright notice on those minifigures. Geller Decl. II ¶9, Ex. E; BL MSJ SOF ¶23.

Lego alleges that copyright notices have been continuously placed on the minifigures since at least 1998, and dismisses the contents of Geller's affidavits as "self-serving." Lego. Reply Br. at 11. It also argues that Geller, at a minimum, had inquiry notice of Lego's copyright, and failed to allege that he had "looked for a copyright marking on LEGO packaging or Minifigure figurines sold during the relevant time period." *Id.*

The evidence presented by Best-Lock raises a triable issue of fact as to whether Best-Lock was aware that Lego owned copyrights in the Lego minifigures. Geller's sworn statement that he was unaware of Lego's ownership of copyright registrations in the Lego minifigures, coupled with his production of two sample Lego minifigures on which he was unable to locate a copyright notice, preclude summary judgment against Best-Lock on this issue. Perhaps, as Lego claims, Geller's representations lack credibility in light of his position at Best-Lock. And it may be that Geller failed to exercise due care in searching for copyright notices. But it is for the trier of fact to assess Geller's credibility on these core questions at trial, not for the Court on a motion for summary judgment. At this stage, the evidence set forth by Best-Lock is sufficient to survive summary judgment. *See Shanlian Quan v. Ty, Inc.*, No. 17 C 5683, 2019 WL 1281975, at *2-3 (N.D. Ill. Mar. 20, 2019) (affidavit from executive at defendant company stating that the company was unaware that plaintiff owned the disputed copyrights was sufficient to establish that "no reasonable jury could find that [the company] knew about [plaintiff's] alleged copyright interest").

### 3. Detrimental Reliance

The final question to be resolved is whether Best-Lock relied on Lego's conduct to its detriment. *Dallal* at *1. Best-Lock asserts that it has relied on Lego's 13 years of inaction and affirmative representations that it would not file suit "by increasing its sales and advertising efforts for its figures in the United States, by promoting the well-known interchangeability of Best-Lock

figures and their body parts with Lego's, by increasing its retailer customer base in the United States, [and] by investing more in the United States for its figures." Answer ¶ 61. Geller also submitted a declaration attesting that:

> Best-Lock has worked tirelessly and invested heavily in our U.S. business, increasing advertising and marketing expenditures, as well as expanding distribution channels along with the retail customer base for our toy blocks and figures. Over that period of time, Best-Lock has developed substantial goodwill in the United States and throughout the world in the 'Best-Lock' name, while earning a reputation for quality and reliability at reasonable prices. Throughout this time, Best-Lock has relied on Lego's inaction to grow its business network and increase its sales.

Geller Decl. I ¶ 23. Geller further states:

> During the past 14 years, Best-Lock has made substantial investments in creating and expanding its U.S. business including but not limited to developing and manufacturing molds and machinery to produce its figures. Best-Lock has also substantially invested in its offices and workforce and training for its employees.

Geller Decl. II ¶ 34.

In response, Lego contends that various statements by Geller expressing antagonistic feelings toward Lego demonstrate that the company did not actually rely on Lego's representations. Lego MSJ Br. at 33. Instead, it suggests, the desire to manufacture the figures stemmed from Geller's desire to, in his words, "piss [Lego] off." *Id.* Lego also points to Best-Lock's sparse discovery responses concerning the design and development of the Best-Lock minifigures as further evidence that Best-Lock did not detrimentally rely on Lego's representations. Lego specifically cites Best-Lock's statements that it had "no knowledge concerning any molds used to create any of Best-Locks figurines," did "not have any specifications or drawings or any other design documents related to the development of the minifigures or the molds used to manufacture the minifigures," and created the current design of the minifigures using "a single hand drawing [provided by Geller] to

a manufacturer." *Id.* Based on these statements, Lego asserts, "Best-Lock may have invested money in growing its business, but it did not invest specifically in developing its figurines. Best-Lock could have developed the same business with a different figurine, apparently without much difficulty." *Id.* at 33-34.

Geller's statements, while probative, are not so revealing as to justify a summary resolution of this issue. Similarly, Best-Lock's discovery responses are evidence to be weighed by a trier of fact, but not determinative of the present motion. Moreover, Best-Lock's discovery responses are not inconsistent with its arguments in opposition to summary judgment: the fact that Best-Lock does not have molds or detailed design specifications for its minifigures does not compel the conclusion that it did not invest in the design and development of its minifigures.

Lego also cites three cases that purportedly stand for the proposition that "expansion and development, even if substantial, is insufficient to establish detrimental reliance to support an estoppel defense." Lego MSJ Br. at 34. In *Basic Books*, the court recognized that the defendant "convincingly asserts that it has expended much time and energy in its Professor Publishing business and has continued to expand its educational photocopying . . . over the years in line with its [own] policies and procedures," but nonetheless held that "this does not reach the level of detrimental reliance." 758 F. Supp. at 1540.

The two other cases cited assessed prejudice to the defendant in the context of a laches defense rather than equitable estoppel.[29] *Am. Greetings Corp. v. Kleinfab Corp.*, 400 F. Supp. 228,

―――――――――――――

[29]  The Court is not persuaded that the element of prejudice in a laches claim overlaps with detrimental reliance in an equitable estoppel claim. Lego does not cite any cases that so hold, and, to the contrary, numerous courts have historically treated "material prejudice" as a distinct element that must be proven to assert an equitable estoppel defense *in addition to* detrimental reliance. *See, e.g.*, *Chubb Integrated Sys. v. Nat'l Bank of Wash.*, 658 F. Supp. 1043, 1050 (D.D.C. 1987) ("To establish the defense of equitable estoppel, a defendant must prove the two elements of laches,

234 (S.D.N.Y. 1975) arose out of the defendants' allegedly unauthorized copying and distribution of fabrics bearing plaintiff's copyrighted designs. The defendants argued on a motion for preliminary injunction that they had been prejudiced by plaintiff's 3.5 month delay between learning of the infringing conduct and applying for a preliminary injunction, as during that time the defendants had shipped tens of thousands of yards of the allegedly infringing fabrics. The court rejected that argument, finding that "defendant, if anything, profited by plaintiff's delay rather having been injured by it." *Id.* In *Living Media India v. Parekh*, No. 92 Civ. 8079 (TPG), 1994 WL 68193, at *1 (S.D.N.Y. Feb. 28, 1994), plaintiff filed suit for defendants' unauthorized importation and distribution of the domestic edition of the publication India Today. The court rejected defendants' laches defense for failure to show prejudice. *Id.* The court wrote: "All that has happened is that defendants have committed the illegal acts, from which they have presumably made some profit. They have shown no prejudice of the kind which would make it inequitable to have a court stop their illegal activity." *Id.*, at *3.

The cases cited by Lego are not binding on this Court. Indeed, ample authority supports the opposite position. In *Byron v. Chevrolet*, for example, the plaintiff's copyright infringement claim was barred by equitable estoppel where the defendants had "expended large quantities of money developing consumer recognition." Similarly in *Coleman v. Corning Glass Works*, 619 F. Supp. 950, 955 (W.D.N.Y. May 3, 1985), the court commented, "it is settled that the successful expansion of an infringer's business is itself the kind of prejudice which will support the defense of laches." *See also Le v. City of Wilmington*, 736 F. Supp. 2d 842, 852 (D. Del. 2010) ("[T]he City

---

unreasonable delay and material prejudice, as well as two additional elements: affirmative conduct by the plaintiff inducing the belief that plaintiff had abandoned its claim, and detrimental reliance by the defendant.").

detrimentally relied on the Work by transforming (at significant expenditure of money, material, and employee time) its system . . . to [be able to] use the Work."); *cf. Haas v. Leo Feist, Inc.*, 234 F. 105, 108 (S.D.N.Y. 1916) ("It must be obvious to every one familiar with equitable principles that it is inequitable for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed infringer spends large sums of money in its exploitation, and to intervene only when his speculation has proved a success.") (Hand, J.). The Court finds this line of cases more persuasive. Lego had full knowledge of the infringing minifigures, but waited for more than a decade to seek recovery. During the intervening years, Best-Lock expended large amounts of money and other resources to build out its United States presence and goodwill — all of which could have been avoided if, over the course of years, Lego had not sat on its right to sue Best-Lock for infringement.

In any event, though, this situation is distinguishable from the cases cited by Lego. In *Basic Books*, *American Greetings*, and *Living Media*, the courts' holdings emphasized that the defendants continued to operate (and profit from) their businesses in the ordinary course. *See, e.g.*, *Basic Books*, 758 F. Supp. at 1540 ("defendant . . . has *continued* to expand its educational photocopying . . . over the years *in line with its [own] policies and procedures*" (emphasis added)). Here, by contrast, Best-Lock contends – and the numbers seem to bear out – that Best-Lock pursued an aggressive growth plan *in the United States specifically,* based on its belief that Lego would not file in this country. Best-Lock is sold in 80 countries, and was not founded in the United States. It is reasonable to infer that the company's investment and growth in the United States, which now accounts for 40 percent of Best-Lock's total sales and Best-Lock's largest market, was an affirmative business decision at least partially driven by Lego's actions and inaction.

Taking the foregoing into account, Best-Lock's detrimental reliance on Lego's conduct precludes summary judgment in Lego's favor.

It is apparent from the discussion in this Part that Best-Lock's defense based on equitable estoppel is not appropriate for summary disposition. The relevant elements give rise to a number of genuine issues of material fact, any one of which would preclude summary judgment enforcing or rejecting the defense. The availability of equitable estoppel to Best-Lock depends upon what the parties did or did not do, said or did not say, and thought or did not think, all within the context of the surrounding circumstances and inferences fairly arising from them. In short, the case is replete with triable issues, which will be resolved by means of a plenary bench trial.

## IV. CONCLUSION

The application of these rulings to the several issues presented by the parties' cross-motions under Rule 56 for partial summary judgment result in the following adjudications of the summary judgment motions.

Those motions may be recapitulated thus:

**Lego's Motion for Partial Summary Judgment [Doc. 130]**

Lego moves for partial summary judgment as to liability for Count I of Lego's Second Amended Complaint for copyright infringement.

Lego also moves for partial summary judgment on each of Best-Lock's five pleaded affirmative defenses (numbers Second through Sixth): equitable estoppel; laches; no substantial similarity; copyright invalidity; and unenforceability of copyrights..

Lego also moves for partial summary judgment on each of Best-Lock's three counterclaims (numbers First through Third): invalidity due to functionality; non-infringement by Best-Lock; and fraud by Lego on the Copyright Office, the CBP, and this Court.

**Best-Lock's Motion for Partial Summary Judgment [Doc. 164]**

Best-Lock moves for partial summary judgment as to Count I of Lego's Second Amended Complaint for copyright infringement, on the ground that Lego's asserted copyright registrations were void *ab initio* and cannot sustain a claim for copyright infringement.

As the unavoidable length of this opinion makes clear, these summary judgment cross-motions require the consideration of a relatively large number of factual, legal and mixed issues. The parties move for *partial* summary judgment, a procedure sanctioned by Rule 56(a), which empowers a party to "move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56(a). In addition, I will on occasion in these Rulings make use of Fed. R. Civ. P. 56(g), added by the 2010 Amendment to Rule 56. Rule 56(g) provides that in a case where "the court does not grant all the relief requested" by a Rule 56 motion, the court "may enter an order stating any material fact – including an item of damages or other relief – that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

For the reasons stated in this Ruling, the Court makes these Orders and Judgments:

1. Lego's motion for partial summary judgment on Count I of its Second Amended Complaint, for copyright infringement, is GRANTED, to the extent that Lego's ownership of a valid copyright and Best-Lock's unlawful copying of the protectable elements of Lego's minifigures are not genuinely in dispute and are established facts in the case. I make that statement pursuant to Rule 56(g). Lego's claim for copyright infringement, and the partial summary judgment contained in this Paragraph, are SUBJECT TO AND CONTINGENT UPON Best-Lock's Second Affirmative Defense of equitable estoppel, which will be adjudicated after a plenary bench trial.

2.   Lego's motions for partial summary judgment on Best-Lock's Third through Sixth affirmative defenses (based, respectively, on laches; no substantial similarity between products; copyright invalidity; and unenforceability of copyrights), are GRANTED with respect to each of them.  Those affirmative defenses are stricken from the case.

3.   Lego's motions for partial summary judgment on Best-Lock's First through Third counterclaims (based respectively on functionality; non-infringement by Best-Lock; and fraud by Lego) are GRANTED with respect to each of them.  Those counterclaims are stricken from the case.

4.   Best-Lock's motion for partial summary judgment as to Count I of Lego's Second Amended Complaint is DENIED.

5.   Best-Lock's Second affirmative defense, based on equitable estoppel, is not appropriate for summary disposition.  That defense will be adjudicated by the Court following a plenary bench trial addressed to that issue.

These Paragraphs resolve entirely the motions marked Doc. 130 and Doc. 164.  The Court will enter a separate pre-trial Order.

It is **SO ORDERED**.

Dated: July 25, 2019
       New Haven, Connecticut

                                         */s/ Charles S. Haight, Jr.*
                                         CHARLES S. HAIGHT, JR.
                                         Senior United States District Judge